THE HOMAMPOUR LAW FIRM, PC
ARASH HOMAMPOUR (State Bar No. 165407)
WENDI O. WAGNER (State Bar No. 176110)
COREY ARZOUMANIAN (State Bar No. 278035)
15303 Ventura Boulevard, Suite 1000
Sherman Oaks, California 91403
Phone:(323) 658-8077 | Fax:(323) 658-8477
Email: arash@homampour.com

Attorneys for Plaintiffs KENNETH AARON SHINEDLING individually and as guardian ad litem for ADDISON LEILANI SHINEDLING, ALEXIA CELESTE SHINEDLING, and AVA AREN SHINEDLING

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| KENNETH AARON SHINEDLING and ADDISON LEILANI SHINEDLING, ALEXIA CELESTE SHINEDLING, and AVA AREN SHINEDLING by and through their guardian ad litem, KENNETH AARON SHINEDLING<br><br>Plaintiffs,<br><br>v.<br><br>SUNBEAM PRODUCTS, INC., a Delaware Corporation; COUNTY OF SAN BERNARDINO; PHELAN PINON HILLS COMMUNITY SERVICES DISTRICT; and DOES 1 through 90, inclusive<br><br>Defendants. | **CASE NO: 5:12-cv-00438 CJC (Spx)**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Date:  November 9, 2015<br>Time:  1:30 p.m.<br>Dept.:  9B<br><br>*Complaint Filed December 15, 2011*<br>*Assigned to Judge Cormac J. Carney*<br>*Referred to Magistrate Judge Pym* |

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

Plaintiffs hereby oppose Defendant's Motion for Judgment as a Matter of Law which should be denied as there was sufficient evidence to support the jury's verdict.

\\

\\

\\

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD - SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

Plaintiffs' Opposition shall be based on the attached Memorandum of Points and Authorities, the trial transcripts in this matter, the evidence and case law, the pleadings, documents, records, and files in this action, and such oral and documentary evidence and argument which may be presented at the hearing on this motion.

DATED:   September 14, 2015

THE HOMAMPOUR LAW FIRM,
A Professional Law Corporation

By: _____
Arash Homampour,
Wendi O. Wagner,
Corey Arzoumanian
Attorneys for Plaintiffs KENNETH AARON SHINEDLING and ADDISON LEILANI SHINEDLING, ALEXIA CELESTE SHINEDLING, and AVA AREN SHINEDLING by and through their guardian ad litem, KENNETH AARON SHINEDLING

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page ii*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 1

I.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   LEGAL STANDARD ON MOTION FOR JUDGMENT AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  SUMMARY OF TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   Dr. Palmer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Dr. Romig . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.   Sunbeam's Senior Director Product Safety Engineer, Mr. Prins  . . 6

    D.   Subeam's Direct of Project Management, Mr. Vernaglia . . . . . . . 7

IV.   THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO FIND THAT DEFENDANT SUNBEAM FAILED TO ADEQUATELY WARN AND THAT THE FAILURE WAS A CAUSATIVE FACTOR . . . . . . . 9

    A.   Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.   Warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   Defendant Did Not Adequately Warn That the Automatic Shut-Off Switch May Not Work . . . . . . . . . . . . . . . . . . . 11

        2.   Defendant Did Not Warn Not to Use the Heater While Sleeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        3.   Defendant Did Not Sufficiently Warn of the Dangers to Allow The Consumer to Make an Informed Choice About Usage or Abstention . . . . . . . . . . . . . . . . . . . . . . . . . 13

        4.   The Evidence Showed that Even When All Given Warnings WereComplied With, the Fire Resulted . . . . . . . . . . . . . . 16

V.    SUFFICIENT EVIDENCE WAS PRESENTED TO ESTABLISH A NEGLIGENT DESIGN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.   Defendant Again Misrepresents Plaintiffs' Position and the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.   Dr. Palmer's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . 18

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD - SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

C.    The Negligent Defect Claim Stands, As The Jury Found Defect and Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.    THERE WAS SUFFICIENT DIRECT AND CIRCUMSTANTIAL EVIDENCE TO SUPPORT THE JURY'S FINDING ON THE DAUGHTER'S BYSTANDER EMOTIONAL DISTRESS CLAIMS . 22

VII.    DEFENDANT WAIVED ITS RIGHT TO COMPLAIN ABOUT THE VERDICT FORM AS TO NEGLIGENT RECALL AND IN ANY EVENT AGREED THAT IT WOULD BE SUBSUMED UNDER NEGLIGENCE 26

VIII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

# <u>TABLE OF AUTHORITIES</u>

## <u>FEDERAL CASE LAW</u>

*Allstate Ins. Co. v. Hugh Cole Builder, Inc.*,
　137 F.Supp.2d 1283 (M.D.Ala.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Desert Palace, Inc. v. Costa*,
　539 U.S. 90 (U.S.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
　367 F.Supp.2d 413 (W.D.N.Y.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Home Indem. Co. v. Lane Powell Moss & Miller*,
　43 F.3d 1322 (9th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Air Crash Disaster Near Cerritos, Cal.*
　967 F.2d 1421 (9th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Juhnke v. EIG Corp.*,
　444 F.2d 1323 (9th Cir.1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
　372 F.Supp.2d 1104 (N.D.Il.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mason v. E.L. Murphy Trucking Co.*,
　769 F.Supp. 341 (D.Kan.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Massok v. Rellek, Inc.*,
　147 Fed. Appx. 651 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pekarek v. Sunbeam Products, Inc.*,
　672 F.Supp.2d 1161 (D. Kan. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pooshs v. Philip Morris USA, Inc.*
　904 F. Supp.2d 1009 (E.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Reeves v. Sanderson Plumbing Products, Inc.*,
　530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Rudd v. Gen. Motors Corp.*,
　127 F.Supp.2d 1330 (M.D.Ala.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith v. Ford Motor Co.*,
　882 F.Supp. 770 (N.D.Ind.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Smith v. Ingersoll–Rand Co.*,
　214 F.3d 1235 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stegall v. Citadel Broadcasting Co.*
　350 F.3d 1061, 1067 (9th Cir. 2003) , as amended (Jan. 6, 2004) . . . . . . . . . . 23

*Tennant v. Peoria & P.U. Ry.*,
　321 U.S. 29 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

*United States v. Garcia,*
   7 F.3d 885 (9th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Winarto v. Toshiba Am. Electronics Components,*
   274 F.3d 1276 (9th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

## **STATE CASE LAW**

*Aguayo v. Crompton & Knowles Corp.,*
   183 Cal.App.3d 1032 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Bird v. Saenz*
   28 Cal.4th 910 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23, 24

*Goldstein v. Superior Court,*
   223 Cal.App.3d 1415 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Hathaway v. Superior Court,*
   112 Cal.App.3d 728 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Scherr v. Las Vegas Hilton Hotels Corp.,*
   168 Cal.App.3d 908 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23, 24

*Thing v. La Chusa,*
   48 Cal.3d 644 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Wilks v. Hom,*
   2 Cal.App.4th 1264 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Zuniga v. Housing Authority,*
   41 Cal.App.4th 82 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

## **FEDERAL STATUTES**

FRCP Rule 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 · FAX (323) 658-8477

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   SUMMARY OF ARGUMENT

Defendant's motion for judgment as a matter of law (JMOL) must be denied as there was a legally sufficient evidentiary basis for a reasonable jury to find that:

> 1)   Defendant Sunbeam failed to adequately warn that the subject heater should not be used while sleeping or that automatic safety shut off that the consumer would expect to work but may not work and that this failure caused the heater to be used and resulting fire,

> 2)   Defendant Sunbeam negligently designed the subject heater (which should not be used while sleeping and which had an automatic safety shut off that the consumer would expect to work but may not work), and

> 3)   Plaintiff daughters had valid bystander emotional distress claims. Further, Defendant's claim that Plaintiffs waived the negligent recall claim is outrageous considering that it was Defendant that stipulated to the removal of that claim as a separate claim on the verdict form and that it would be subsumed in the negligence claim such that if the jury finds negligence, then Plaintiffs prevailed in the failure to recall claim.

## II.   LEGAL STANDARD ON MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant's motion for judgment as a matter of law can only be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ..." *Juhnke v. EIG Corp.*, 444 F.2d 1323, 1325 (9th Cir.1971) (noting that directed verdict and motion for judgment notwithstanding the verdict "are measured by the same standards as the latter is merely a renewal of the former.").

In considering a motion for judgment as a matter of law under Rule 50, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "It is the jury,

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

not the court, which ... weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts .... Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions because judges feel that other results are more reasonable." *Tennant v. Peoria & P.U. Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Therefore, the Court's role is not to substitute its view of the evidence for that of the jury. *Winarto v. Toshiba Am. Electronics Components*, 274 F.3d 1276, 1283 (9th Cir.2001). When two possible sets of inferences are supported by the record, "the inferences that support the jury's verdict of course win the day." *Id*. at 1287.

Here, Defendant's motion is patently defective as it fails to address all of the evidence and testimony at trial. Instead, Defendant selectively quotes from and distorts snippets of testimony.

## III. SUMMARY OF TESTIMONY[1]

### A. Dr. Palmer

Dr. Palmer described various testing that was done with exemplar heaters, as well as the PowerPoint that illustrated his opinions and video showing that smoldering combustion could be reached in 20-30 minutes. (52:5-53:3; 69:15-73:17 [Ex. A]; 30:2-39:18 [Ex. B]; PowerPoint-Trial Ex. 249 [Ex. C]; Trial Ex. 28 [Ex. D]). He went through the design hierarchy for the subject heater, identifying the hazards as potential for fire and shock, guarding as preventing excessive temperature, and warnings as what communicates the hazards. He testified that the hierarchy is a fundamental process when engineering of a product (53:4-55:9 [Ex. A]). There was no documentation provided by Sunbeam that a hazard analysis was done for the subject heater, which is indicative of inadequate engineering design. ( 55:20-56:17; 74:25-75:11 [Ex. A]; 40:12-41:5 [Ex. B]).

---

[1]Additional summaries of testimony are found throughout, as and where necessary.

---

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page 2*

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

That Vernaglia, who was in charge of the heater project, was not aware of anyone applying to design hierarchy was relevant on this point. (44:8-18 [Ex. B]). Dr. Palmer believes that if such an analysis had been done, Sunbeam would have concluded that the radiant heater was not safe for residential use, particularly where it cannot be tended to continuously, such as when sleeping. (56:18-57:4; 75:12-76:1 [Ex. A]).

A comparison was done between fan heaters and radiant heaters, and it was demonstrated that non-radiant heaters never get to a point where they will cause ignition in outside materials, whereas radiant heaters operate at a much higher temperature and can cause ignition temperatures in common combustibles, as shown by his testing. (30:2-39:18 [Ex. B]). He opined that had Mr. Shinedling used a non-radiant heater, the fire would never have happened. (57:3-63:19; 73:18-74:24 [Ex. A]). It was also explained that the sample non-radiant heater had an auto shut-off that will trip way below an ignition temperature. The type of radiant heater in the subject fire also had the same shut-off, but it did not work in the situation which started the subject fire. (35:19-39:18 [Ex. B]; Trial Ex. 28 [Ex. D]). A reasonable engineer could have foreseen this because of the residential application - children, pets, etc. could accidently get materials within range of the heater, causing a fire. (63:20-68:18; 76:2-77:17 [Ex. A]). However, the manual that accompanied the heater gave the consumer the impression that the heater would turn itself off in an overheat situation. (*Id.* 89:7-25; Trial Ex. 103 [Ex. E]). The consumer should have been given a warning that it would not work in that situation. (90:1-11; 91:24-92:17 [Ex. A]). The warnings that were given were insufficient. (*Id.* 90:15-91:12).

The jury was told about another heater made by Sunbeam, before the fire, which had a sensor which could tell if something was within an inch of the heater and would interrupt its operation. To Dr. Palmer, that signified that Sunbeam was aware of the hazard of something being a floor level, and that it tried to eliminate the hazard. (*Id.* 92:18-93:14, 20-94:2).

\\

\\

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 · FAX (323) 658-8477

Dr. Palmer testified that even if there had been no problems with the heaters, it was up to the manufacturer to go through the design hierarchy and make sure that it was safe. (*Id.* 68:4-19). Regarding UL testing, Dr. Palmer explained that they are minimum standards, and that UL warns that the manufacturer needs to insure product safety. UL does not test for everything, including whether materials on the floor by the heater will start a fire (i.e. whether the auto-off will work). UL does not declare products safe. (77:18-83:7 [Ex. A]; 39:10-13 [Ex. B]).

Sunbeam did not evaluate whether the auto shut-off would work if materials came within three feet of the heater. (39:5-7; 46:23-48:2 [Ex. B]). It just warned that nothing should be placed there, even though it was aware that sometimes it unintentionally happens. Sunbeam did not test and design for the environment in which the heater was to be used. (83:8-87:2 [Ex. A]; 45:3-46:9 [Ex. B]). Violation of the three foot warning was reasonably foreseeable. (87:4-89:6 [Ex. A]).

Sunbeam did not design out the hazard, as it produced high temperatures. The auto shut-off did not guard against the hazard, as it did not protect against all over-temperature conditions. There was no warning on the heater to indicate that the auto shut-off would not always work. (68:20-69:14 [Ex. A]). As a result, it was Dr. Palmer's opinion that the best thing to do was to use a convection-type heater while sleeping. (*Id.* 93:15-19). This was inline with the CPSC's recommendation that radiant heaters not be used while sleeping. (*Id.* 101:19-102:10; Trial Ex. 107 [Ex. F]). Such a recommendation, along with other communications, should have been part of Sunbeam's scientific library, but Sunbeam did not maintain such a library (94:3-101:5 [Ex. A]; 45:22-46:22 [Ex. B]; Trial Exs. 73, 107, 108, 212 [Exs. F-I]). The recommendation should have been evaluated and have been part of Sunbeam's warnings, but was not. (101:19-104:14 [Ex. A]).

Dr. Palmer testified that the risks associated with the heater were not outweighed by its benefits, and that a convection heater was a safer alternative. (5:21-6-19 [Ex. B]). He also testified that because the auto shut-off would not work when materials get within three feet of the heater, the consumer's expectation would not be met. (*Id.* 42:22-43:4).

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page 4*

He explained that the CPSC did not conclude that the subject heater was safe when the subject fire was investigated, but communicated to Sunbeam that more information was needed regarding the hazards. He was unaware of Sunbeam ever having provided that information. (7:13-13:12 [Ex. B]; Trial Ex. 218 [Ex. J]). This was concerning, considering that Sunbeam knew from its later testing that the heater was hot enough to char cloth. (13:14- 15:17 [Ex. B]; Trial Exs. 233.1, 233.2 [Ex. K]). Based on prior incidents and warranty claims, Sunbeam was aware that the subject heater was causing fires. However, Sunbeam did not maintain this information in a complete and usable fashion, nor is there any evidence that they used it to make their product safer, which was unreasonable. (16:16-26:10; 43:19-44:12 [Ex. B]).

**B.    Dr. Romig**

Dr. Romig testified that the first fuel ignition was clothing within inches of the heater, and the ignition source was the heater. (29:24-30:5 [Ex. L]). The ignition temperatures of various substances range between 300 and 400 centigrade. (*Id*. 31:2-11). In the subject fire, the auto shut-off did not function to turn the heater off before the fire started. (*Id*. 32:22-25). A normally operating convection heater would not make material reach those temperatures, and would not start a fire. (*Id*. 31:12-32:9).

Based on Dr. Palmer's testing, it was Dr. Romig's opinion that the timing of the fire was not consistent with the clothing being in front of the heater when the Shinedlings went to bed. It was more consistent with clothing having been tipped over, which was supported by the drawings of evidence done after the fire. (*Id*. 33:1-23).

Dr. Romig used various diagrams to set the scene and discuss how the fire progressed. (*Id*. 34:3 -44:2 ; Trial Exs;. 2.1, 7, 202.1 (admitted as 329), 249.66, 249.68 - Exs. Y-BB]). He then explained the course of action taken after the fire, and that decedent could not have survived the flashover which occurred. (*Id*. 41:8-53:14). He described Mr. Shinedling as having been faced with an emergency situation. (*Id*. 53:16-25). He confirmed that Mr. Shinedling's statement that he was unable to reenter the house was consistent with the amount of heat that would have been generated, and the rate at which

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
1 5 3 0 3   V E N T U R A   B O U L E V A R D   ·   S U I T E   1 0 0 0
S H E R M A N   O A K S ,   C A L I F O R N I A   9 1 4 0 3
PHONE (323) 658-8077 · FAX (323) 658-8477

a fire progresses. (*Id*. 55:2-56:20).

## C.   Sunbeam's Senior Director Product Safety Engineer, Mr. Prins

Sunbeam's Prins is a senior director product safety engineer. He is not a licensed engineer. (3:9-11 [Ex. M]). He testified that Sunbeam does **not** keep a database as to property damage and personal injury, with information and investigation results. (*Id*. 14:18-24). He admitted that it is known that people misuse their heaters and that UL testing is done to determine that the auto shut-off will work under certain conditions. (*Id*. 18:24-23:20). The only testing done for fire is the UL testing, but not placing material within three feet of the heater to see if it will turn off in an overheat situation. (*Id*. 28:23-29:2; 34:21-24). This was true even though the CPSC states that the manufacturer should always contemplate issues unique to the design of their product. (*Id*. 59:20-60:18).

Prins admitted that Sunbeam does not tell the consumer that the auto shut-off will not work in certain situations, or that it was only meant to protect the integrity of the heater, although the box and manual state that it will turn off in an overheat situation. (*Id*. 28:8-22; 46:22-47:3, 48:18-24). Prins testified that Sunbeam did not warn the consumer not to use a space heater while sleeping. (71:5-8 [Ex. M]).

Sunbeam's Prins also admitted that he did not tell the CPSC that the auto shut-off would not work when materials got within three feet of the heater, which CPSC was investigating the cause of the subject fire. (*Id*. 58:20-25).

Prins admitted that it was after Sunbeam acquired Holmes in 2006 when he became aware that if combustible materials are put right up against and at the bottom of the heater, the automatic safety shutoff may not work. (29:13-31:1 Ex. M]). Prins admitted, *sometime after his 2006 analysis,* he became aware of the 2004 CPSC warning, and he never even raised the issue that maybe Sunbeam should warn their users "never leave a space heater on when you go to sleep." (70:25-72:13 Ex. M]).

Prins also confirmed that Sunbeam (after purchasing Holmes) began to sell a new heater with an additional safety protection, the HQH 369 with the Safety Max Feature which had beams placed in front of the heater to detect objects that touch the face of the

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

heater (or interfered with the beams) so that it would shut down the unit. (41:11-41:17 [Ex. M]).

Prins admitted that he knew since 2006 that the auto shut-off would not work when combustible materials were at the bottom the heater, but that he neither documented this nor shared it with any of the engineers at Sunbeam. (*Id.* 29:6-32:1). He admitted that documenting a hazard analysis would allow for the ability to have engineers look at the product and look for ways to make it safer. (*Id.* 37:18-38:14).

### D.   Subeam's Direct of Project Management, Mr. Vernaglia

Stephen Vernaglia is the Director of Project Management for Sunbeam. (83:8-10 [Ex. L]; Vernaglia Depo 10:2-17 [Ex. N]). He explained that there are four types of heaters, including ceramic, which has built in safety, radiant, and convection. (84:4-5 [Ex. L]; Vernaglia Depo 18:6-19:12 [Ex. N]). He also explained the differing UL testing that was done for radiant heaters, including the drape test, vertical wall test, top-over test, etc. (8:22-23 [Ex. M]; Vernaglia Depo 23:25-26:17 [Ex. N]; 84:12-16 [Ex. L]). The standard that applies to the subject quartz heater is UL 1278. (84:17-18 [Ex. L]; Vernaglia Depo 26:22-27:9 [Ex. N]). Meeting that standard allows them to market the heater with the UL mark, but it does not inform the consumer which safeguards have been taken. (90:9-10 [Ex. L]; Vernaglia Depo VIII 384:12-18 [Ex. O]). Nor does it mean that the heater is safe or free from defect. It is the responsibility of the manufacturer to make sure that it is safe. (5:6-8 [Ex. M]; Vernaglia Depo 6/3/15 35:3-21 [Ex. P]).

Vernaglia testified that he was involved in the design of the subject heater (HQH307) as the project leader that took it from the industrial design phase through production. (6:5-17, 19-22 [Ex. L]; Vernaglia Depo 51:3-8 [Ex. N]; VIII 326:4-12 [Ex. O]). Vernaglia admitted that Sunbeam does not keep track of statistics regarding residential fires believed to be caused by home heaters. (87:21-24 [Ex. L]; Vernaglia Depo 230:25-231:3 [Ex. Q]). It does not keep any kind of scientific literature library. (46:10-15 [Ex. B]; 304:13-16 [Ex. Q]).

\\

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
1 5 3 0 3 VENTURA BOULEVARD • SUITE 1 0 0 0
SHERMAN OAKS, CALIFORNIA 9 1 4 0 3
PHONE (323) 658-8077 • FAX (323) 658-8477

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page 7*

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

1    Vernaglia agreed that Sunbeam was required to design heaters to address the hazard

2    of ignition of combustibles. (5:22-23 [Ex.E]; Vernaglia Depo  42:6-10 [Ex. P]). He did

3    not take into consideration what the auto-ignition of certain materials would be. (5:24-25

4    [Ex. M]; 43:3-11 [Ex. P]).

5    If there was an issue that he had not know about with heaters starting fires, he got that

6    information from Prins, Sunbeam's safety engineer. Prins was to have worked with the

7    claims on products to address any issues in product design. (86:21-23 [Ex. L]; Vernaglia

8    Depo 41:19-42:8 [Ex. N]). However, he never had a discussion with Prins about hazard

9    analysis or safety changes. (89:22-24 [Ex. L]; Vernaglia Depo 365:17-366:2 [Ex. O]).

10    There is an overheat sensor/thermostat on the heater which senses a temperature rise.

11    (84:23-24 [Ex. L]; Vernaglia Depo 31:20-32:1 [Ex. N]). He explained that the generation

12    of heaters such as the subject heater had the thermostat at the top of the heater because

13    that location worked well for testing. (87:7-8 [Ex. L]; Vernaglia Depo 55:4-24 [Ex. N]).

14    The purpose of the thermostat is to prevent the heater from starting fires with combustible

15    materials. (89:4-6 [Ex. L]; 86:9-11[Ex. R]; Vernaglia Depo 308:25-309:3[Ex. Q]; VIII

16    357:2-5 [Ex. O]).

17    The primary hazard with radiant heaters is that it can start a fire if combustible

18    materials get on or within three feet of the heater. (38:15-20 [Ex. P]). Radiant heaters will

19    allow the temperature of what is in front of it to continually climb to ignition. (6:25-7:1

20    [Ex. M]; Vernagila Depo 52:17-21 [Ex. P]). Defendant was aware that sometimes things

21    could get in front of the heater unintentionally. (88:5-7 [Ex. L]; Vernaglia Depo 244:5-9

22    [Ex. Q]). Despite this, no one considered that additional abnormal situation testing should

23    be done. Nothing prevented Sunbeam from doing such testing. (89:14-16 [Ex L];

24    Vernaglia Depo VIII 347:17-348:6 [Ex. O]).

25    Vernaglia admitted that the owner's guide tells the consumer that the heater has an

26    auto safety shut off and that when a potential overheat temperature is reached the system

27    will automatically shut the heater off. He agreed that the consumer would have an

28    expectation that the system would be turned off in an overheat situation. (42:7-21 [Ex. B];

---

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page 8*

Vernaglia Depo 282:22-283:10 [Ex. Q]).

Sunbeam knew before the subject incident that heaters were being used in homes while people were sleeping. (86:18-21 [Ex. L]; Vernaglia Depo 38:21-24 [Ex. P]). It also knew that combustible materials could inadvertently get within three feet of the heater. (86:18-21 [Ex. L]; Vernaglia Depo 39:8-13 [Ex. P]). Sunbeam never raised the issue of providing a warning that the heater should not be used while sleeping. (49:15-17 [Ex. L]; Vernaglia Depo 36:1-6 [Ex. P]).

He denied that there was a document anywhere at Sunbeam that discussed how to make quartz heaters safer or which demonstrated a design hierarchy analysis for quartz heaters. (43:8-10 [Ex. B]; Vernaglia Depo 288:17-24 Ex. Q]).

## IV. THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO FIND THAT DEFENDANT SUNBEAM FAILED TO ADEQUATELY WARN AND THAT THE FAILURE WAS A CAUSATIVE FACTOR

Plaintiffs put on more than enough evidence for the jury to reach the conclusion that Sunbeam's failure to warn was a substantial factor in causing Plaintiffs' harm under any theory and that the warnings given by Sunbeam were inadequate.

Defendant's motion sets up two arguments that Plaintiffs never made, and then argues that it is entitled for judgment as a motion of law for Plaintiffs' failure to meet those arguments with evidence. This is improper.

### A. Causation

There was sufficient scientific and circumstantial evidence for the jury to reach the inference that the fire was started in the manner proposed by Plaintiffs, i.e. that clothing fell from a hamper during the night and into proximity of the heater. *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F.Supp.2d 1283, 1292 (M.D.Ala.2001) (permitting testimony of expert regarding cause and origin of fire). Also, "[a]lthough [an expert] lacks direct evidence of the cause of the fire, [the expert] may rely upon circumstantial evidence to support his theory." *Id.*, at 1289; *see also Rudd v. Gen. Motors Corp.*, 127 F.Supp.2d

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

1330, 1343 (M.D.Ala.2001) ("Again, contrary to GM's contention, the fact that much of [the expert's] data constitutes circumstantial evidence does not of itself detract from their substantiality.... Inference chains built upon ... circumstantial evidence are a well-established feature of admissible expert testimony."); *Pekarek v. Sunbeam Products, Inc.,* 672 F.Supp.2d 1161, 1169 (D. Kan. 2008) (court denied defendant's request for summary judgment, finding that there was circumstantial evidence from which a jury could find that a manufacturing, design, or warning defect in a Sunbeam blanket caused a fire.)

Mr. Shinedling testified that he had slept with the hampers where they were before and that he had previously made sure that they were far enough away. When he went to sleep that night everything had been normal (i.e., where it should have been ). (D. Ex. A 107:1-15; 108:18-20). Plaintiffs' expert Romig testified that based on the testing done by Plaintiff's expert Dr. Palmer which showed that material in front of the heater can reach smoldering combustion within 25 minutes, it was most likely that the clothing was not in the position that started the fire at the time the Shinedlings went to bed. The fire would have happened around midnight or 1:00 a.m. had they been in that location. The fire actually started sometime shortly before 6:18 a.m., which indicated that the clothing was moved at some point relatively shortly prior thereto. (D. Ex. A 84:1-23).

Stuart's testimony did nothing to refute Plaintiffs' theory of causation. He testified that a bag of clothing started the fire. He also testified that there was a hamper found next to the bag that could have contained the bag and that it was possible that the bag fell or was knocked out of the hamper. (47:1-13; 53:18-54:1 [Ex. S]).

Plaintiffs offered sufficient scientific and circumstantial evidence to support a jury's finding as to causation.

## B. <u>Warnings</u>

Defendant claims that Plaintiffs argued "Sunbeam failed to warn them not to use the heater while sleeping *because combustibles could be accidentally knocked in front of the heater*" or that "*the automatic shut-off switch does not turn off the heater when*

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

*combustibles are accidentally knocked within three feet of the front of the heater*."
(Motion 4:5-9, emphasis added). It should be noted that Defendant does not cite to any
portion of the transcript to show that these arguments were made. Defendant further
claims that because there was no evidence that the fire was caused by the accidental
knocking over of clothes, Sunbeam's failure to warn *of that risk* could not have caused
Plaintiffs' injuries. This argument must fail, as Plaintiffs never made such claims or
arguments.

What Plaintiffs actually argued was that Sunbeam failed to warn that the heater would
not turn off like Defendant represented it would.

### 1.  Defendant Did Not Adequately Warn That the Automatic Shut-Off Switch May Not Work

The warning on the heater, to keep items three feet away, does not address the
contrary information in the manual that says that it will turn off in an overheat situation.
(89:7-92:17 [Ex. A]). Sunbeam's Vernaglia admitted that the owner's guide tells the
consumer that the heater has an auto safety shut off and that when a potential overheat
temperature is reached the system will automatically shut the heater off. He agreed that
the consumer would have an expectation that the system would be turned off in an
overheat situation. (Vernagila Depo 282:22-283:10 [Ex. Q]). Defendant knew that it
would not turn off if something got too close, but the consumer wasn't provided with that
information. (89:7-92:17 [Ex. A]; 30:4-31:25 [Ex. M]). The consumer simply wasn't told
of this limitation or that the heater should not be used while sleeping as a result. (D. Ex.
A 11:2-21; 259:2-21; 260:260:25).

The jury concurred that the heater did not work as safely as the average consumer
would expect it to work. This is completely consistent with a finding that Defendant
failed to adequately warn that the shut-off switch may not work. Defendant ignores that
there are two different causation questions subsumed in the instructions given to the jury
on the two strict liability claims: 1) whether the heater's failure to perform safely was a
substantial factor in causing Plaintiffs' harm; and 2) whether the heater's design was a

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 · FAX (323) 658-8477

substantial factor in causing Plaintiffs' harm. (28:14-29:10 [Ex. T]). The jury could have found that the heater was not designed to shut-off under the conditions present, and that that design was not a defect, but that the expectation created in the consumer that it would do so (and didn't) was a substantial factor in causing the fire. This is consistent with the jury's finding that there were risks known to the manufacturer that presented a substantial danger, which were unknown to the consumer (who had expectations to the contrary) and that Sunbeam failed to warn about the known risks. It should be noted that to the extent that Defendant claims in its moving papers that the verdict as to failure to warn and strict liability - design defect are inconsistent, it did not raise this inconsistency before the jury was dismissed, or in its motion for new trial, and so has waived this argument. *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir.1995) (collecting cases) ("When counsel is invited to consider whether or not to discharge the jury, counsel risks waiver of objections to any inconsistencies in the jury's findings if counsel does not raise the issue before the jury is excused."). Thus, this argument must fail.

## 2. Defendant Did Not Warn Not to Use the Heater While Sleeping

Plaintiffs further presented evidence that the CPSC said not to use space heaters while sleeping. Sunbeam knew before the subject incident that heaters were being used in homes while people were sleeping. (Vernaglia Depo 38:21-24 [Ex. P]). But Sunbeam did not incorporate the CPSC recommendation into its warnings (Trial Ex. 107 [Ex. F]; 101:19-103:9 [Ex. A]). If Sunbeam had warned not to use the radiant heater when sleeping, to use a non-radiant heater instead, the fire would not have occurred. (72:18-73:2 [Ex. A]; 33:3-13 [Ex. B]).

Defendant argues that if the clothes had not been placed within three feet of the heater the fire would not have happened. This is merely a repetition of its argument at trial, and is not an argument that the jury could not have found liability based on the evidence. There is no evidence that the clothing was *placed* within three feet of the heater. In fact, the evidence showed that it was not, and that the warnings provided were followed. (D. Ex. A 84:1-23; 107:1-15; 108:18-20). It also showed that the manual and the box lead Mr.

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 · FAX (323) 658-8477

Shinedling to believe that he was safe using the heater while sleeping because if an overheat situation occurred, it would turn itself off. He was not aware that you shouldn't use radiant heaters while sleeping, and would never have bought the heater for that purpose had he known that information and/or that the safety feature might not work. (12:5-14; 13:2-16 [Ex. U]).

Defendant's argument that the "uncontroverted evidence - the warnings themselves - demonstrated that Sunbeam satisfied its duty to warn" has no merit. Defendant focuses on the warning to use extreme caution when the heater is left operating and unattended. The jury could easily have found this warning nonsensical.

Given the definition supplied by Defendant that "unattended" means either "not noticed or dealt with" or "not supervised or looked after", the warning itself makes no sense. One cannot simultaneously exercise extreme caution while not supervising, dealing with, noticing or looking after the heater. Defendant argues that "the purpose of the warning is to alert consumers that they must pay attention to the heater." (Motion 10:15-16). One cannot both pay attention to the heater and leave it unattended. To do so is impossible. Neither Defendant nor the warning explain what "extreme caution" means. Presumably, it means to make sure that all other warnings were complied with, which is what was done.

Defendant's argument that the risk of leaving the heater unattended is that it could start a fire only furthers Plaintiffs' position. If that is the risk, then telling the consumer to exercise extreme caution when leaving the heater running unattended was the wrong warning. There was sufficient evidence that the jury could have found that the consumer should have been warned to not leave the heater unattended when running (i.e., not to use while sleeping) and that the auto-safety feature might not work.

### 3. Defendant Did Not Sufficiently Warn of the Dangers to Allow The Consumer to Make an Informed Choice About Usage or Abstention

Defendant cites to *Aguayo v. Crompton & Knowles Corp.*, 183 Cal.App.3d 1032

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 · FAX (323) 658-8477

(1986) for the proposition that once the consumer has been sufficiently alerted to the possibility of danger, the consumer has the choice either to use the product with knowledge of the risk or to abstain from doing so and there can be no failure to warn liability. The key is that the consumer has to be sufficiently alerted. The evidence was that Mr. Shinedling was not sufficiently alerted, and the jury agreed.

Defendant marketed the heater as having a auto-safety shut off and heat safety protection tested beyond UL standards (which is false), giving the consumer the expectation that if the heater were to get into an overheat situation it would turn off. (35:5-20 [Ex. V]; 42:7-21 [Ex. B]; Vernaglia Depo 282:22-283:10 [Ex. Q]).

Defendant's expert admitted that there is no warning that there is a risk of fire because the auto-safety shutoff might not work. (21:22-22:2; 35:5-10 [Ex. V]). He agreed that one of the purposes of the shut off is to prevent the heater from starting a fire with combustible material (23:7-11 [Ex. V]). It is there to protect in the event of foreseeable misuse, such as material coming into contact with the heater. (47:1-4 [Ex. V]). Defendant's own expert admitted that a consumer would want to know if a safety feature on a product may not work. (29:9-11 [Ex. V]).

While Defendant may have alerted Plaintiff Kenneth to the fact that there was potential danger in using the heater, it did not alert Plaintiff Kenneth to the risk that the automatic safety shutoff would not work, or that the heater should not be used while sleeping. (Defendant's footnotes 27-31). It cannot be said that Defendant "sufficiently" alerted Plaintiff Kenneth to these dangers, or even that it alerted him to the dangers, at all. Therefore Plaintiff Kenneth, as the consumer, was not warned to the possibility of those dangers and made no informed decision as to using the heater with knowledge of the risk or abstaining from doing so.

For Defendant to claim that the risk is not in the operation of the auto-safety feature but instead the ever-present risk of fire inherent in the warning not to place flammables in front of the heater is not compelling. As seen by this case, a person may follow all of the warnings and still have material enter into the danger zone despite their best

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

intentions. If they are told that the heater will turn itself off (23:7-11 [Ex. V]), they might still choose to use the heater, wrongly believing that it is safe to do so. There was sufficient evidence that Defendant failed to warn of the risk that the auto-safety shut off might not work and it was therefore not safe to sleep with the heater on.

Defendant's argument that it had no duty to tell the consumer "that the auto-safety shutoff cannot detect every potential object in front of the heater" because it "was not designed to detect whether objects in front of the heater . . . were catching on fire" has no merit. Defendant was aware that sometimes things could get in front of the heater unintentionally. (244:5-9 [Ex. Q]). Defendant's expert admitted that one of the functions of the shutoff was to prevent the heater from starting a fire with combustible material (23:7-11 [Ex. V]). Further, if the auto-safety shutoff was not designed to determine if items outside the heater were overheating, the jury could have found that the manual and box should not have led the consumer to believe that the heater would shut off in an overheat situation, or should have sufficiently warned that the heater would not turn off if items near it were overheating. Instead, it told the consumer "When a potential overheat temperature is reached, the system will automatically shut the heater off". The jury could easily have found that this was insufficient to warn of the potential danger, as it was a positive statement that the consumer would be safe.

With respect to Dr. Palmer's testimony, Defendant does not give an accurate summary, at all. Instead, Defendant cherry-picks sentences out of context and attempts to mold them to fit its position. This is also improper.

Dr. Palmer opined that radiant heaters are unreasonably dangerous for use in a residential setting because all radiant heaters reach very high temperature and can heat outside objects to ignition. (61:14-63:8 [Ex. A]). Sunbeam's Vernaglia agreed with this basic concept. (52:17-21 [Ex. P]). Dr. Palmer testified that there was no warning by Sunbeam that the auto safety shutoff may not work and that there should have been, as the hazard had not been mitigated. (69:10-14; 90:3-11 [Ex. A]). He also testified that it was an oversight by Sunbeam not to incorporate the CPSC's warning not to sleep with a

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

space heater on and to keep children and pets away. (101:25-102:10; 103:16-104:3 [Ex. A]).   Read in context, which Defendant fails to give, Dr. Palmer stated additional warnings "other than persuading someone not to use it" would not have been useful. (D. Ex. A 56:7-13). This must be read in correlation with his opinion that radiant heaters are unreasonably dangerous for use in a residential setting because children and pets will not respect the warnings and outside objects can be heated to ignition.

### 4.   The Evidence Showed that Even When All Given Warnings Were Complied With, the Fire Resulted

Contrary to Defendant's assertions, Dr. Palmer did *not* testify that if Mr. Shinedling had not left the heater unattended there would not have been a fire. He testified that if the three foot zone was not violated there would not have been a fire. (Defendant's fn. 60). As previously stated, the evidence showed that Mr. Shinedling followed the warnings in the first instance and believed that if something accidentally got in front of the heater, the heater would turn itself off; if he had been advised not to sleep with the heater on, he would not have; and if he had been advised that the shutoff wouldn't work, he wouldn't have purchased the heater. Defendant argues that if Mr. Shinedling had headed the warnings, the fire would not have happened. However, Defendant fails to point out one warning for which there was evidence that it was not headed.

Defendant argues, without presenting any evidence, that "Mr. Shinedling knew the risk of leaving the heater unattended, and he did it anyway." Plaintiffs adequately demonstrated that, in fact, he did not know the risks and could not have known the risks, because Sunbeam did not warn him of the risks.

Defendant states "the result was a catastrophe, but the risk attendant to his decision was well-disclosed." To what "decision" is Defendant referring? The decision to sleep with the heater on that Sunbeam didn't advise him he couldn't so use? The decision to sleep with the heater on that Sunbeam lead him to believe would be safe because of the auto-shut off? The decision to go to bed with all items three feet away from the heater, as prescribed? This is a statement unsupported by any valid argument and should be

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

dismissed.

Plaintiffs provided sufficient evidence from which the jury could conclude that Defendant did not adequately warn not to use the heater while sleeping and that the auto safety feature might not work.

Defendant argues, again without evidence, that the jury was "overcome by passion to blame Sunbeam and recompense Plaintiffs for their loss." This statement is proven not to be true by the fact that the jury found Mr. Shinedling to be partially at fault for the fire.

## V. SUFFICIENT EVIDENCE WAS PRESENTED TO ESTABLISH A NEGLIGENT DESIGN

### A. Defendant Again Misrepresents Plaintiffs' Position and the Evidence

Defendant again offers up an argument never made by Plaintiffs and then finds fault for not having presented evidence to support the argument never made. Defendant claims, citing to evidence contained in its fn. 66, that Plaintiffs, through Dr. Palmer, argued that the heater should have been designed so that its automatic shut-off feature would offer fail-safe protection against fire hazard. Yet, the testimony cited to (none of which was by Palmer) does not say this. It says: 1) the high limit switch (auto-shut off) did not work; 2) it should shut off and the consumer has an expectation that it will shut off; 3) Mr. Shinedling had an understanding that it would turn off; and 4) Vernaglia testified that a consumer would expect it to turn off. This testimony is consistent with the jury finding a defect under the consumer expectation test and negligent design, in that Sunbeam did design a heater which would meet consumer expectations. That Sunbeam was negligent in its design was supported by its employee, Vernaglia, who testified that Sunbeam tested for the UL Standard, but did not do any tests to determine what happens when combustible material gets within three feet of the heater, even though it was aware that there was a potential for fire in such a situation and that the consumer may inadvertently get such materials within three feet. He admitted that more testing could be done than just those prescribed by the UL Standard. (212:23-218:2 [Ex. Q]). He admitted that you cannot pass a test that is not performed. (VIII 371:12-15 [Ex. O]).

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
1 5 3 0 3 VENTURA BOULEVARD · SUITE 1 0 0 0
SHERMAN OAKS, CALIFORNIA 9 1 4 0 3
PHONE (323) 658-8077 • FAX (323) 658-8477

Vernaglia testified that he was involved in the design of the subject heater (HQH307) as the project leader that took it from the industrial design phase through production. (51:3-8 [Ex. N]; VIII 326:4-12 (Ex. O]). The HQH307 was a cosmetic update from a previous model, the HQH305. (326:13-16, 20-22, 327:1-6, 9-328:1-8, 15-16 [Ex. O]). The redesign did not make any safety changes and it took about a year. (329:3-6, 7-12; 336:13-15, 18-19 [Ex. O]). No fire claims of the previous model were reviewed. (341:20-25 [Ex. O]). Sunbeam did not collect data as to how fires were started with its home heaters. (VIII 348:14-24 [Ex. O]). Vernaglia admitted that Sunbeam does not keep track of statistics regarding residential fires believed to be caused by home heaters. (230:25-231:3 [Ex. Q]). It does not keep any kind of scientific literature library. (304:13-16 [Ex. Q]). Vernaglia denied that there was a document anywhere at Sunbeam that discussed how to make quartz heaters safer or which demonstrated a design hierarchy analysis for quartz heaters. (288:17-24 Ex. Q]). Based on this evidence, the jury could reasonably have found that Sunbeam was negligent for not having done the testing which would lead it to discover that its heater was not going to perform to the safety standards expected by consumers, for therefore not taking steps to design this lapse in expectation and functionality out, for not guarding against it, or warning about it. The jury could also have found that, while the heater was not defective for not having an auto-shut off that worked when material was placed in front of it, it was negligent for not having designed it to do so.

**B.     Dr. Palmer's Testimony**

Defendant's objections to Dr. Palmer's qualifications are simply a rehashing of its failed motion in limine to exclude Dr. Palmer. The Court conducted a *Daubert* hearing and found Dr. Palmer to be a highly educated and trained electrical engineer, whose testimony is the product of reliable principles and methods of physics, thermodynamics, and engineering, including the design hierarchy and fundamental heat transfer principles. The Court also found that Dr. Palmer reasonably applied those principles and methods to the facts of the case. (6/2/15 62:14-63:17 [Ex. W]).

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page 18*

1    There is no doubt that Dr. Palmer was qualified to give his opinion. Dr. Palmer's

2    extensive education, experience, and background were before the Court. [Dkt. 156-1].

3    Defendant's objections that Dr. Palmer was not qualified because he was not a designer

4    of space heaters, hadn't investigated a fire involving a quartz heater, did not know the

5    effectiveness of other heaters, etc., are all without merit. Dr. Palmer did not have to have

6    prior experience with a space heater in order to opine about a space heater. *Smith v.*

7    *Ingersoll–Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) (safety expert and human

8    factors expert qualified even though neither had experience with particular machine). "An

9    expert need not necessarily have specific experience with a particular facet of his or her

10   expertise in order to be competent to testify as to that facet," and "[a] lack of

11   specialization generally does not affect the admissibility of the opinion, only its weight."

12   *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1113 (N.D.Ill.2005)

13   (internal quotation marks and citations omitted); *see also Dreyer v. Ryder Auto. Carrier*

14   *Grp., Inc.,* 367 F.Supp.2d 413, 417 (W.D.N.Y.2005) (finding an expert qualified to opine

15   on a design defect of autohaulers based on his general experience loading, unloading, and

16   operating autohaulers); *Smith v. Ford Motor Co.*, 882 F.Supp. 770, 772–73

17   (N.D.Ind.1995) (permitting an expert to testify as to the cause of a truck fire based on his

18   experience in the auto collision repair industry); *Mason v. E.L. Murphy Trucking Co.*, 769

19   F.Supp. 341, 344 (D.Kan.1991) (finding an expert qualified to opine on unique markings

20   of a transportation trailer based on nineteen years of "practical experience" operating and

21   maintaining transportation trailers).

22   It should be noted that Sunbeam's own expert never designed a heater. (43:13-15 [Ex.

23   V]).

24   The cases cited by Defendant for the proposition that Dr. Palmer was not qualified

25   are not persuasive. *Massok v. Rellek, Inc*., 147 Fed. Appx. 651 (9th Cir. 2005), an

26   unpublished case. An unpublished disposition of the 9th Circuit which was published

27   before January 1, 2007 may not be cited, pursuant to Circuit Rule 36-3. Therefore,

28   Defendant may not rely on this case. However, it should be pointed out that the expert in

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

question in that case performed inadequate testing and had failed the Georgia state mechanical engineering examination five times. However, the Court noted that it was not an abuse of discretion to permit expert testimony, even when the specialist lacks "particularized expertise", citing *United States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir.1993).

In *Pooshs v. Philip Morris USA, Inc*. 904 F. Supp.2d 1009 (E.D. Cal. 2012), the experts were not disqualified in toto. Two doctors were proffered by plaintiff as experts, Dr. Cummings and Dr. Farone. Dr. Cummings was an epidemiologist with a focus on public health. The court found that he was qualified to testify regarding many subjects for which he had offered an opinion, but that as an epidemiologist he was not qualified to testify as an expert in how to design cigarettes. *Id.* at 1019. As an epidemiologist, Dr. Cummings did not have any background, education or experience that would translate to a knowledge of how cigarettes were designed. Dr. Farone was not allowed to testify as to design because his theories had been refuted by research and his alternative design was not supported by scientific proof. *Id.* at 1023. In contrast, Dr. Palmer's background, education and experience translate to a direct understanding of thermodynamics principles, heat transfer mechanisms, electrical power conversion, and the engineering hierarchy with respect to hazards. His analysis was not based on any subtlety or hidden aspect of product design that requires years of space heater design experience, but was based on a solid foundation of basic engineering and scientific principles.

Defendant does not challenge Dr. Palmer's experiments or his methodology. It challenges his opinion. As the Ninth Circuit explained, the Supreme Court in Daubert:

> . . . had in mind a flexible inquiry focused solely on principles and methodology, not on the conclusions that they generate. As long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts. *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005) (quotations omitted).

Defendant's complaint is that Dr. Palmer opined that radiant heaters are unreasonably dangerous for use in a residential setting because all radiant heaters reach very high

---

temperature and can heat outside objects to ignition. (61:14-63:8 [Ex. A]). Defendant finds fault with the opinion because it claims no other expert in the field holds this opinion. That is not the test. The test is whether the opinion is based on solid principles and methodology. The basis for the opinion was agreed to by Defendant's employee Prins. (26:10-15 [Ex. M]). Ignition temperatures are a fact, and no "inventory" of other radiant heaters on the market was necessary, as suggested by Defendant. Defendant does not attack the principle or the methodology Dr. Palmer used to demonstrate the principle, it only attacks the opinion that these heaters should not be used in a residential setting. This is improper.

Yet again, Defendant claims that Dr. Palmer opined something he did not - that the heater should have been designed so that it would shut off when all objects fall in front of it or that it should have been designed to be fail safe. What Dr. Palmer actually said, as quoted by Defendant in its fn. 78, is that Defendant should have warned that it might not work; that Sunbeam did not tell CPSC that it wouldn't work; that the consumer's expectation that it would turn off would not be met; that it was not safe to use in a residential environment because children and animals cannot be expected to follow warnings; and that it was not designed for the purpose to turn it off in the circumstances of this incident. Overall, Dr. Palmer's testimony was that radiant heaters should not be used in a residential environment because they cannot be made safe (56:18-57:5; 64:21-65:17 [Ex. A]; 87:21-88:3 [Ex. B]).

The science behind Palmer's opinions was measurable, repeatable and acceptable. There was no reason to limit or prevent Palmer from giving his opinions.

## C.   The Negligent Defect Claim Stands, As The Jury Found Defect and Causation

The jury found Defendant was liable under the consumer expectation test. In order to do so, the jury was instructed: "To establish this claim, plaintiffs must prove all of the following: No. 1. That Sunbeam Products, Inc., designed the subject radiant heater; No. 2. That the subject radiant heater did not perform as safely as an ordinary consumer would

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

have expected it to perform when used or misused in an intended or reasonably foreseeable way; No. 3. That plaintiffs were harmed; and No. 4. *That the subject radiant heater's failure to perform safely was a substantial factor in causing plaintiff's harm.* (28:12-23 [Ex. T]). The jury was not asked to find, either by instruction or the verdict form, that the heater's design was a substantial factor, as it was for the risk-benefit test. It was asked whether the failure to perform safely was a substantial factor.

That the jury found that the heater's failure to perform as safely as an ordinary consumer would expect was a substantial factor in causing Plaintiffs' harm is supported by its finding on the failure to warn claims, as the jury found that the failure to warn was a substantial factor. Failure to warn sisters with a consumer's expectation that the product would perform safely. In the absence of the manufacturer's disclosure of a risk known to it, but unknowable to the consumer, the consumer has the expectation that the product is safe.

Defendant's claim that a defect was not found is incorrect. The questions regarding causation as to each defect claim were separate and distinct. The jury found defect and causation under the consumer expectation test. Defendant does not argue that there was insufficient evidence to support the verdict as to the negligence component of negligent design, only that a defect was not found. Plaintiffs' negligent design theory was supported by the evidence. The jury's finding was proper.

**VI.** **THERE WAS SUFFICIENT DIRECT AND CIRCUMSTANTIAL EVIDENCE TO SUPPORT THE JURY'S FINDING ON THE DAUGHTER'S BYSTANDER EMOTIONAL DISTRESS CLAIMS**

Defendant does not question that the daughters were present at the scene of the fire. In fact, this was a stipulated fact. (25:19-26:11 [Ex. T] ). It was also stipulated that:

•   "On January 5th, 2011, a fire started in the master bedroom of the plaintiff's home";

•   "Amy, Kenneth, and Ava were sleeping in the master bedroom at the

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

1  time of the fire"; and

2  •  "Amy Celeste Shinedling died on January 5th, 2011, in the fire at

3  plaintiff's home. . ."

4  Nor does Defendant dispute that the daughters suffered severe emotional distress. The

5  only dispute comes from Defendant's implication that only direct evidence could

6  establish the daughters' contemporaneous awareness. Defendant ignores the fact

7  Plaintiffs can prove their case through circumstantial evidence and direct evidence is not

8  required. *Stegall v. Citadel Broadcasting Co.* 350 F.3d 1061, 1067 (9th Cir. 2003) , as

9  amended (Jan. 6, 2004). Citing to the United Supreme Court in *Desert Palace, Inc. v.*

10 *Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (U.S.2003), the 9th Circuit in *Stegall*

11 noted that:

12  "[t]he reason for treating circumstantial and direct evidence alike
13  is both clear and deep-rooted: 'Circumstantial evidence is not only
     sufficient, but may also be more certain, satisfying and persuasive
14  than direct evidence.' *Id.* (Citation). Moreover, the Court also
     recognized the critical role that circumstantial evidence plays even
15  in criminal cases: 'The adequacy of circumstantial evidence also
     extends beyond civil cases; we have never questioned the
16  sufficiency of circumstantial evidence in support of a criminal
     conviction, even though proof beyond a reasonable doubt is
17  required.' *Id.* Finally, the Court noted that 'juries are routinely
     instructed that 'the law makes no distinction between the weight or
18  value to be given to either direct or circumstantial evidence.'*Id.*"

19 First, Defendant improperly cites to cases where factually it was shown the plaintiffs

20 were not contemporaneously aware: *Bird v. Saenz* 28 Cal.4th 910 (2002) was a medical

21 malpractice case in which plaintiffs were not present at the time of the injury producing

22 event. In Scherr v. Las Vegas Hilton Hotels Corp. , 168 Cal.App.3d 908 (1985), plaintiff

23 witnessed a fire on television and thus was not "present". In *Hathaway v. Superior Court*,

24 112 Cal.App.3d 728 (1980) plaintiffs were inside a home when their son was electrocuted

25 outside and were not aware that the electrocution was taking place. In *Goldstein v.*

26 *Superior Court*, 223 Cal.App.3d 1415 (2008), parents were unaware that their child was

27 being given an excessive amount of radiation and could not observe the injury producing

28 event. None of these cases are applicable.

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD • SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

The situation presented by the subject incident is analogous to *Wilks v. Hom,* 2 Cal.App.4th 1264 (1992); *In re Air Crash Disaster Near Cerritos, Cal.* 967 F.2d 1421 (9th Cir.1992); and *Zuniga v. Housing Authority*, 41 Cal.App.4th 82 (1995). In each of these cases, plaintiffs were present when their homes were on fire and knew that their relatives were inside. To the extent that these cases conflict with *Scherr*, it should be noted that *Scherr* was decided before *Thing v. La Chusa*, 48 Cal.3d 644 (1989), when cases were analyzed on an ad hoc basis. For that reason, cases coming after *Thing* should be given greater weight. See historical analysis in *Bird v. Saenz* (2002) 28 C4th 910, 915, 123 CR2d 465, 468; and *Thing v. La Chusa* (1989) 48 C3d 644, 651-661.

Here, the jury heard that the girls were screaming, wanting to know where there mother was. (36:14-25 [Ex. U]). They were told that she was going to meet them in the back. *Id.* Addison followed her father back into the house when he went to get decedent, but there was too much heat and smoke for him to progress. (37:24-38:11 [Ex. U]). Mr. Shinedling retrieved the girls and took them to the neighbor's house. (39:20-23 [Ex. U]). Obviously, the girls recognized that their mother had not met up with them and was not with them. Mr. Shinedling used the phone at the neighbors and told 911 that decedent was not with them and that she was still in the house. (39:21-6 [Ex. U]). Mr. Shinedling, Sr. (the grandfather) described the girls as being in shock (22:18-21 [Ex. X]). Defendant argues that the girls were told of their mother's death at the scene. That the fact of their mother's death was confirmed by a third party while the fire was still ongoing does not equate to them not knowing that their mother was in the fire.

At the hearing, the court noted that the girls were "breaking out all flushed and red" and had "tears". (71:21-72:6 [Ex. V]). These girls are minors.

Further, Plaintiffs presented unrebutted expert testimony from Dr. Reading that they each had (or been diagnosed with) Post Traumatic Stress Disorder (PTSD) with an explanation that PTSD is "an adverse event, trauma", where "the person reexperiences the event" through intrusive thoughts. It is an event where a loved one is at risk of great harm or death. Here, the fire event posed a risk of harm to each other person, as well as to Amy

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

Shinedling. Dr. Reading explained how each girl had resulting and persistent negative issues in all domains of their life with a poor prognosis. (47:1 - 49:1; 70:9 - 80:10; 83:15 - 87:4 [Ex. X]).

As to Addison, Dr. Reading testified that "she had a clear memory of the event", "continuing difficulty with feeling safe", "loss of safety", and a "loss of...control and predictability." (70:20 - 71:10 [Ex. X]). Addison would try not to think about what happened but ended up thinking about her mom every day (or having intrusive thoughts consistent with PTSD.) (72:1 - 12 [Ex. X]). Addison is still struggling and suffering with the loss of her mother. (75: 3- 10 [Ex. X]) Her and her sisters have been "extremely compromised" as a result of the underlying incident and re-traumatized with their father's own negative reaction to it (with excessive drinking and suicide attempts.) (75:17 - 77:13 [Ex. X]) Addison is now fearful of something happening to her dad. Ava gets up in the night to make sure her dad is still alive, sneaking into the bedroom to check if they are breathing. (77:21 - 78:25 [Ex. X]) Addison is at risk for having relationship issues and all are more vulnerable for reactivation. (79:8 - 80:2 [Ex. X])

As to Alexia, Dr. Reading confirmed the same diagnosis and prognosis as for Addison. (80:3 - 10, 83:15 - 18 [Ex. X]).

As to Ava, Dr. Reading did say it was hard to diagnose PTSD with children but he did not say she did not have PTSD. In fact, he confirmed that Ava had been diagnosed previously as having PTSD with Ava aware she lost her mom in the fire, checking on family members to make sure they are alive, having intrusive dreams about the fire, that she worries a lot, that she needs to be reassured frequently, that her feelings are easily hurt, that she refuses to sleep alone and that she abnormally talks often about death or injury.

(83:19 - 86:25 [Ex. X]) Her prognosis was the most guarded. (87:1 - 4 [Ex. X]).

In other words, being diagnosed with PTSD meant each girl had to be aware that their mother was killed in the fire. Thus, there was unrebutted direct and/or circumstantial evidence that each child: 1) was present at the scene, 2) was aware the fire caused the

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD · SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 · FAX (323) 658-8477

1    death of their mother, and 3) suffered sever emotion distress a result. CACI 1621.

2    To suggest, as Defendant has, that each child should have been asked if they were

3    aware that their mother was dying in the fire is just cruel when there was substantial direct

4    and circumstantial evidence that they were presently aware that their mother was in the

5    home, which was on fire, and that she was presently being injured or in the process of

6    dying. There was sufficient circumstantial evidence to show that the Shindeling girls had

7    a present awareness that their mother was being injured and dying in the fire.

8

9    **VII.    DEFENDANT WAIVED ITS RIGHT TO COMPLAIN ABOUT THE**

10    **VERDICT FORM AS TO NEGLIGENT RECALL AND IN ANY**

11    **EVENT AGREED THAT IT WOULD BE SUBSUMED UNDER**

12    **NEGLIGENCE**

13    It is pretty outrageous that Defendant would argue that Plaintiffs waived the negligent

14    failure to recall claim when it was Defendant that stipulated on the record that the

15    negligent failure to recall claims would be subsumed in the other negligence causes of

16    action. In other words, the parties agreed that at Plaintiffs could argue negligent failure

17    to recall, and if the jury found negligence, then Plaintiffs would prevail on that claim.

18    (140:20-141:5 [Ex. X]).

19    Additionally, the parties reserved the right to ask that certain instructions be removed

20    if evidence relating to the instruction was not ultimately introduced. [Dkt. 230; page 2 fn

21    1]. Sunbeam had the opportunity to timely argue (they did not) that Plaintiffs failed to

22    introduce enough evidence related to the negligent recall instruction and/or claims and ask

23    that the instruction be removed after the close of the evidence (and prior to the reading of

24    the instructions.) Sunbeam did not; and has waived this argument.

25    \\

26    \\

27    \\

28    \\

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
15303 VENTURA BOULEVARD - SUITE 1000
SHERMAN OAKS, CALIFORNIA 91403
PHONE (323) 658-8077 • FAX (323) 658-8477

## VIII.    CONCLUSION

For the foregoing reasons, Defendant's motion should be **denied.**

DATED:   September 14, 2015

THE HOMAMPOUR LAW FIRM,
A Professional Law Corporation

By: _____
Arash Homampour,
Wendi O. Wagner,
Corey Arzoumanian
Attorneys   for   Plaintiffs   KENNETH
AARON  SHINEDLING  and  ADDISON
LEILANI   SHINEDLING,   ALEXIA
CELESTE   SHINEDLING,   and   AVA
AREN SHINEDLING by and through their
guardian  ad  litem,  KENNETH  AARON
SHINEDLING

THE HOMAMPOUR LAW FIRM
A PROFESSIONAL LAW CORPORATION
1 5 3 0 3 VENTURA BOULEVARD · SUITE I 0 0 0
SHERMAN OAKS, CALIFORNIA 9 I 4 0 3
PHONE (3 2 3) 6 5 8 - 8 0 7 7 • FAX (3 2 3) 6 5 8 - 8 4 7 7

*Plaintiffs' Opposition to Defendant's Motion for Judgment as a Matter of Law - Page 27*