1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

4    KENNETH AARON SHINEDLING, ET AL.,  )
                                        )
5                                       )
                                        )
6                        Plaintiffs,    )
                                        )
7                                       )
                                        )
8            Vs.                        )   No. EDCV12-00438-CJC
                                        )
9                                       )
                                        )
10   SUNBEAM PRODUCTS, INC., ET AL.,     )
                                        )
11                                      )
                                        )
12                       Defendants.    )
                                        )
13   _____   )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                 *JURY TRIAL, DAY 1*

18                    *VOLUME II*

19              SANTA ANA, CALIFORNIA

20             TUESDAY, JUNE 9, 2015

21

22

23          MIRIAM V. BAIRD, CSR 11893, CCRA
         OFFICIAL U.S. DISTRICT COURT REPORTER
24       411 WEST FOURTH STREET, SUITE 1-053
            SANTA ANA, CALIFORNIA 92701
25                (714) 894-5384
                 MVB11893@aol.com

1                    **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFFS,**        ARASH HOMAMPOUR
     **KENNETH AARON SHINEDLING, ET**        COREY ARZOUMANIAN
4    **AL.,:**                               HOMAMPOUR LAW FIRM
                                             15303 VENTURA BOULEVARD
5                                            SUITE 1000
                                             SHERMAN OAKS, CA 91403
6

7

8

9

10

     **IN BEHALF OF THE DEFENDANTS,**        GARY A. WOLENSKY
11   **SUNBEAM PRODUCTS, INC., ET**          ARENT FOX LLP
     **AL:**                                 555 WEST FIFTH STREET 48TH
12                                           FLOOR
                                             LOS ANGELES, CA 90013-1065
13                                           - AND -
                                             DAVID J O'CONNELL
14                                           GOLDBERG SEGALLA LLP
                                             311 SOUTH WACKER DRIVE
15                                           SUITE 2450
                                             CHICAGO, IL 60606
16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                                    <u>INDEX</u>

2      <u>WITNESS:</u>                                           <u>PAGE:</u>

3

        **OPENING ARGUMENT BY PLAINTIFF**                      **5**
4       **OPENING ARGUMENT BY DEFENSE**                        **27**
        <u>**John Arthur Palmer, Plaintiffs' Witness, Sworn**</u>   47
5       <u>DIRECT EXAMINATION</u>                                 47

6                                  * * * * *

7

        <u>EXHIBITS:</u>
8

9
                                   * * * * *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1          SANTA ANA, CALIFORNIA; TUESDAY, JUNE 9, 2015; 1:00 P.M.

 2                                ---

 3          THE CLERK:  All rise.

 4          THE COURT:  Please be seated, ladies and gentlemen.

 5          Mr. Homampour, there is a stipulation you're going

 6    to read first, sir?

 7          MR. HOMAMPOUR:  There is, Your Honor.  The parties

 8    have stipulated to certain facts, and I'm going to go ahead

 9    and read them.

10          So first, the entity Holmes and Sunbeam are one and

11    the same for purposes of the evidence that the jury is going

12    to see.  So they will see the heaters that have the name

13    Holmes on them.  That is the same as defendant Sunbeam.

14          THE COURT:  Is that correct, sir?

15          MR. O'CONNELL:  That is correct.

16          MR. HOMAMPOUR:  The parties have agreed that

17    Kenneth Shinedling is the husband of decedent Amy Shinedling.

18    They were married on October 16, 1993.  Kenneth was born on

19    January 10, 1973.  Amy Shinedling was born on April 1, 1975.

20    They have three daughters -- Addison, Alexia, and Ava.

21    Addison was born July 17, 1998.  Alexia was born October 26,

22    2001.  Ava was born July 31, 2007.

23          The parties have agreed that on January 5, 2011, a

24    fire started in the master bedroom of the plaintiffs' home

25    located at 8270 Sky Line Drive, Pinon Hills, California.
```

01:03PM  5
01:03PM 10
01:04PM 15
01:04PM 20
01:04PM 25

|    |    |
|----|----|
| 1  | Amy, Kenneth, and Ava were sleeping in the master bedroom at |
| 2  | the time of the fire.  Addison, Kenneth, Alexia, and Ava were |
| 3  | all present at the scene of the fire. |
| 4  | Amy Celeste Shinedling died on January 5, 2011, in |
| 5  | a fire at plaintiffs' home.  Amy Shinedling was 35 years old |
| 6  | at the time of her death.  Addison, Alexia, and Ava have all |
| 7  | undergone therapy since the incident. |
| 8  | The subject heater was manufactured by Sunbeam on |
| 9  | October 10, 2006.  The subject heater provides radiant heat. |
| 10 | Can I go ahead and state my opening? |
| 11 | THE COURT:  All right. |
| 12 | So stipulated? |
| 13 | MR. O'CONNELL:  So stipulated, Your Honor. |
| 14 | THE COURT:  Very well. |
| 15 | Mr. Homampour, please give us your opening |
| 16 | statement. |
| 17 | **OPENING ARGUMENT BY PLAINTIFF** |
| 18 | MR. HOMAMPOUR:  In essence this case is about a |
| 19 | defective home heater that started a fire that killed a |
| 20 | mother and a wife.  The home heater was defective because it |
| 21 | had a safety feature that did not work, and the safety |
| 22 | feature is an automatic shutoff that is supposed to turn the |
| 23 | heater off before it starts a fire, and that did not work |
| 24 | with this radiant heater. |
| 25 | To understand why this happened, we have to sort of |

01:05PM (lines 5, 10, 15)
01:06PM (lines 20, 25)

UNITED STATES DISTRICT COURT

go back in time.  And you'll hear expert testimony explaining

to you the difference between radiant heaters on one hand and

non-radiant heaters.  I'm going to try and explain that to

you briefly right now.

01:06PM      This is a radiant heater.  This is not the subject

heater.  The subject heater was burned and it was destroyed

essentially.  This is similar to the heater that was involved

in the incident.  This is a fan heater.  It is not a radiant

heater.  Despite the size difference, they are the same

01:07PM  wattage and essentially provide the same heat although

different form of heat comes out.  But this is 1500 watts;

this is 1500 watts.

      Now, non-radiant heaters produce heat by blowing

the heat from the inside of the heater out into the room.

01:07PM  Non-radiant heaters never produce heat high enough to cause

combustible materials like clothing or towels to catch on

fire.  So in order for a towel, for example, to catch on fire

or for clothing to catch on fire, heat of over 450 degrees

Fahrenheit has to blow onto it to start a fire.

01:07PM      The heat from non-radiant heaters never gets above

approximately 150 degrees Fahrenheit.  They just don't

produce that high of amount of heat.  Non-radiant heaters

have a device in them, a thermostat, that if they sense the

heat is getting over approximately 185 degrees Fahrenheit or

01:08PM  200 degrees, it shuts it off.

1          So the heat coming from non-radiant heaters is

2     never high enough to start a fire in the first place with

3     ordinary combustible materials because it never gets to

4     450 degrees.  Even if something got hot enough that it got

01:08PM  5     halfway close to starting a fire, non-radiant heaters have a

6     thermostat sensor in them that recognizes the temperature and

7     shuts the machine off.  Whether it's tipped over or

8     otherwise, if the sensor senses something over 185 degrees,

9     it shuts off.  So it doesn't even come close to starting a

01:08PM 10     fire.

11          So you could get a towel or clothing within three

12     feet of a heater that is non-radiant, and it will not start a

13     fire, period.  Our expert will show that.  And the defendant

14     will tell you that they're not aware of any fire ever

01:09PM 15     occurring when clothing or combustible material gets within

16     three feet of a non-radiant heater.

17          Radiant heaters are a totally different animal.

18     Radiant heaters radiate heat away from the heater.  It is

19     like the sun.  So if you are on a cold day, 60 degrees

01:09PM 20     outside, but you go out and stand in direct sunlight --

21     you're at a park or you're at some outdoor event -- and all

22     of a sudden you start sweating, that's because your body and

23     objects accumulate the heat that is produced in a radiant

24     format.  When the sun radiates on you, even though the

01:09PM 25     outsides are cold, you will get hot because your temperature

1    will gradually increase.

2           That's the same with clothing and towels.  If an --

3    if a pile of clothing is within three feet of the heater

4    that's a radiant heater, the temperature of that pile will

01:10PM  5    increase potentially to over 1200 degrees.  Remember, I told

6    you anything over 450 degrees starts a fire.

7           So with radiant heaters, if you get clothing or

8    ordinary towels, and you're at home and you're sleeping and

9    the dog runs by and knocks over clothing or someone gets up

01:10PM  10   and goes to the bathroom and knocks over clothing and

11   clothing or any cotton or towel gets within three feet of a

12   radiant heater, if it is not covering the heater, if it's

13   just in front of it, a fire can start, because these radiant

14   heaters produce 1200 degrees Fahrenheit heat.

01:10PM  15   This radiant heater also has an automatic shutoff

16   device that tells the user -- and we'll go over that in the

17   manual -- that as designed, this radiant heater is supposed

18   to shut off before it gets into an overheat situation.

19           What the defendant knew and what any engineer with

01:11PM  20   basic training would tell you is that the sensor inside this

21   radiant heater doesn't work and will not shut off this heater

22   in the event clothing or towels get within three feet, and

23   here's the reason why.  The sensor only measures the

24   temperature inside the heater.  But because a radiant heater

01:11PM  25   radiates away from the heater, it can't sense that a pile of

clothing is now at or above 450 degrees Fahrenheit and is going to start a fire.

So since, I think, the '90s, the Consumer Product Safety Commission -- and I'll show you this document in a moment -- has said in communications:  Do not use heater unattended in a room while sleeping.  The reason you don't want to use a radiant heater in a room unattended while sleeping you'll hear is because while you're sleeping, if clothing or material gets within three feet of that radiant heater producing 1200 degrees Fahrenheit heat, a fire can start.  It will not shut off itself.

Compared to the non-radiant heater, you can sleep; you can leave it unattended.  It never produces enough heat, high enough heat to ever start a fire with clothing or material.

Both of these heaters have warnings.  There are warnings on the tag.  There's a warning at the bottom.  The warning at the bottom for this heater, the radiant heater, says:  Risk of fire.  Keep combustible materials such as furniture, papers, clothes, and curtains at least three feet away from the front of the heater and away from the sides and the rear.  And it says:  Do not -- same sort of warning on here about objects being -- don't let it get closer than three feet to the front of the heater.  I think it also says in the -- I can't read this.

01:14PM

01:14PM

01:15PM

01:15PM

01:15PM

1       There is no warning on the radiant heater telling

2   the user that this will not work and shut itself off even

3   though the manual tells the user there is an automatic safety

4   shutoff that will turn off the heater.  So what our expert

5   will explain to you and what science has known is radiant

6   heaters should never be used at home in a room while you're

7   sleeping unattended because the risk of fire is too great.

8       A person can comply with the warning label and keep

9   clothing or combustibles three feet away from the heater and

10  a fire can start if the clothing or materials get

11  inadvertently or by accident within three feet of the heater,

12  and the heater will shut off.

13      Difficult to see to your left and to your right are

14  some of the exhibits that you're going to see in this case.

15  I don't have my glasses on.  I can barely see.  Over here we

16  have the Tower Courts heater manual for the subject heater.

17  On the heater manual you'll see that it says auto safety

18  shutoff with instant tip-over protection.  The heater is

19  equipped with a patented technologically advanced safety

20  system that requires the user to reset the heater if there is

21  a potential overheat situation.  When a potential overheat

22  temperature is reached, the system will automatically shut

23  the heater off.

24      That is not true with the radiant heater.  That is

25  the manual for the radiant heater involved in the incident,

and that is not true.  This heater will not shut off before a

fire starts, and that is because of the design defect in the

heater that that temperature sensor can't sense elevated

temperatures outside of the heater within three feet of the

01:16PM  heater unless something is blocking the heater.

So you're going to hear that the company has done

minimum testing through something called Underwriters

Laboratories.  Underwriters Laboratories, you've seen the UL

mark.  It's usually in white plastic stamped on things.  All

01:16PM  that means is that this product has undergone some minimum

testing, not exhaustive, not extensive, not every test, but

some tests.

UL will charge the company money, a few thousand

dollars, and say we'll test your product.  If you pass our

01:16PM  minimum standards, you can put the UL mark as a marketing

tool on your device; however, it's agreed that UL is a

private standard.  It is not the law.  They are minimum

standards.

The defendant will also agree just because a

01:17PM  product has a UL stamp or passes UL standards does not mean

it's safe.

MR. WOLENSKY:  Objection, Your Honor.

Argumentative.

THE COURT:  Overruled.

01:17PM  MR. HOMAMPOUR:  You'll hear that testimony from

UNITED STATES DISTRICT COURT

```
 1    their own expert.  It doesn't mean that the product is safe.

 2    And you will also hear from the defendant's own product

 3    engineer that no matter what UL does, Sunbeam still has its

 4    own obligation to make sure that it provides the safest

 5    possible product.  This is from the defendant's own corporate

 6    representative.

 7            Now, the testing that UL did doesn't address the

 8    defect we talked about.  UL does the following testing only.

 9    They will test these heaters to see if they shut off in

10    situations where they block the heater.  What that does is

11    when you put a towel on or around the heater and block it,

12    any elevated temperature goes back into the heater and

13    triggers that sensor, because once this thing starts getting

14    hot because there's combustible material -- a towel or

15    clothing or a T-shirt -- near or right on it, the heat goes

16    back into that sensor and the sensor triggers and shuts it

17    off.

18            But when you take the clothing and you don't put it

19    on the heater and you put it within three feet or an inch,

20    they know that automatic shutoff that they market to people

21    in the manual will shut it off, they know it won't work.  And

22    Underwriters Laboratories doesn't do this test.  They don't

23    test to see if heaters will shut off with the towel within an

24    inch or three feet.

25            Here's the warning on the tag.  We've already gone
```

```
 1   over this warning.  Again, a person can comply with the
 2   warning and a fire will still start with this radiant heater
 3   if combustible materials accidentally get in front of the
 4   heater.
 5            So with the non-radiant heaters, even if you get
 6   combustible material, clothes -- again, combustible material
 7   has special meaning in this case.  It doesn't mean
 8   gasoline-soaked material.  Combustible material as we're
 9   using the phrase means T-shirts, towels, clothing.  With the
10   non-radiant heater, if you deliberately violate that warning
11   and you put a T-shirt right next to the heater, a fire will
12   not start because the design of the heater has the safety
13   system that works with non-radiant heaters.  The temperature
14   sensor will shut it off before it starts a fire and because
15   the non-radiant heaters never produce high enough heat to
16   start a fire.
17            With the radiant heaters, if that warning is by
18   accident violated by a dog or someone getting up in the
19   middle of the night, the design safety feature to shut it off
20   doesn't work.
21            You'll hear about something called the SafetyMax.
22   In 2007 the company realized by making a safety feature that
23   if you get clothing or towels within three feet of the heater
24   but not covering it, that the machine may have to shut itself
25   off because it will start a fire.  So the evidence of this
```

01:19PM (line 5)
01:19PM (line 10)
01:19PM (line 15)
01:20PM (line 20)
01:20PM (line 25)

1    SafetyMax is to show you the company knew before this fire

2    ever started that there are scenarios where the heater will

3    start a fire outside of a towel actually being draped onto

4    the heater.

01:21PM    5         So what they did is they have this beam that shoots

6    down the face of the heater, and if it senses anything within

7    half an inch breaking the beam, it shuts itself off.  Again,

8    our expert will explain that safety feature would not

9    necessarily have prevented this incident.  You'll decide that

01:21PM   10    later.  But the point of that safety feature is it shows the

11    company knew that if combustible materials get close enough

12    to the heater but aren't covering it to cause the temperature

13    sensor to work, that a fire could start.

14         The Consumer Product Safety Commission, you're

01:21PM   15    going to hear about that.  They are a government agency, and

16    they get involved sometimes in deciding if certain products

17    have to be taken off the market.  They don't get involved in

18    every situation with every product.  Sometimes they do.

19         Well, back in 2005 the Consumer Product Safety

01:22PM   20    Commission looked at radiant heaters, and they wrote a letter

21    to Underwriters Laboratories and they pointed out that unlike

22    air heaters, radiant heaters have the possibility of raising

23    the surface temperature of an object in the path of the

24    radiant flux very high.  They conclude there's a possibility

01:22PM   25    of continued heating until ignition temperatures are reached.

1          So the concept I explained to you, the Consumer

2     Product Safety Commission recognized that in 2005 and told

3     Underwriters Laboratories about it.  The defendant knew about

4     it because they were on a committee with the Consumer Product

01:22PM    5     Safety Commission and Underwriters Laboratories on some of

6     these standards.

7          Later in 2005 there's another communication where

8     the Consumer Product Safety Commission tells Underwriters

9     Laboratories in essence what I just explained to you, and

01:23PM   10     that is that air heaters like this one, the smaller one, they

11     avoid igniting combustibles in two ways:  First, no commonly

12     found materials ignite at the air temperatures exhausted by

13     the heater.  That means the max temperature can't start a

14     fire with common combustibles with these air heaters.

01:23PM   15          Second, air heaters don't accumulate heat in the

16     object, whereas a radiant heater accumulates the heat in an

17     object to the point where the object will get to ignition

18     temperatures.  So you'll see that again the Consumer Product

19     Safety Commission is telling the testing laboratory used by

01:24PM   20     defendant:  Here's an issue that we're seeing with radiant

21     heaters and starting fires.

22          Of course, the -- Your Honor, one second.  For some

23     reason it stopped working.

24                    (Pause in proceedings)

01:24PM   25          MR. HOMAMPOUR:  All right.  I'll just do it the

      1    old-fashioned way.

      2            So in 2005 the Consumer Product Safety Commission

      3    sent out a bulletin.  These bulletins are, you know, for the

      4    companies like Sunbeam and other manufacturers of space

01:24PM    5    heaters to pay attention to.  It says:  To prevent the risk

      6    of fire, never leave a space heater on when you go to sleep

      7    or place a space heater close to any sleeping person.  Turn

      8    the space heater off if you leave the area.

      9            None of that information which the defendant's own

01:25PM   10    expert will agree is important information for the user to

     11    know is communicated to the user in the manual or in

     12    warnings.  So my client you'll hear -- we'll get to the

     13    incident -- he had no idea when he bought this radiant heater

     14    that the automatic shutoff wouldn't work.  He had no idea

01:25PM   15    that this radiant heater could actually start a fire.  He had

     16    no idea that this radiant heater should not be used while he

     17    is sleeping with his wife and baby in bed.  And he had no

     18    idea it shouldn't be used while unattended.

     19            So he did not know, and he'll tell you he didn't

01:26PM   20    know because he read the warning and there was no warning by

     21    the company to not use this radiant heater in his room while

     22    he was sleeping with his baby and his wife.

     23            He will tell you had he gotten that simple

     24    information, he absolutely would not have used this radiant

01:26PM   25    heater in his bedroom.  You'll hear he had two heaters, one

radiant and one not radiant, and he would have used another heater.  He would not have used a radiant heater if he had known that there was a real risk of fire if materials got within three feet and that that automatic shutoff wouldn't turn it off.

THE COURT:  You want to take a moment just to see if you can get it to work?

(Off-the-record discussion)

MR. HOMAMPOUR:  In 20 years I've never had it actually not work during opening or closing, but that's okay. I'm just going to keep going, Your Honor, and not waste time.

You're going to hear deposition testimony in the next few days from the defendant's director of project management.  He'll agree that heaters should not start fires. And that's important because if you take our incident, and obviously you know a fire started because a radiant heater was used, you'll hear from our expert and he'll explain it to you very simply.  If my client had been told not to use the radiant heater while sleeping and we have this non-radiant heater which provides the same wattage in his bedroom in the same location, there would be no fire.  There would be no death, and we wouldn't be here.

I was going to play you some video deposition of the defendant's employee, Mr. Vernaglia, which you'll hear as we go into the case.  Let me just tell you what he's going to

1       testify to.

2              I asked him:  The owner's guide distributed with

3       the subject heater tells the consumer the heater has an auto

4       safety shutoff; correct?  His answer is yes.

01:28PM  5              And it tells the consumer that when a potential

6       overheat temperature is reached, the system will

7       automatically shut off -- shut the heater off; correct?  He

8       acknowledged it should shut the heater off in an overheat

9       situation.

01:29PM 10              He also agreed:  So the consumer has an expectation

11      that if a potential overheat temperature is reached, the

12      system will automatically shut the heater off; correct?

13      Correct.  And the evidence is going to show that that

14      automatic shutoff did not work despite the consumer having an

01:29PM 15      expectation the heater would shut it off before it started a

16      fire.

17              You'll hear that I asked the defendant:  Are there

18      any documents anywhere at your location where you discuss how

19      to make Quartz heaters safer?  His answer:  No, not that I

01:29PM 20      know of.  Sunbeam, you heard all of the different products

21      they make in voir dire, and there are no documents anywhere

22      at their company where they talk about how to make these

23      radiant heaters safer.

24              You will also hear that this whole discussion that

01:30PM 25      we've had about the hazards unique to radiant heaters and how

```
 1   their automatic shutoff doesn't work despite what they put in
 2   the manual when you get materials within three feet and the
 3   difference between the temperature of non-radiant heaters
 4   never getting hot enough to start a fire but radiant heaters
 5   starting a fire, none of that is discussed by anyone at the
 6   company before this heater was put on the market and sold to
 7   consumers -- not one engineer, not one report, not one
 8   e-mail, nothing where they discuss these basic concepts I've
 9   discussed with you here today.
10           THE COURT:  Mr. Homampour, you want to just take a
11   moment.  We have our IT expert, and he can consult and see if
12   he can get your system working.
13           MR. HOMAMPOUR:  Sure.
14           THE COURT:  Ladies and gentlemen, we're take an
15   in-court break.  Does anybody need to use the rest room or
16   any facility?  Please feel free to stand, stretch just for a
17   moment or talk about anything but the case.
18                   (Pause in proceedings)
19           MR. HOMAMPOUR:  We'll keep going and I'll call you
20   later if I need help.  Thank you.
21           THE COURT:  Thank you.
22           MR. HOMAMPOUR:  So on the night of the fire -- you
23   heard it was January 2011 -- Mr. Shinedling and his wife
24   lived in a home in Pinon Hills.  It was a large home for
25   their family, and heating was very expensive to heat the
```

01:30PM (line 5)
01:30PM (line 10)
01:31PM (line 15)
01:32PM (line 20)
01:32PM (line 25)

1    entire house because it would heat the entire house and not

2    just single rooms.  So he wanted to just heat certain rooms,

3    so he used defendant's portable space heater.

4         He did not know this distinction between radiant

01:33PM   5    heaters and non-radiant heaters.  He read the warning.  It

6    said keep material three feet away.  He complied with that.

7    He didn't know the automatic shutoff would not work.  Had he

8    known, he would have never used a radiant heater.

9         On the night of the incident, he's got three young

01:33PM   10    girls.  Ava is the baby.  She was three years old.  She was

11    with her sisters in another room.  They heard some coyotes.

12    It scared her, so she wanted to sleep with Mommy and Daddy.

13    So she came and slept with Mom and Dad in bed.

14         Amy Shinedling had rheumatoid arthritis, so she had

01:33PM   15    some impairments that affected her ability to move as quickly

16    as she otherwise would have.  She had good days and she had

17    bad days.  Sometimes she needed assistance like a walker.

18    Other days she could walk far distances.  But it came and it

19    went.  She had a bad knee.

01:34PM   20         So on the night of the incident you'll hear that in

21    their bedroom Ava was sleeping in the bed with Kenneth and

22    with Amy.  They had two space heaters.  They had a regular

23    non-radiant heater providing heat in one corner, and they had

24    a Holmes Sunbeam HQ307 radiant heater in another part of the

01:34PM   25    room providing heat for the room.

1          They had a hamper full of clothes which

2     Mr. Shinedling will tell you he kept about five feet away

3     from the heater.  He didn't get it close enough to the heater

4     so it was within three feet.  He kept it five feet away.

01:34PM   5     Because Amy was having some disabilities and had difficulty,

6     they kept a box in the room where they would put trash in,

7     like papers and stuff, and then every other day get rid of

8     it.

9          They had a pile of clothing in another corner of

01:35PM  10     the room, and this was clothing that they were going to

11     either throw away or donate, and that clothing was not within

12     three feet of the heater.  So Ava, Kenneth, and Amy go to

13     bed, and then early morning Kenneth is woken screaming.  His

14     wife says that there's a fire.  He's freaking out.  She tells

01:35PM  15     him to take the baby, Ava obviously.  He grabs the baby.

16          He comes around.  He sees the fire right at the

17     space heater.  He is again freaking out.  He doesn't know

18     what to do.  His wife tells him to go get the girls.  By this

19     time when he comes around, she's off the bed and on the

01:35PM  20     floor.  He thinks she's escaping, so he takes Ava and goes to

21     the other kids', his two daughters', room and gets his two

22     daughters, and then he goes outside.

23          By the way, it's cold.  You'll see in pictures

24     there's snow on the ground at this time of year where they

01:36PM  25     live.  He takes his daughters out in their robes with his

01:36PM

01:36PM

01:37PM

01:37PM

01:37PM

 1    baby huddled in his arms.  He gets them to safety.  They have

 2    a hauler, a toy hauler where they keep jet skis or whatever

 3    type of equipment in the hauler.  He gets his daughters to

 4    the toy hauler.  As he's running out of the house, he picks

 5    up a cordless phone and he calls 911.  You'll hear -- I think

 6    the defendant is going to play that 911 call.  It's

 7    harrowing.  He's screaming.  You can hear his daughters

 8    yelling.

 9          They are outside of the house.  You can hear the

10    911 operator telling him:  Don't go back in the house.  But

11    he wants to go back in to find his wife.  So you can hear him

12    go back in the house with the cordless phone.  He's about to

13    go try and make sure his wife made it out alive, and the

14    phone goes dead because the wires burned down.

15          He sees his daughter behind him, so he has to go

16    tell his daughter:  You can't come in.  He goes back out.  He

17    goes to a neighbor's house, you know, trying to put his

18    daughters in safety.  Can I have a phone?  He calls 911

19    again.  Can't come into the house.  By this time it's

20    burning.  Again they tell him:  Don't go into the house.

21          Ultimately he learns and we all know that his wife

22    died in that fire.  She was unable to escape.

23          It's very simple.  The evidence is going to show

24    had Sunbeam communicated to Mr. Shindling not to use radiant

25    heaters in a room while you're sleeping and unattended and

|     |     |
| --- | --- |
| | 1 |
| | 2 |
| | 3 |
| 01:38PM | 5 |

1    that safety feature that tells you it's going to shut off in

2    an overheat situation doesn't work, there would be no fire.

3    There would be no death.

4         You're going to hear that Mr. Shinedling has

5    undergone some pretty brutal times taking care of his three

6    daughters, issues of suicide.  You'll hear evidence of how

7    hard it's been for him and his daughters to be without a wife

8    and a mother.

9         I was going to show you pictures, but I'll just

10   tell you.  They were high school sweethearts, both members of

11   the Mormon church.  Very close, very tight family.  Life was

12   all about the kids.  They loved each other tremendously, were

13   very, very close.  They had been married for about 17 years.

14        So you will hear the impact on Mr. Shinedling and

15   those kids is devastating, and it doesn't get easier.  It's

16   not like as time goes by, it gets easier.  Every event, every

17   day they are reminded that they don't have -- that he doesn't

18   have the love of his life, and they don't have a mom.

19        I'm almost done.  Let me outline the claims so that

20   you're clear what we're saying in this case and what the

21   defenses are.  So the first claim is that the heater is

22   defective in design.  There are two tests for you to use to

23   analyze whether something is defective.  First is what's

24   called the consumer expectation test.  What that means is:

25   Does it perform as safely as a consumer would expect it to?

01:39PM

1          We believe the evidence is going to show that a

2     consumer has an expectation that when they use a radiant

3     heater, it will shut off before it starts a fire as the

4     defendant represents in its own manual.  So this product does

5     not work as safely as a consumer would expect it to, and it's

6     defective under California law.

7          The second test, we become a little bit more like

8     engineers and we look at what are the risks of a design of a

9     product as compared to the benefits.  You'll hear under that

01:40PM

10    risk benefit analysis the risks of using and selling a

11    radiant heater for use at home when people are sleeping

12    unattended are far greater than any benefits.

13         You'll hear there are alternate designs available

14    for defendant.  If they want to sell home heaters for people

01:40PM

15    to use when they're sleeping and when it's unattended, they

16    have a whole line of products they can sell instead, and

17    those are non-radiant heaters.

18         You'll hear that a radiant heater does not provide

19    any better heating experience when you're sleeping.  In fact,

01:40PM

20    it probably provides a worse heating experience because it's

21    radiating and focused on you when you're under covers.  When

22    you're under covers and sleeping, you wouldn't want sun heat

23    on you.  You wouldn't want heat in the entire room.

24         So under the risk/benefit test, we believe the

01:41PM

25    evidence is going to show that that heater is defective.

1       That's the second defect.

2               We also believe the evidence is going to show this

3       radiant heater is defective in warning.  What that means is

4       should they have warned about a risk that they knew about or

01:41PM   5       should have known about that a consumer would not know about?

6       The risk is not risk of fire.  The risk is that if you use

7       this in a room when you're sleeping unattended and clothing

8       or something by accident gets within three feet, is this

9       heater going to shut off as they told you it would?  That

01:41PM   10      risk is it won't.

11              We believe the evidence is going to show that the

12      consumer does not know that.  It's not communicated anywhere

13      in their warnings or anywhere in their literature:  By the

14      way, this automatic shutoff may not work.  So we believe the

01:41PM   15      evidence is going to show that it's defective in warning.

16              Another claim is negligent warning, which just

17      means what a reasonable manufacturer selling products like a

18      radiant heater knowing or should have known these issues we

19      covered with you today should tell the user:  Don't use these

01:42PM   20      heaters in a room when you're sleeping.  Don't use it

21      unattended.  The safety shutoff may not work.

22              We believe the evidence is going to show a

23      reasonable manufacturer would communicate those basic core,

24      you know, necessary information so someone can keep their

01:42PM   25      family safe and not have this sort of event happen.

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | The fourth claim is were they unreasonable as a             |
|       | 2  | manufacturer?  So would a reasonable manufacturer have sold |
|       | 3  | this product the way they sold it for use sleeping while    |
|       | 4  | unattended?  We believe the evidence is going to show it    |
| 01:42PM | 5 | won't.                                                      |
|       | 6  | The fifth claim is recall.  Basically what that             |
|       | 7  | covers is if for some reason the defendant didn't know as of |
|       | 8  | 2006 of the hazards we've identified through basic science of |
|       | 9  | their heater, did they learn afterwards and should they have |
| 01:43PM | 10 | at least given a recall or some sort of notice?  We believe |
|       | 11 | the evidence is going to show before and after 2006 they knew |
|       | 12 | and they should have at the minimum, bare minimum, sent out a |
|       | 13 | notice or recall telling people:  Don't use these heaters   |
|       | 14 | while you're sleeping in a room unattended.                 |
| 01:43PM | 15 | That covers our claims.  The defendant has a claim |
|       | 16 | and they are alleging that Mr. Shinedling was negligent for |
|       | 17 | not saving his wife.  We believe that he acted as anyone    |
|       | 18 | would in an emergency situation.  He did what he was told and |
|       | 19 | he did what his heart told him, and that was to save his baby |
| 01:43PM | 20 | and to save his daughters.  He made every reasonable effort |
|       | 21 | to come back and save his wife even with the 911 operators  |
|       | 22 | telling him not to go back in, and he was unable to do so.   |
|       | 23 | We believe the evidence is going to show that there |
|       | 24 | was nothing reasonable that Mr. Shinedling could have done to |
| 01:43PM | 25 | have avoided this incident or saved his wife.               |

1          Now, one thing I didn't cover is what happened that

2     night that caused the clothing to get within three feet,

3     because everyone will agree clothing got within three feet of

4     the heater and that's what started the fire.  Mr. Shinedling

01:44PM    5     will tell you again that he kept the clothing in a basket

6     five feet away.  It wasn't within three feet.  He doesn't

7     know personally, because he didn't see it, how clothing got

8     within three feet.  He didn't do it.

9          But he will tell you that his wife would sometimes

01:44PM   10     get up to go to the rest room in the middle of the night, and

11     it may have been her that knocked over the hamper and the

12     clothing may have gotten within three feet.  He'll tell you

13     that he had no idea that that may start a fire that would

14     kill his wife and that had he known that, he would never have

01:44PM   15     bought this heater.

16          That's our case in its essence.  Thank you very

17     much.

18          THE COURT:  All right.

19          Mr. Wolensky.

01:45PM   20          MR. WOLENSKY:  Thank you, Your Honor.

21                    **OPENING ARGUMENT BY DEFENSE**

22          MR. WOLENSKY:  May it please the Court, counsel,

23     ladies and gentlemen of the jury, I along with David

24     O'Connell have the privilege of representing the men and

01:45PM   25     women of Sunbeam in this lawsuit.  This is a sad and tragic

1    accident.  There is no question about it.  And our hearts go

2    out to the Shinedling family for the loss of a mother and of

3    a wife.

4         Nevertheless, it is our view that Sunbeam is not

01:46PM   5    liable for the accident.  The fact of the matter is we will

6    prove that there was no defect in the radiant heater and that

7    it was safe for its intended use.

8         Plaintiffs' counsel in his opening discussed,

9    mentioned a number of times that the heater started the fire.

01:46PM  10    Heaters don't start fires unless the unit somehow

11    malfunctions.  There is no evidence in this case, there will

12    be no contention that the heater malfunctioned.

13         The other way for a heater to cause a fire is if

14    there was a manufacturing defect.  There is no evidence in

01:46PM  15    this case.  There will be no contention that there was a

16    manufacturing defect.  So if that is the case, then the only

17    way for a heater to be involved in a fire is if there was an

18    environmental issue or if it was the way it was being used.

19         There is absolutely no dispute in this case that

01:47PM  20    something, combustibles, clothes, trash, garbage, whatever

21    got too close to the heater, well within this three-foot

22    area.

23         The plaintiffs' claim and the plaintiffs' expert,

24    who you'll hear shortly, is simply going to say that radiant

01:47PM  25    heaters get too hot and shouldn't be sold.  The fact of the

UNITED STATES DISTRICT COURT

matter is he is the only one in the world who holds this opinion, and there is no one else.  This opinion was contrived for purposes of this lawsuit.

This really is a very simple case.  As a result of the failure to follow clear and conspicuous warnings that were understandable and a failure to keep combustible materials away from the radiant heater, a fire started.

Now, as His Honor instructed preliminarily, you're going to hear a lot of argument, a lot of questions from the attorneys.  But the only competent evidence, the only evidence to consider is the evidence that comes out of that witness box, the testimony that comes out of that witness box and the evidence that the judge allows you to hear.

And credibility in this case is going to be very important, and that's the credibility of all the witnesses -- plaintiffs' witnesses, the defense witnesses.  And it's going to be your job to decide who is credible and who is not, who is telling you the facts, who is giving you the whole story, and who is not.  That will be your job to determine.

Now, I have essentially organized Sunbeam's case around three separate themes, and these themes will be prevalent all the way throughout this trial.  The first theme is that the Holmes heater is safe, was well designed and thoroughly tested prior to sale to the public.

The second theme is that the warnings and

| | |
|---|---|
| 1 | instructions of the Holmes heater, the radiant heater, are |
| 2 | clear and easy to understand.  They adequately apprise the |
| 3 | user of the risk of fire and how to prevent it, and |
| 4 | Mr. Shindeling knew and understood them. |
| 01:50PM 5 | The last theme is that the fire started because |
| 6 | combustibles were placed too close to the heater.  Consumers |
| 7 | readily understand that the risk of putting paper, clothes, |
| 8 | trash, garbage, too close to a radiant heater.  It could be |
| 9 | expected that a fire would occur if these instructions were |
| 01:50PM 10 | not followed. |
| 11 | So I'd like to give you a little bit of a road map |
| 12 | as far as what Sunbeam thinks the evidence is going to prove. |
| 13 | It's expected that the evidence is going to show that the |
| 14 | Shindelings either bought or built their house around 2003, |
| 01:50PM 15 | and from that time they owned heaters, about four space |
| 16 | heaters -- two radiant heaters, two Holmes radiant heaters, |
| 17 | and two other portable heaters; that when it was chilly, when |
| 18 | it cold out, the heaters were in constant use at night and |
| 19 | also sometimes during the day if Mrs. Shindeling was at home. |
| 01:51PM 20 | So we expect the evidence is going to show that |
| 21 | these heaters, the portable heaters and the radiant heaters, |
| 22 | were used constantly.  They were literally used for thousands |
| 23 | of hours before this particular accident in 2010.  That would |
| 24 | be about six or seven years. |
| 01:51PM 25 | We expect the evidence to show that Mr. Shindeling |

01:52PM

01:52PM

01:53PM

01:53PM

01:54PM

```
 1    read and understood all of the warnings and instructions that
 2    came with the radiant heater.  Mr. Shinedling knew, we expect
 3    the evidence to show, that the radiant heaters were very,
 4    very hot and that it was very important to keep all
 5    combustibles at least three feet away from the Quartz
 6    heaters.
 7          He knew -- Mr. Shinedling knew that it was very
 8    important not to leave an operating radiant heater
 9    unattended.  And that is clear and I'll show you in the
10    instructions in just a minute.
11          The evidence is also going to show that the
12    Shinedlings never, through all the years that they had the
13    radiant heaters, never ever had a problem with any -- with
14    either of the two heaters including the one that was involved
15    in this fire.  In fact, you will hear Mr. Shinedling testify
16    that the heater was knocked over at least once.  And when it
17    was knocked over or tipped over, the automatic shutoff
18    worked.
19          You will also hear now that in the days before this
20    fire Mr. Shinedling was doing housekeeping, getting --
21    collecting to give away or to throw away lots and lots and
22    lots of clothes.  And if Mr. Shinedling testifies
23    consistently with his prior statements and testimony, he will
24    say that during this time and on the evening before the
25    accident, there were clothes piled around the room
```

everywhere.  They were piled individually or in piles of

clothes, in laundry baskets, boxes.  They were all over the

place.

On the night before the fire, the Shinedlings went

01:54PM   to sleep around 10:30 to 11:00 at night.  Ava Shinedling,

this little girl, was in bed between the Shinedlings.  There

were two heaters in the room, as plaintiffs' attorney

mentioned.  Both were operating.  Both were on high settings,

the highest settings.

01:54PM   The morning of January 5, 2011, the Shinedlings are

awakened to essentially the blare of a smoke alarm.  At first

Mr. Shinedling only saw smoke but didn't see a fire.  The

smoke was not enough to impair his ability to see or to

breathe.

01:55PM   Mr. Shinedling did grab Ava, got out of his side of

the bed -- and let me show you a drawing or a sketch.

For the record, Your Honor, this is Exhibit 329-1.

We will have better sketches and we will have

better graphics for you when we get all of the computers

01:56PM   fixed during the trial, but essentially this is a sketch of

the master bedroom.

Just to give you some sort of perspective here,

this right here is the master bedroom.  This right here is

the bed.  Mr. Shinedling slept on this side of the bed

01:56PM   (indicating).  Mrs. Shinedling slept on this side of the bed

1    (indicating).

2           There was a heater.  This is supposedly the Holmes

3    heater right here, and this is the General Electric heater

4    right here (indicating).

01:56PM  5           So what happened on the morning of the fire is that

6    Mr. Shinedling grabs Ava, gets out his side of the bed with

7    Ava, runs around to about here (indicating).  We expect the

8    evidence to show that at this point he sees a small fire.  We

9    expect the evidence to show the fire to be about two feet

01:57PM 10    wide and about three feet high.  Says -- small fire.

11           At the same time, he sees his wife.  Now, his wife,

12    as you heard in plaintiffs' opening, had arthritis and had

13    knee replacement and all that.  But in the weeks and the days

14    leading up to the accident, she had no problem walking and

01:57PM 15    little problem doing any of her chores.

16           Now, as Mr. Shinedling is right about here

17    (indicating), he looks and his wife is on the floor.  He

18    doesn't know -- he didn't see how she got on the floor, has

19    no idea.  On the floor.  He sees her essentially sitting on

01:58PM 20    her rear end, and she's moving back with her arms and hands.

21           There is no discussion at all as to whether she's

22    okay or whether she needs help.  We expect the testimony to

23    show that Mr. Shinedling had no understanding as to whether

24    his wife was capable of getting up from the floor.  And when

01:59PM 25    he saw her, he didn't know if his wife was hurt or not.

1          He also saw, depending on the version -- as you

2     will hear, there are several versions of this -- that either

3     the heater itself was on fire or a laundry basket which

4     somehow fell was on fire.

01:59PM   5          So Mr. Shinedling sees his wife in that position,

6     and he has two exits.  He has choices to make.  Number one,

7     these -- and although it's not marked, right about where my

8     point, the tip of my pen is, there are French doors there.

9     The French doors, if you just open those French doors, they

02:00PM  10     lead to the outside.  Okay.

11          Then the other way is through the hallway, through

12     a hall and then -- and this is the route that Mr. Shinedling

13     did take.  And that is out the hall, through the family room,

14     to bedroom number five where his two daughters were.  Then

02:00PM  15     from bedroom number five he went outside.  He took his three

16     daughters outside and to a -- this is not marked, but

17     essentially it's a toy hauler or a toy trailer.

18          Now, all of that took a matter of seconds.  Then

19     when they got to the toy hauler, instead of going back in to

02:01PM  20     get -- to see if his wife needed help, then he decides to

21     make a 911 call.  You will hear that 911 call in detail.

22          After the 911 call, he went to a neighbor and -- he

23     ran to the neighbor and then called 911 again.  So there are

24     two 911 calls.  When he first saw the fire, before getting

02:02PM  25     his daughters he saw this small fire right here, right about

1    here (indicating).  At that point in time there was no effort

2    to put out the fire.

3           Eventually at his neighbor's house with the girls,

4    he then heard sirens.  The first responders were coming to

02:02PM    5    help out.  Mr. Shinedling stayed in the home of his neighbor

6    for about an hour and didn't go out to tell the first

7    responders that his wife was still in the house.  As a matter

8    of fact, the first responders thought that there were

9    actually five people in the house.  So that's what we expect

02:03PM   10    the evidence to show about the fire.

11           Now I want to get to our themes and about the

12    subject space heater.  So theme number one is that the Holmes

13    Quartz heater was safe, well designed, and thoroughly tested

14    prior to sale.  Radiant Quartz heaters have literally been

02:03PM   15    sold for decades and decades and decades and decades, and

16    they have been under the jurisdiction of the Consumer Product

17    Safety Commission.  And never, not once has the Consumer

18    Product Safety Commission recalled a Quartz heater because it

19    was too hot.

02:04PM   20           The CPSC has the jurisdiction to recall a radiant

21    heater or all radiant heaters anytime it wants, just like the

22    National Highway Transportation Safety Administration, NHTSA,

23    has been doing with defective airbags and other things.  The

24    fact of the matter is that the CPSC does not believe through

02:04PM   25    its investigations that the radiant space heaters are too

```
 1    hot.  Nor does --
 2            MR. HOMAMPOUR:  Your Honor, objection.  That's
 3    improper argument.  It's outside the evidence.
 4            THE COURT:  Overruled.
 5            Again, ladies and gentlemen, opening statements is
 6    not evidence.  It's just to give you a sense of what the
 7    parties believe the evidence will be.
 8            MR. WOLENSKY:  Nor does the CPSC believe that a
 9    warning is required concerning sleeping with radiant heaters
10    operating.  They've never ever required that warning of
11    radiant heaters.
12            Now, as far as radiant heaters, just the model that
13    we are talking about, which is the HQH307, there were more
14    than ten million of these sold over the years.  We're going
15    to introduce a great deal of evidence through Mr. Prins who
16    I've introduced previously, as well as Mr. John Loud, who is
17    an expert of Sunbeam's.
18            Some of the benefits that you will hear about
19    include that radiant heaters emit heat, natural heat so that
20    it does feel like the sun.  It creates instantaneous heat.
21    It is also hypoallergenic.  It doesn't blow dust around, so
22    all that's being emitted is the heat itself and it doesn't
23    swirl up all the dust in a room.
24            It heats extremely well in large spaces, drafty
25    spaces, big rooms.  It heats the person or the object and not
```

02:04PM (line 5)
02:05PM (line 10)
02:05PM (line 15)
02:06PM (line 20)
02:06PM (line 25)

|  | |
|---|---|
| 1 | all the air that surrounds it.  It's portable, and obviously |
| 2 | being portable, it can be easily moved from room to room if |
| 3 | so desired.  Now, this unit has been extremely thoroughly |
| 4 | tested.  It's been tested through applicable industry |
| 02:07PM 5 | standards.  These are not minimum standards.  These are very |
| 6 | stringent industry standards, and they are developed through |
| 7 | a process that you will hear about that includes not only |
| 8 | manufacturers but consulting engineers.  The CPSC is |
| 9 | involved. |
| 02:07PM 10 | And the idea is to develop these standards that are |
| 11 | reliable and repeatable so that designers and developers of |
| 12 | space heaters can do these tests over and over and over again |
| 13 | in order to minimize the risks to the consumer.  In addition, |
| 14 | it allows the engineers who are developing products to |
| 02:08PM 15 | develop safer products. |
| 16 | Now, you're going to hear a lot about Underwriters |
| 17 | Laboratories testing.  You're going to hear again how it was |
| 18 | all -- how these standards were developed, and specifically |
| 19 | you're going hear not only about the normal tests that UL |
| 02:08PM 20 | does but also abnormal tests.  And what you're going to be |
| 21 | able to do is to see how these tests are used in developing |
| 22 | the product and why these tests help the designers to in fact |
| 23 | develop a safe product for its intended use. |
| 24 | The HQH307 met and exceeded all of these standards. |
| 02:09PM 25 | It complied with all warnings that were required to be placed |

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | on the heater and on the power cord and in the instruction |
| 2 | manual. |
| 3 | Now, as a result of this fire, the CPSC started |
| 4 | what's called a 15(b) investigation -- as a result of this |
| 02:09PM 5 | fire.  And the CPSC -- |
| 6 | MR. HOMAMPOUR:  Your Honor, I'm sorry.  That's |
| 7 | outside the evidence I'm aware of. |
| 8 | THE COURT:  Overruled. |
| 9 | MR. WOLENSKY:  Thank you, Your Honor. |
| 02:09PM 10 | THE COURT:  Again, this is what the parties believe |
| 11 | the evidence will be, ladies and gentlemen.  It will be up to |
| 12 | you to determine whether that was the evidence that was |
| 13 | presented. |
| 14 | MR. WOLENSKY:  And the Consumer Product Safety |
| 02:09PM 15 | Commission, what they did is they asked.  And when they ask, |
| 16 | they demand.  They demand evidence from us, from Sunbeam. |
| 17 | They demand exemplar heaters.  They demand design documents. |
| 18 | They demand tests, all of the tests that we do.  They demand |
| 19 | the incident history. |
| 02:10PM 20 | They also had investigation that was already done |
| 21 | not by Sunbeam but by the authorities on this accident. |
| 22 | We're also obviously required to provide manuals and anything |
| 23 | else that the Consumer Product Safety Commission wanted to |
| 24 | evaluate. |
| 02:10PM 25 | Well, what the Consumer Product Safety Commission |

1    found is this:  that the commission did not ask or require

2    that the subject model heater not be sold.  They did not ask

3    Sunbeam to make any changes to the design of the heater, and

4    it did not ask that any warnings be added to the manual or on

02:11PM   5    the heater itself.

6            Finally, which is well within the purview of the

7    Consumer Product Safety Commission especially in connection

8    with this period of hyper regulation in the last seven or

9    eight years, the CPSC did not ask for the product to be

02:11PM   10   recalled because it was too hot, as the plaintiffs claim.

11           One thing plaintiffs' counsel mentioned is his

12   expert, which you're going to hear from him shortly.  The one

13   thing that you will hear is that Mr. Palmer did testing.  He

14   did extensive testing.  He did 50 or 60 hours' worth of

02:12PM   15   testing, and he tested with all sorts of items to try to get

16   them to catch fire -- different distances, different

17   conditions.  He didn't get one.  He didn't get one

18   combustible to catch fire spontaneously.

19           He did get one to catch kind of after certain

02:12PM   20   things that he did, but you'll hear about that shortly.

21           So in addition, you'll hear about field data.  I'm

22   going talk about that in a minute, but the field data also

23   demonstrates the safe design of this unit when used as

24   intended.

02:12PM   25           Now, the second theme that I want to talk about

1    briefly are that the warnings and instructions for the Holmes

2    Quartz heater are complete, clear, and easy to understand.

3    It's important to understand that all heaters have a risk of

4    fire.  For instance, an open-flame heater can ignite a

02:13PM    5    combustible on contact immediately.  However, if our good

6    warnings are heeded and used, it is virtually impossible to

7    have a fire start by using this radiant heater short of some

8    malfunction or manufacturing defect that does not exist, does

9    not exist in this particular lawsuit.

02:14PM    10    Real-world data is going to show that there were

11    millions of these radiant heaters, the HQH307, sold; that

12    they were used for hundreds of millions of hours.  And yet

13    there is -- you will hear that there is about a handful, if

14    not less, of incidents of fires that have started because

02:14PM    15    clothes were too close or combustibles were too close to the

16    heater.

17    Now, you're going to hear -- I would expect, you're

18    going to hear various evidence put in by the plaintiffs that

19    has to do with other claims, other incidents, statistics, and

02:15PM    20    things like that of portable heaters that start fires.  I

21    would ask you very respectfully that when you hear this

22    evidence, you would ask yourself:  Is the plaintiff just

23    talking about radiant space heaters as opposed to all others?

24    That is the way I would ask you to evaluate any evidence

02:15PM    25    regarding other incidents and statistics.

1          Now, let's get to the instructions.  So this is a

2     model of the radiant heater.  I just want to point out the

3     instructions and warnings that are here.  The first warning

4     here is that there is a risk of fire.  Keep combustible

02:16PM   5     material such as furniture, papers, clothes, and curtains at

6     least three feet, parens, 0.9 meters, end parens, from the

7     front of the heater and away from the sides and the rear.  So

8     this is an on-product warning.

9          Now, in addition, this is something that doesn't

02:16PM   10    come off, is the label on the plug, on the cord.  So every

11    time you plug it in and unplug it, it's right here.  Again it

12    says:  Do not place any objects such as furniture, papers,

13    clothes, and curtains closer than three feet to the front of

14    the heater and keep them away from the sides and rear

02:17PM   15    wherever it is plugged in.  And it says, it's headed, it

16    says:  Warning, to reduce risk of fire.

17         In addition, these are all warnings that you will

18    hear that Mr. Shinedling said he read and he understood.  And

19    then -- and this is the part of the Holmes owner's guide for

02:17PM   20    Tower Quartz heaters.  Let me zoom in on this.  Here it is.

21    It says:  Please read and save these important safety

22    instructions.  When using electrical appliances, basic safety

23    precaution should always be followed to reduce the risk of

24    fire, electric shock, and injury to persons, including the

02:18PM   25    following.  One, read all instructions before using the

1    appliance.

2          I'll skip down to three:  The heater is hot when in

3    use.  To avoid burns, do not let bare skin touch hot

4    surfaces.  If provided, use handles when moving the heater.

02:18PM  5    Keep combustible materials such as furniture, pillows,

6    bedding, papers, clothes, and curtains at least three feet,

7    parens, 0.9 meters, end of parens, from the front of the

8    heater and keep them away from the sides and the rear.

9          If we can go down to number six:  Extreme caution

02:19PM  10   is necessary when any heater is used by or near children or

11   invalids and whenever the heater is left operating and

12   unattended.  These are pretty clear, conspicuous, and

13   easy-to-understand warnings.

14         Now, there was a lot of talk about an automatic

02:19PM  15   shutoff and how it didn't work and all that business, but I

16   will tell you first of all the automatic shutoff did work

17   when the unit was tipped over.  That's why it is called

18   tip-off, tip-over automatic shutoff.

19         Secondly, you will hear in great detail from

02:20PM  20   Mr. Prins probably Thursday.  You will hear in great detail

21   from Mr. Prins about how the unit performs, how it is

22   designed, and what the automatic shutoff does and does not

23   do.

24         If a user complies with warnings and instructions,

02:20PM  25   it is -- it makes it virtually impossible for a fire to

```
 1   start.  Mr. Shinedling was aware of these warnings, and he

 2   knew how the risks increased if the warnings were not

 3   followed.  He was aware of all appropriate actions to take to

 4   avoid these risks, and he also knew that the heater gets very

 5   hot.

 6            Finally, very briefly, the last theme.  The fire

 7   started because combustibles were placed too close to the

 8   heater.  Well, this risk is remote.  It can still occur if

 9   the user fails to follow instructions.  Consumers readily

10   understand this risk and expect that it could occur if they

11   fail to follow the warnings and instructions.

12            Everyone agrees that the fire started because

13   combustibles were placed too close to the heater.

14   Plaintiffs' counsel said Mr. Shinedling complied with the

15   instructions.

16            Well, if it's -- I think it's foreseeable that

17   sometimes you stack something up and it's going to fall,

18   whichever direction.  The fact of the matter is that there

19   were clothes everywhere in the room.  Try as you might, there

20   was a pile someplace somewhere that when it got tipped over,

21   it just got tipped over and too close to the radiant heater.

22            I told you that this was going to be a very simple

23   case.  This is the type of case, ladies and gentlemen, that

24   really is tailor-made for your common sense.  You will listen

25   to the facts.  You will follow the law, but you will be able
```

1    to use your common sense.  And I urge you to do that.  I also

2    urge you to judge the credibility of all of the witnesses and

3    evidence that is presented by both sides.

4         So now you have our side of the case, Sunbeam's

02:23PM  5    road map for the case.  The plaintiff gets to go first, gets

6    to put on all of the evidence that is allowed by the judge.

7    And we don't go until later.  We're second, which might not

8    be until next week.

9         So I would hope and respectfully request that you

02:23PM  10   would keep an open mind until you have had a chance to listen

11   to our case also.  I want to thank you for your rapt

12   attention on behalf of Sunbeam.

13        THE COURT:  Ladies and gentlemen, why don't we take

14   about a 15-minute break, give the court reporter a chance to

02:23PM  15   rest as well as yourselves, and we'll pick back up.  Please

16   don't talk about the case to each other or to anybody.  Don't

17   do any kind of research or investigation.  And please keep an

18   open mind until you have heard all of the evidence and it's

19   time to deliberate.

02:24PM  20        THE CLERK:  All rise.

21        (Open court - jury not present)

22        THE COURT:  Please be seated.  Is there anything we

23   need to discuss?

24        MR. O'CONNELL:  Your Honor, if I could make one

02:24PM  25   comment.  It was, you know, how we were talking about the

1    witnesses and how you wanted only witnesses to be called one

2    time in each case, yet we are telling -- I mean, it's just

3    telling the jury that this is all of plaintiffs' case, but

4    we're going to have witnesses who are testifying on behalf of

02:25PM   5    the defense in the middle of plaintiffs' case.

6        I just -- I don't know if it can be addressed, but

7    it might sound confusing.

8        THE COURT:  Well, we'll see how it plays out.  It's

9    just opening statements.  We'll see how the evidence comes

02:25PM   10   in.

11       MR. O'CONNELL:  Well, I mean, we know what's going

12   to happen with Mr. Prins, and we know what's going to happen

13   just with Mr. Vernaglia and Mr. Prins.

14       THE COURT:  If you both would like me to, I can

02:25PM   15   tell the jury that I've instructed the parties that we only

16   want to hear from a witness once.  It's more efficient, and I

17   think it's more respectful of the jury's time.

18       MR. O'CONNELL:  That's --

19       MR. HOMAMPOUR:  I have one issue.

02:25PM   20   THE COURT:  You want me to give that instruction?

21       MR. HOMAMPOUR:  That's fine.

22       THE COURT:  Okay.

23       MR. O'CONNELL:  Thank you.

24       MR. HOMAMPOUR:  So in his opening he said, implying

02:25PM   25   and for no relevant reason that he stayed in the home of the

UNITED STATES DISTRICT COURT

1    neighbor and didn't go outside and didn't tell the first

2    responders his wife was in the house.  So that's not relevant

3    in any way to their defense.  That is an implication that he

4    started the fire and wanted his wife to die.

02:26PM    5        THE COURT:  Well, you want a mistrial?

6        MR. HOMAMPOUR:  I'm not asking for a mistrial, but

7    I would ask that the defense attorney be admonished not to

8    repeat that, not to ask Mr. Shinedling that, not to explore

9    it.  It has nothing to do with his ability to go back into

02:26PM   10    the house and save her or not, whether he waited too long

11    according to his characterization of the evidence.

12        THE COURT:  Well, I don't want to speak for the

13    defense.

14        What's the response?

02:26PM   15        MR. WOLENSKY:  It goes directly to causation.  He

16    does everything except go back into the house.

17        THE COURT:  That's how I understood it.  So whether

18    that's true or not and whether that's accurate or not, that

19    is going to be up for the jury to decide.

02:26PM   20        Okay.  I'll give an instruction.  Mr. Homampour, do

21    you want me to have our very capable IT person to come up to

22    see if he can fix that?

23        MR. HOMAMPOUR:  If you could.  Let me switch over

24    to ours first and see if it's working.

02:27PM   25        MR. WOLENSKY:  Do you want to use our computer?

```
         1              MR. HOMAMPOUR:  No.  It's on mine.

         2                   (Off-the-record discussion)

         3                   (Recess taken at 2:35 p.m.;

         4              proceeding resumed at 3:00 p.m.)

02:58PM  5         (Open court - jury present)

         6              THE COURT:  Please be seated, ladies and gentlemen.

         7    Sorry for the delay.  We were trying to get the equipment at

         8    least functional for this afternoon.

         9              Mr. Homampour, are you ready to call the first

02:58PM  10   witness, sir?

         11             MR. HOMAMPOUR:  I am.  Thank you.

         12             Plaintiffs call Dr. John Palmer.

         13             THE COURT:  Mr. Palmer, if you can please come

         14   forward, sir, and stand by the court reporter.  We'll

02:59PM  15   administer an oath and have you take the witness stand, sir.

         16        John Arthur Palmer, Plaintiffs' Witness, Sworn

         17             THE CLERK:  Please state your full name for the

         18   record and spell your last name.

         19             THE WITNESS:  John Arthur Palmer, P-a-l-m-e-r.

03:00PM  20             THE COURT:  Please proceed.

         21             MR. HOMAMPOUR:  Thank you.

         22                      DIRECT EXAMINATION

         23   BY MR. HOMAMPOUR:

         24   Q.  You can put that down and take it up when you're ready.

03:00PM  25   Dr. Palmer, can you let the jury know:  What type of expert
```

1    are you?

2    A.    Good afternoon, ladies and gentlemen.   I am an expert in

3    electrical engineering.

4    Q.    And can you go over your relevant educational

03:00PM    5    background, please.

6    A.    I have a bachelor's degree in electrical engineering

7    from Brigham Young University, and I have a master's of

8    engineering and a Ph.D. in electric power engineering from

9    Rensselaer, R-e-n-s-s-e-l-a-e-r, Polytechnic Institute.

03:00PM   10    Q.    Can you go over your relevant work experience, please.

11    A.    Upon completing my Ph.D., I taught at the Colorado

12    School of Mines for four and a half years.   Also while I was

13    there, I did some consulting on the side for NEI Electric

14    Power Engineering.   I also started working for a company

03:01PM   15    called Knott Laboratory, which is a forensic engineering

16    firm, and continued with them after I left the Colorado

17    School of Mines until 2009.

18         In 2009 I left Colorado and moved to my current

19    home in Utah and started my own business, Palmer Engineering

03:01PM   20    and Forensics.   I've been the president of Palmer Engineering

21    and Forensics since May of 2009.

22    Q.    What do you do at your firm?

23    A.    We do engineering consulting both in the design world as

24    well as in what we call the forensic world or basically

03:02PM   25    failure analysis and expert witness efforts, such as my

1    investigation associated with this case.

2    Q.    What type of products have you investigated other than

3    space heaters involved in this case?

4    A.    I've looked at a wide range of products ranging from

03:02PM  5    washing machines and dryers to refrigerators to heating

6    systems, built-in heating systems as well as larger products,

7    industrial-level circuit breakers, transformers, and utility

8    equipment.

9    Q.    When you look at these products, what are you

03:02PM  10   essentially looking for or looking at?

11   A.    When I evaluate products, I look for a number of

12   different things.  First I look at the actual product that

13   was involved in the incident or the circumstances that

14   trigger the investigation, and I look for particular

03:03PM  15   anomalies -- markings or damage that may be indicative of

16   what happened.

17        I also evaluate the product in itself, in its own

18   right.  That is, I look at the product design.  I evaluate it

19   in context of standards in the industry that it is associated

03:03PM  20   with.  And most importantly I evaluate it in the context of

21   the engineering design process that is fundamental to the

22   engineering process.

23   Q.    Have you done that work in this case?

24   A.    I have.

03:03PM  25   Q.    Let's back up a little bit more.  Are you licensed in

1    any states?

2    A.    I am a licensed professional engineer in six states.

3    Q.    What are those states?

4    A.    Utah, Arizona, Colorado, Wyoming, Alabama, and Florida.

03:03PM  5    Q.    What does it mean to be a licensed professional

6    engineer?

7    A.    In order to become a licensed professional engineer, you

8    have to meet a certain experience requirement -- well, first,

9    a certain education requirement.  Generally most states

03:04PM  10   require that you have a bachelor's degree in engineering from

11   an accredited institution.

12          And then subsequent to achieving that bachelor's

13   degree, you also need to have some work experience

14   associating with other professional engineers making sure

03:04PM  15   that your experience and your education are sufficient to

16   meet a certain threshold.  Then there's a fairly in-depth

17   exam that is required as a prerequisite to being a registered

18   professional engineer.

19   Q.    Are there individuals that call themselves, quote,

03:04PM  20   unquote, engineers that aren't really licensed engineers?

21   A.    There are individuals who assert themselves as engineers

22   who are not licensed.  There are some who assert themselves

23   as engineers who are not engineers, that don't have the

24   engineering background.

03:05PM  25   Q.    Relevant to your work in this case, what is it that

|  | |
|---|---|
| 1 | someone with a license as an engineer who has their relevant |
| 2 | education, background, and training, what do you know as |
| 3 | distinct from someone who just calls themselves an engineer |
| 4 | but doesn't have that background? |
| 03:05PM   5 | A.   In the context of this case, it was my understanding of |
| 6 | fundamental principles of electrical engineering, heat |
| 7 | transfer, thermodynamics, as well as the principles of hazard |
| 8 | analysis and safety engineering that are all tied together |
| 9 | that I applied in the context of this case to evaluate this |
| 03:05PM  10 | particular product. |
| 11 | Q.   Is the analysis in this case rocket science, or is it |
| 12 | basic, or how would you characterize it? |
| 13 | A.   I would characterize it as fundamental engineering |
| 14 | analysis.  It's not anything that is beyond the abilities of |
| 03:06PM  15 | most engineers, but it is pretty fundamental to the |
| 16 | engineering process. |
| 17 | Q.   And if you could just provide an outline of what you did |
| 18 | to arrive at your opinions in this case, please. |
| 19 | A.   To arrive at my opinions, first I looked at the physical |
| 03:06PM  20 | evidence that was provided, basically the remains of the |
| 21 | heater as they were extracted from the debris of the fire. |
| 22 | Also I looked at examples of the heater that were not burned |
| 23 | which we call exemplars, and evaluated those exemplars and |
| 24 | looked at them both in the context of their individual item |
| 03:07PM  25 | but also as the design that was reflected in that product. |

|    |    |
|----|----|
| 1  | Then I also reviewed a large body of material |
| 2  | including design documentation from Sunbeam as well as the |
| 3  | reports and testimony of the other experts and witnesses in |
| 4  | the case. |
| 5  | Q.  And did you do your own analysis of exemplar heaters? |
| 6  | Could you describe what you did. |
| 7  | A.  In the process of evaluating the heaters, we did a |
| 8  | series of tests, some that were consistent with the UL |
| 9  | testing, some of them that were alternatives to elaborate or |
| 10 | to explore various possibilities that might reasonably be |
| 11 | expected to be seen in the context of a residential |
| 12 | application of a heater like this. |
| 13 | Q.  Did you create a PowerPoint that illustrates your |
| 14 | opinions and the basis for your opinions? |
| 15 | A.  Yes.  I was involved in creating a PowerPoint that |
| 16 | illustrated my opinions. |
| 17 | MR. HOMAMPOUR:  Your Honor, I'd like to show |
| 18 | Exhibit 249. |
| 19 | THE COURT:  You may. |
| 20 | BY MR. HOMAMPOUR: |
| 21 | Q.  So we're on Exhibit 249.2, and could you please just |
| 22 | explain what does this mean to the jury. |
| 23 | A.  Well, ultimately there is a process of evaluation of |
| 24 | products.  In the evaluation of that product, if you |
| 25 | ultimately come to the conclusion that it is an unreasonably |

03:07PM — line 5
03:08PM — line 10
03:08PM — line 15
03:08PM — line 20
03:08PM — line 25

 1    dangerous product, it really shouldn't be on the market.  The

 2    public should not be exposed to products that are just

 3    unreasonably dangerous.

 4    Q.    And have you done that safety hierarchy analysis for

03:09PM   5    this case?

 6    A.    I have.

 7    Q.    Let's go to the second slide, and go ahead.  Describe

 8    first what is the safety hierarchy, and we'll go through it

 9    for this matter.

03:09PM  10    A.    In a nutshell, and this applies generally but this

11    particular slide highlights it in the context of Sunbeam.

12    But when an engineer is looking at a product, the first step

13    in this hierarchy is to evaluate the product and identify

14    whatever hazards might be associated with that product.

03:09PM  15            Then upon identifying the hazards, then ideally

16    they'll design those hazards out.  They'll modify the design

17    such that the hazards are no longer present or they're

18    limited in some way.  If you cannot design out the hazard,

19    then the next tier of the hierarchy dictates that you should

03:10PM  20    guard against the hazard.

21            So once you have evaluated and if you have

22    determined that you can guard against it, obviously that

23    would be incorporated into the design.  If you can't guard

24    against it, then the next tier of the hierarchy is to warn

03:10PM  25    the user that there are hazards, that they should be -- that

1    they should take certain actions to avoid hazards.

2            Now, just to put that in context, identifying the

3    hazards in this case, any kind of heating appliance,

4    because by its very nature it's generating heat.  That is

03:10PM  5    going to pose a hazard of fire.  If it's electrical, there's

6    also a hazard of shock.  If it's hot, there's a hazard of

7    burns.

8            There's a number of different hazards that you

9    would identify, and then each of those hazards you would go

03:11PM  10   through as an engineer and evaluate how can I limit those

11   hazards.  In the case of most heaters, including these two

12   that are here, the hazard of somebody touching the hot

13   element is prevented or guarded against by enclosing that,

14   you know, behind a grill.  So that's a means of guarding.

03:11PM  15          So eliminating the hazard would be to contain

16   the -- to keep the temperature lower.  Or, excuse me,

17   designing out the hazard would be to keep the temperature

18   lower.  Guarding against the hazard would be to prevent that

19   excessive temperature from being in a place that would be

03:11PM  20   dangerous.

21          Then warning would be -- it can be anything from a

22   label to an alarm to specialized training, whatever it takes

23   to communicate effectively to the user what that hazard is.

24   Q.   Now, is this safety analysis something that you believe

03:12PM  25   every company would do with any consumer product?

1    A.    It is fundamental to the process of engineering.

2    Anybody who is developing products should have engineering

3    evaluation of that product in this context.  So whatever the

4    product may be, ranging from washing machines to space

03:12PM   5    heaters to circuit breakers, the conditions associated with

6    that product need to be evaluated in this context.

7    Q.    And why?  What's the ultimate goal or point?

8    A.    The ultimate goal is to ensure the public safety, to

9    make sure that people are safe when they use these products.

03:13PM   10    Q.    You've reviewed materials produced by the defendant in

11    this case?

12    A.    I have.

13    Q.    And you have reviewed deposition testimony from

14    Mr. Prins and Mr. Vernaglia and Mr. Best and other employees

03:13PM   15    and, quote, unquote, engineers at Sunbeam?

16    A.    I have.

17    Q.    And you reviewed their expert's testimony?  They have a

18    counterpart to you?

19    A.    Yes.

03:13PM   20    Q.    And is it fair to say you were produced over 10,000

21    pages of materials, well over?

22    A.    I'd say that's probably a fair guess.

23    Q.    And in any of the materials, did the defendant produce

24    or identify any hazard analysis safety hierarchy or

03:13PM   25    otherwise?

A.   Associated with the HQH307 there was no documentation

provided to indicate that they had done any kind of

engineering or hazard analysis for this product.  Now, we did

find there was another product that they did a sort of hazard

03:14PM   analysis on but not the HQH307.

Q.   Is that important to your opinions?

A.   It is.

Q.   How so?

A.   Well, if you're going to go through the process of a

03:14PM   true engineering analysis and hazard analysis for a product,

especially one that has the potential to cause a fire, then I

would assume you would keep such documentation.  The fact

that they did not keep any documentation of a hazard analysis

and, in fact, the project manager over the development of the

03:14PM   HQH307 said that he didn't even know what a hazard analysis

was, all of that was indicative of inadequate engineering

design.

Q.   Had Sunbeam done the hazard analysis you have done, what

conclusions do you believe they should have reached?

03:15PM   A.   I believe they should have reached the conclusion that

this product was not safe.

Q.   And particularly is it not safe when used in certain

instances?

A.   Yes.  It's not safe in the context of a residential

03:15PM   environment, particularly where it might be used in a

```
 1   sleeping quarters and not have somebody tending to it

 2   continuously.

 3   Q.   And is your opinion related strictly to radiant heaters?

 4   A.   Yes.  I've got a different opinion on other kinds of

 5   heaters.

 6   Q.   So let's go ahead and walk through your PowerPoint.  If

 7   you want to illustrate with the two heaters that are there

 8   with you, you can do so.

 9   A.   Okay.

10   Q.   Now, you have -- the smaller heater is what type of a

11   heater?

12   A.   This is a convection heater or a forced fan heater.

13   Basically -- it's a little hard for you to see from where you

14   are, I'm afraid, but there's wires inside that electricity

15   flows through, generates heat.  Then there's a fan on there

16   that blows air over that coil of wire.  So that's a

17   forced-air heater or fan heater or convection heater.

18   Q.   So let's break it up.  For purposes of our discussion

19   today, can we talk about radiant heaters versus non-radiant

20   heaters?  Is that okay?

21   A.   That would be absolutely fine.

22   Q.   And the small heater falls into the --

23   A.   The non-radiant heater.

24   Q.   Are there other examples of non-radiant home space

25   heaters that jury members may be using or have been
```

03:15PM  5
03:15PM  10
03:16PM  15
03:16PM  20
03:16PM  25

1    acquainted with before?

2    A.   Sure.  There's a wide variety of different non-radiant

3    heaters.  Most of them are of a style that blow air over

4    either a coil, a wire, or they may blow air over a ceramic

03:17PM    5    heating element.  So it would be a ceramic heater, is what

6    I'll call that.  But it's essentially the same thing.

7    There's a heating element in there that is embedded within a

8    ceramic material, and then that air blows over that to carry

9    the heat out into the room.

03:17PM   10    Q.   And what is the maximum temperature generally generated

11    by non-radiant heaters like that small heater that you have

12    in front of you?

13    A.   This particular one I tested, and it put out an air

14    temperature of about 124 degrees Fahrenheit.  That was what I

03:17PM   15    had measured on the air coming out.

16    Q.   And --

17    A.   Others may be a little bit higher or lower than that,

18    but generally for forced-air heaters or non-radiant heaters,

19    the temperatures will generally be well under 200 degrees

03:17PM   20    Fahrenheit.

21    Q.   Why is that important?

22    A.   Well, it's important because the ignition temperature or

23    what we call the auto ignition temperature, the temperature

24    at which things will catch fire for typical combustible

03:18PM   25    materials that you would see in a household, is about

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | 450 degrees Fahrenheit.  So keeping that temperature well |
| 2 | below that threshold is an important element to avoid the |
| 3 | hazard of fire from an engineering perspective. |
| 4 | Q.   Do you have a towel over there, I think?  There's -- |
| 03:18PM 5 | MR. HOMAMPOUR:  May I approach, Your Honor? |
| 6 | THE COURT:  You may. |
| 7 | BY MR. HOMAMPOUR: |
| 8 | Q.   Using the towel, if you could show the jury, if someone |
| 9 | gets a towel in front of a non-radiant heater, as a general |
| 03:18PM 10 | rule would it start a fire? |
| 11 | A.   No.  Just -- and I did an experiment to demonstrate |
| 12 | this.  But essentially if you hop out of the shower or |
| 13 | whatever and you drop the towel on the floor in front of this |
| 14 | heater, what it will do is it will slow the amount of air |
| 03:19PM 15 | going through it, which allows it to heat up.  But then at |
| 16 | temperatures well below any kind of ignition temperature, it |
| 17 | will shut the heater off. |
| 18 | And so we measured temperature.  I think it was |
| 19 | about 160.  I think it will show up in the PowerPoint here in |
| 03:19PM 20 | a few minutes.  If on the other hand -- well -- |
| 21 | Q.   Let's stay there.  So as a general rule does any |
| 22 | consumer non-radiant home portable space heater in and of |
| 23 | itself generate heat at a level of 450 or higher to start a |
| 24 | fire? |
| 03:19PM 25 | A.   Not to my knowledge. |



1   Q.   And is that a design?  In other words, if the

2   manufacturer says I want to design a heater so it doesn't get

3   to 450 degrees or higher because I don't want to start a fire

4   if material gets too close to it, can they set the

03:20PM   5   temperature setting so it's well below 450 degrees?

6   A.   Sure, and you do that -- you can actually have the same

7   amount of heat coming out of this device or the other device

8   at dramatically different temperatures because you're moving

9   the air over it instead of the air just being stagnant around

03:20PM   10   it.

11   Q.   Now let's show the other item, which is a radiant

12   heater.  Is that a similar one to the subject heater?

13   A.   Yes.  This is a radiant heater that is similar to the

14   subject heater.  It's a model HQH307.

03:20PM   15   Q.   Now, let me ask you this:  They look different.  How can

16   you say they are the same or even compare them?

17   A.   Well, if you look at the actual nameplate on it, there's

18   a label on here that says 1500 watts.  Now, that from an

19   electrical engineering standpoint, that tells me it's amount

03:21PM   20   of energy delivered per second.  So the amount of energy that

21   this pushes out in terms of heated air is 1500 watts.  The

22   amount of energy that comes out of this in terms of the

23   radiant heat effect is 1500 watts.

24        In terms of changing the temperature of a room,

03:21PM   25   they will do exactly the same thing.  In terms of introducing

1   a total amount of energy, thermal energy into the room, it

2   will be the same amount of energy at the same rate for both

3   of these different devices.

4   Q.   Can I use a horrible analogy and maybe I'm right?  Is it

03:21PM  5   like speakers?  You know, sometimes you see a smaller speaker

6   that has a watt rating that's equivalent of a bigger speaker

7   and they produce the same volume?

8   A.   That is probably a reasonable analogy.  The amount of

9   sound can be the same coming out of a small speaker or a big

03:21PM 10   speaker in terms of the intensity of the volume.  But in

11   terms of changing the temperature, the average temperature of

12   the room, in this case both of these devices would have the

13   same impact.

14   Q.   Now, is there a fundamental difference in terms of risk

03:22PM 15   of fire with the radiant heater and the non-radiant heater to

16   your right?

17   A.   There is a fundamental difference between them.

18   Q.   And what is that difference?

19   A.   The radiant heater, if you can see it from where you're

03:22PM 20   sitting, there's actually two tubes that go down on either

21   side of this heater.  When it's plugged in, those tubes will

22   glow and the energy, the thermal energy, comes out in the

23   form of what we call infrared radiation, which is basically

24   like heat in a light form.

03:22PM 25          In other words, even when it's a cold winter day

UNITED STATES DISTRICT COURT

1      outside and you go stand in the sun, you can feel the heat

2      from the sun.  That's because of the infrared radiation from

3      the sun.  This heater does essentially the same thing,

4      emitting infrared radiation as light waves so that it doesn't

03:23PM   5   necessarily heat up the air.  It just emits these light waves

6      and you can feel it from some distance back.

7             Now, the difference is that in order for that to

8      happen, you have to have a very, very high temperature -- in

9      this case 1200 degrees Fahrenheit or more -- in order to have

03:23PM   10   a glowing red to generate enough heat to where it can

11     actually emit, is the term we use, or have the heat waves

12     come off of it in that way.

13            As opposed to this one which blows warm air out at

14     124 degrees, this is generating infrared radiation at

03:23PM   15   1200 degrees.  So it's a significantly higher temperature.

16     Q.   What else is the difference in terms of the -- strike

17     that.

18            So can the non-radiant heater, we said, can it

19     start a fire with combustible clothing or cloth within three

03:24PM   20   feet?

21     A.   If it's operating normally, it will not generate

22     temperatures that are high enough to ignite combustible

23     materials.

24     Q.   What about a radiant heater?

03:24PM   25   A.   A radiant heater, because of the very high intensity of

the heating element, if somebody drops the towel in front of

this thing, then it very well could ignite because the

temperatures that are being generated within it are being

emitted and can be absorbed on the surface of materials.

03:24PM  That will raise the temperature of those materials and can be

in excess of the ignition temperature of common combustibles.

Q.   Did you duplicate that in testing?

A.   I did.

Q.   What did your testing show?

03:24PM  A.   I was able to demonstrate that just putting the towel up

against the front of the heater actually did cause it to go

into smoldering combustion.  When I started to move the

towel, it actually ignited into full flames.

Q.   And let's just cut to the chase in terms of one issue.

03:25PM  If you take this event involving Mr. Shinedling and his

family and you swap out that radiant heater and put in the

non-radiant heater, would there have been a fire?

A.   If he had been using this forced fan heater as opposed

to this radiant heater, the fire would never have started.

03:25PM  Q.   In terms of the non-radiant heater, there's an automatic

shut off on that device?

A.   The non-radiant heater has an automatic shutoff, what

was call a high-limit switch, which senses when the

temperature inside the heater is too high, and it will shut

03:26PM  off the heater.

Q.   What is that temperature set at?

A.   That temperature is set at, I think it's, 180 degrees Fahrenheit.

Q.   Less than half of the necessary temperature to start a towel on fire, or clothing?

A.   It's, yes, significantly below the temperature, auto ignition temperature of a towel or other combustible material.

Q.   Does the radiant heater also have an auto shutoff sensor in it?

A.   It does.  It has in it a special temperature sensor that is what we call a high-limit switch that is supposed to protect against the possibility of an overheat condition as they say.

Q.   Does that work in the radiant heater?

A.   Well, sometimes, but it doesn't work reliably.

Q.   Did it work in this instance?

A.   In the instance of the fire that is the subject of this case, obviously it ignited the materials without the high limit having prevented that.

Q.   Is that an event that any reasonable engineer could predict well before the radiant heater was ever put on the market and sold for use by consumers in their home unattended while sleeping?

A.   I would say it's definitely a very reasonably

1    foreseeable event.

2    Q.    Why is that?

3    A.    Because in a residential application in a home, people

4    have -- they buy space heaters specifically for use in their

03:27PM    5    bedroom or in their living room or places where people are

6    living.

7         People are not necessarily tidy.  They don't

8    necessarily keep their laundry hamper empty, or they'll have

9    some clothing in their laundry hamper or even -- if you've

03:27PM   10    ever seen my kids' room, even on the floor.  So it's just an

11    untidy environment that is not tightly controlled.

12         Even if you try to keep that space directly in

13    front of the heater clear of combustibles, it's entirely

14    possible that children or pets or people that are up in the

03:28PM   15    middle of the night may accidentally knock combustible

16    materials into that space in front of the heater and expose

17    it to that extreme temperature that can cause a fire.

18    Q.    Now, with non-radiant space heaters, if your room is

19    untidy and you've got your -- you're doing spring cleaning

03:28PM   20    early in January and you're going through clothes and you're

21    deciding what you're going to give away and what you're going

22    to throw away and you've got them piled up all over your room

23    and they accidentally get kicked within three feet of that

24    non-radiant heater, no matter how untidy your room is, is a

03:29PM   25    fire going to start?

UNITED STATES DISTRICT COURT

```
 1              MR. O'CONNELL:  Objection to form.

 2              THE WITNESS:  As long as --

 3              MR. HOMAMPOUR:  Hold on.

 4              MR. O'CONNELL:  Objection to form.

 5              THE COURT:  Overruled.  If you understand the

 6     question, sir, please answer it.

 7              THE WITNESS:  As long as the heater is operating

 8     normally, it will not generate temperatures high enough to

 9     ignite materials in that way.

10     BY MR. HOMAMPOUR:

11     Q.   What about the radiant heater?

12     A.   The radiant heater, even though it may be operating

13     normally, operating as designed, if the clothing gets in

14     close proximity in front of the heater, it can ignite.

15     Q.   So in that instance, the auto safety shutoff will not

16     work?

17     A.   Particularly when the items are down low, it doesn't

18     work very effectively.

19     Q.   Okay.  Let's go back to your slides and we'll get back

20     to illustrating your last point through some graphics.  Okay?

21     A.   Okay.

22     Q.   So the first slide, they must design products to prevent

23     hazards.  If you could just explain that without restating

24     your opinions you've already told the jury.

25     A.   Right.  In essence, when you have something that has
```

03:29PM (line 5)
03:29PM (line 10)
03:29PM (line 15)
03:29PM (line 20)
03:30PM (line 25)

UNITED STATES DISTRICT COURT

|  |  |
|---|---|
|  | 1 |

hazards and you identify those hazards, you should design

them out insofar as practicable.

Q.   Now, if Sunbeam wanted to sell to consumers a home

heater that is used while you're sleeping, unattended in a

03:30PM   room, could they have designed a product to fit that need

that would have been safe and not have started this fire?

A.   They have.  It's -- this product will work just fine for

that purpose.

Q.   The non-radiant heater?

03:30PM   A.   The non-radiant heater.

Q.   So if Sunbeam wanted to design a product to be used in

the home environment when people are sleeping, they had an

alternative design.  Is that fair to say?

A.   Absolutely.

03:30PM   Q.   An alternative to the radiant heater was the non-radiant

heater?

A.   Correct.

Q.   The next part of the hierarchy, if you could explain

that in a way that you're not repeating yourself.

03:31PM   A.   Again, when you have identified the hazard and to the

extent you can't design those hazards out, then you have got

to protect, you know, guard against those hazards.  In the

case of the non-radiant heater, for example, it's still

generating heat.  If you block the air flow, it's going to --

03:31PM   the temperature is going to go up, but you've got a protector

|     |     |
| --- | --- |
| 1 | in there that will keep it from getting to those ignition |
| 2 | temperatures.  But for the radiant heater, it's not guarded |
| 3 | in the same way or as effectively. |
| 4 | Q.   Now, let me ask you this:  Does it matter if a company |
| 03:31PM 5 | comes in and says, yeah, we don't follow the safety |
| 6 | hierarchy.  We've sold five million of these, and we don't |
| 7 | have any reports of anything wrong.  Is that a valid |
| 8 | engineering defense to this analysis? |
| 9 | A.   Ultimately if you haven't had any issues and you've just |
| 03:32PM 10 | gotten lucky, you've got to do an engineering analysis. |
| 11 | You've got to evaluate the product in this context in order |
| 12 | to ensure the public safety. |
| 13 | Q.   Is it reasonable for a manufacturer to say, well, the |
| 14 | Consumer Product Safety Commission hasn't ordered us to |
| 03:32PM 15 | recall it?  Is that a fair and reasonable response to not |
| 16 | going through this hierarchy? |
| 17 | A.   No.  Ultimately the responsibility for making sure the |
| 18 | products are safe is not that of the federal government. |
| 19 | It's that of the manufacturer. |
| 03:32PM 20 | Q.   Let's go back to the hierarchy.  Then we have the last |
| 21 | one is warning. |
| 22 | A.   Okay.  Again, if you can't guard effectively against the |
| 23 | hazard, then an effective warning must be used. |
| 24 | Q.   So using the radiant heater involved in the incident, |
| 03:32PM 25 | did they design out the hazard? |

A.   They did not design out the hazard.  Under normal

operation the heater produces temperatures well in excess --

not just in excess of 450 degrees but in excess of

1200 degrees.

03:33PM  Q.   Did the auto safety shutoff guard effectively guard

against that hazard?

A.   The high limit or auto safety temperature switch in the

radiant heater is not effective in protecting against the

over-temperature condition and all condition.

03:33PM  Q.   Is there any effective warning by Sunbeam that the auto

safety shutoff may not work?

A.   There is no effective warning on the heater that

indicates that the high limit or the auto safety feature may

not work.

03:33PM  Q.   I'm going to jump through some of these that you've

discussed already.  Since you spent some time on these nice

graphics, I'm going to stop at the few and ask you to just

explain what we see here.

A.   Well, this is kind of just taking this little fan heater

03:34PM  and cutting it in half and looking at what is going on.  You

can see there in the middle the coil of wire that has

electricity flowing through it to generate the heat and then

the fan blades there on the left side that draw the air over

that coil so that it heats up the air.

03:34PM       So you have cool air coming in.  It goes over the

UNITED STATES DISTRICT COURT

1    coil, and then warm air is going out.  The amount of energy

2    that you're imparting during that time is the 1500 watts of

3    energy being convectively transferred, to put it in technical

4    terms, from the coil of wire into the room.

03:34PM    5    Q.   We're looking for the record that's Exhibit 249.12.

6    Right now you have a slide about 249.16.  Can you explain

7    what we see here.

8    A.   Right.  This kind of illustrates just an example

9    124 degrees is the temperature of the air coming out of the

03:35PM    10    heater while, you know, you've got a nice cool room of

11    64 degrees in this example.  The air coming out of the heater

12    is never going to be warmer than the temperature of the coil

13    itself.  That's one of those -- the nature of the convective

14    heat transfer.

03:35PM    15          The nature of using air to transfer that heat is

16    that the air has to be cooler than the coil for the energy to

17    move from the coil into the air.  So as the energy moves from

18    the coil into the air, it keeps that coil from being too hot;

19    but it also, you know, makes the temperature of the air go

03:36PM    20    up.  And so as that air comes out, it's going to come out at

21    a temperature lower than the temperature of the heating coil.

22    Q.   Let's look at slide 249.17.  Just explain what we see

23    here in the graphic and then what your opinion is.

24    A.   Well, in this graphic what we're illustrating is that

03:36PM    25    the air coming out of the heater is never going to be hotter

|     |     |
| --- | --- |
|     | 1 |

than the coil, and it's never going to be hotter than the

temperature of the air coming out.  And so the clothing or

whatever may have been dropped on the floor isn't going to

ignite because the temperature is so much lower than the

ignition temperature of combustible material.

Q.   And now we're going to have some graphics with the

radiant heater?

A.   Right.

Q.   Let's look at slide 249.23.  What do we see here?

A.   Well, this just kind of illustrates if we take

this heater and cut it in half and look at what is going on

in the inside.  We have that superheated Quartz rod in the

middle or going down on either side, and that emits this

infrared radiation that is shown here coming out as squiggly

lines.  Of course, you can't see the infrared radiation, but

it comes out.  And then whatever it hits absorbs that heat

and is warmed by it.

        The air itself has relatively little temperature

change as a result of this infrared radiation coming out.

Instead, the surfaces around absorb that heat and then the

air is heated by the release of energy from the surfaces that

have absorbed it.

Q.   So if a consumer is sleeping in bed under the covers

with their wife and their daughter, is their heating

experience going to be any better with a radiant heater than

UNITED STATES DISTRICT COURT

```
 1   with a non-radiant heater that you have up there?
 2   A.   Well, ultimately it's going to have the same effect on
 3   room temperature.  You're going to have the energy coming
 4   out.  If it hits the end of the bed or it hits the table or
 5   just the wall or whatever happens to be spread out in the
 6   room, that energy that's absorbed on those surfaces will go
 7   into the air in the room.
 8           And the amount of energy that is coming out of this
 9   device is exactly the same as the amount of energy coming out
10   of this device.  So the average temperature of the room is
11   unchanged.  So if you're -- unless you're physically in
12   direct line of sight from the heater, you're not going to
13   feel a difference.
14   Q.   That's important.  So if the heater is facing the bed as
15   you have in the graphic, with a radiant heater would you even
16   really feel the heat?
17   A.   No.
18   Q.   Does Sunbeam tell users in the warnings or in the manual
19   here are the reasons why you should pick a radiant heater
20   versus a non-radiant heater?
21   A.   I believe they had some comments that they -- some
22   marketing materials that spoke in favor or provided some of
23   the differences between radiant and fan heaters.
24   Q.   And are any of those communications telling the user
25   that there's a greater potential for fire with a radiant
```

03:38PM  (line 5)
03:39PM  (line 10)
03:39PM  (line 15)
03:39PM  (line 20)
03:39PM  (line 25)

|    |    |
|----|----|
| 1 | heater than with a non-radiant heater? |
| 2 | A.    I don't recall seeing anything to that effect. |
| 3 | Q.    So let's go ahead and go to the next slide, which is |
| 4 | Exhibit 249.24.  What does this show us? |
| 03:40PM    5 | A.    This just simply illustrates what we were talking about |
| 6 | before.  Because of the way that heat comes out of the heater |
| 7 | at such a high temperature, if there is something that's on |
| 8 | the floor right in front of it that can absorb that energy |
| 9 | and can rise in temperature even above the auto ignition |
| 03:40PM   10 | temperature, the temperature at which the material will start |
| 11 | burning. |
| 12 | Q.    So does this illustrate how the subject fire could have |
| 13 | started? |
| 14 | A.    This -- |
| 03:40PM   15 | Q.    This slide? |
| 16 | A.    This does illustrate how the subject fire may have |
| 17 | started. |
| 18 | Q.    And if you swap out the radiant heater with a |
| 19 | non-radiant heater, is there a fire? |
| 03:40PM   20 | A.    There would not be any fire. |
| 21 | Q.    I want to make sure we all understand this concept of |
| 22 | the object collecting heat with radiant heaters.  Can you |
| 23 | just show us what you mean with the towel and the radiant |
| 24 | heater, that how does a radiant heater cause the heat of the |
| 03:41PM   25 | object to accumulate. |

A.   Well, ultimately just to back up a step, if we put this towel in front of this fan heater, then the towel heats up because the air from the heater blows on it.  We call that convective heat transfer.

03:41PM   Q.   Does the heat stop the amount of heat generated by the heater?

A.   It will never reach a temperature higher than the air that it's transferring the heat to it.  On the other hand, the towel in front of the radiant heater, that infrared

03:41PM   radiation will impinge on and be absorbed by any materials that are in front of the heater.  And because it's being absorbed, it's going to start getting hot.

Some of the heat will leak off over time.  You know, if you have enough cool air around or if you have

03:42PM   just -- if it happens to be a certain color or certain characteristics of the material, then the heat will come off just as fast as it is absorbed.

But if you have the wrong combination of conditions such as the towel is close enough and there's not much air

03:42PM   circulation, then it will absorb that heat and continue to absorb that energy and continue to absorb that energy as it is impinging on there until it ultimately gets hot enough to begin to char, and then it will smolder and ultimately will go into full flames.

03:42PM   Q.   Is the accumulation of heat in objects as a result of

1    radiant heat, is that a basic heating concept?

2    A.    Yes.  It's a well-known scientific principle.

3    Q.    Is there any document anywhere at Sunbeam or any

4    acknowledgment from Sunbeam, Mr. Vernaglia, that they

03:43PM 5    understand that distinction, that with radiant heaters, an

6    object in front of it will accumulate heat to the point that

7    it could catch on fire, whereas the same object in front of a

8    non-radiant heater will never get higher than the temperature

9    of the heater?

03:43PM 10   A.    They have not done that thorough of an engineering

11   analysis of the hazard.

12   Q.    Should that analysis be done before a radiant heater is

13   ever marketed for use by people in homes?

14   A.    It should be done before any heater is marketed and sold

03:43PM 15   to people.

16   Q.    If Sunbeam had posed this simple analysis back in the

17   '90s before they started selling this heater with the

18   question of should we be marketing this heater for people to

19   use at home while sleeping, what would their answer be if

03:44PM 20   they are doing a reasonable analysis?

21   A.    I would expect them to conclude as I have, that

22   the hazard is too great, that the hazard is not eliminated by

23   a warning, that the hazard is not eliminated by guarding or

24   by design.  And therefore because that hazard has not been

03:44PM 25   sufficiently mitigated, the product shouldn't be sold for

|     |     |
| --- | --- |
|     | 1   |
|     | 2   |
|     | 3   |

1   that particular application.

2   Q.   We're now on slide 249.26.  Quickly describe what we see

3   here.

4   A.   This is just kind of recapping what we talked about.

03:44PM   5   The forced air heater has a temperature that is well below

6   the auto ignition temperature, whereas the temperature of the

7   radiant heater is well above.  From a design standpoint the

8   one mitigates the hazard; the other does not.

9   Q.   Let me go to -- so we're now on slide 249.32.  Explain

03:45PM   10   what we see here.  This is with a non-radiant heater?

11   A.   This is a non-radiant heater.  In the case of this

12   towel, if we were to drape it over this heater -- that's what

13   we're illustrating in the image -- that actually traps the

14   hot air in and heats up, and then there's that high-limit

03:45PM   15   switch inside that triggers and terminates the operation of

16   the heater.

17   Q.   Does that same concept work with a radiant heater?  If

18   you put a towel over it and trap the heat in, it will shut

19   off?

03:45PM   20   A.   Right.  If I put the towel over this heater, again

21   because of the way that that radiant heater works, it heats

22   up the inside of the towel and traps that air in.  And by

23   trapping that hot air in, then ultimately the high-limit

24   switch -- which I expect you probably can't see very well

03:46PM   25   from there, but there's a little dot here, a disk about

```
 1    three-quarters of an inch in diameter that you might be able

 2    to see through the grill.  That's the high-limit switch right

 3    up near the top and between the two different Quartz rods out

 4    of the line of sight so it's not getting the exposure to

 5    the infrared radiation under normal conditions.  But when we

 6    drape the towel over it, that actually traps the heat in and

 7    it causes the high limit to operate.

 8         So for this particular situation, the towel draped

 9    over the top of the heater will cause that high limit to

10    operate.

11    Q.   So if you intentionally violate the warning and you take

12    a towel and you put it over either of those heaters, is it

13    going to shut off?

14    A.   Yes.

15    Q.   Is that the concept of guarding against the hazard that

16    Sunbeam does have in both products?

17    A.   It is.

18    Q.   Now, Underwriters Laboratories, what are they?

19    A.   Underwriters Laboratories is an independent testing

20    organization that establishes standards for various kinds of

21    products and then evaluates those products prior to providing

22    the authorization to list the product.

23         So you may see on a product, anything ranging from

24    a heater to a power strip to a blender, you may see a UL mark

25    on it.  That is indicating that Underwriters Laboratories has
```

UNITED STATES DISTRICT COURT

1    determined that that particular product satisfies their

2    particular standards.

3    Q.   Are those minimum standards? maximum standards?  What

4    type of standards are they that they test these products to?

03:48PM  5    A.   In order to have that UL mark, they have to -- that is

6    the minimum.  The standards are laid out as you've got to

7    meet these particular requirements.

8         But within those standards UL explicitly says we

9    are not taking the obligation of design away from the

03:48PM  10    manufacturer.  The manufacturer still needs to make the

11    product safe.  We're simply with the UL it's -- the UL mark

12    is simply establishing that the minimum standard has been

13    met.

14    Q.   Is it like a marketing thing?  The company pays money

03:48PM  15    and then they have the right to put the UL stamp on their

16    products?

17    A.   It is -- it's certainly used in marketing as a marketing

18    tool among other things.

19    Q.   And does passing UL standards mean the product is safe?

03:49PM  20    A.   It does not guarantee the product is safe.

21    Q.   And does UL test for everything?

22    A.   No.  UL has established general standards to meet --

23    they have a single standard for this product and this product

24    and all the other different kinds and forms and shapes of

03:49PM  25    space heaters.  That single standard doesn't cover every

1    possibility, doesn't cover every application or every shape

2    and size and so forth.  They have a generalized standard and

3    give some specific tests that need to be done.

4    Q.   The defense attorney was commenting and I think he said

03:49PM 5    that they undergo rigorous, thorough testing by UL of the

6    space heater.  In the context of this safety issue that we've

7    been covering for almost an hour, is that addressed in any

8    way by UL?

9    A.   The possibility of the towel, instead of it being draped

03:49PM 10   over the top, of it lying on the floor in front of the heater

11   is not contemplated under the UL standards.  There is no

12   specific test that evaluates that possibility.

13   Q.   Does that illustrate the limitations of Underwriters

14   Laboratories testing, that they don't test for this basic

03:50PM 15   hazard that you've identified for the jury?

16   A.   It does.

17   Q.   So let's go over very quickly what is the testing that

18   UL does of these heaters in terms of overheat.

19   A.   They have a couple of different what they call abnormal

03:50PM 20   tests.  They have normal tests where they look at

21   temperatures under certain normal operating conditions, and

22   then they have a couple of abnormal tests including actually

23   what they call a drape test where they actually cover the

24   product and look to see if it turns off before igniting the

03:50PM 25   material or causing it to smolder.

1          Then they also have another test where they put it

2    up facing a wall with a fabric on that wall and, given

3    certain spacing, look at what -- how that high limit operates

4    under those conditions.

03:51PM  5    Q.   Do either of those set of tests done by Underwriters

6    Laboratories address the defect we've been talking about

7    today?

8    A.   None of them address the inability of that high limit to

9    detect the extreme temperatures that would result from

03:51PM  10   something being on the floor right in front of the heater.

11   Q.   Just so I want to make sure we're all clear.  In the UL

12   test they turn the heater and face the wall, and does that

13   cause the heat -- we all know the heat would come back into

14   the heater and the sensor shuts it off?

03:51PM  15   A.   Correct.  If you have it just facing a wall, then you

16   get enough reflected heat that that will result in the high

17   limit operating.

18   Q.   And then if you intentionally put a towel on the heater

19   and block it, that would cause the heat to go back in, the

03:52PM  20   sensor is triggered, and it shuts off?

21   A.   Right.  It traps the heat in.  The sensor detects that

22   and it shuts off.

23   Q.   Would a glaring sort of missing test from Underwriters

24   Laboratories' analysis of the heater, if we want to use

03:52PM  25   Underwriters Laboratories as the designator of safe, would

missing from their test be, well, what happens to that heater

if you get material within three feet of it but not blocking

it?

A.   Well, ultimately -- you're right.  The UL didn't

03:52PM  prescribe that, but it's not their responsibility to come up

with every conceivable test.  Rather it's the designer of the

product that needs to make sure that the product is safe.

So if there's a unique situation such as this one

with a high limit up at the top where it's not going to sense

03:52PM  the high temperatures that are down at the bottom, then that

is the manufacturer's job to come up with that test, not UL's

to come up with every variant of possible hazard analysis.

Q.   Do you believe that it's the manufacturer's obligation

not even to put that market out for testing if they did the

03:53PM  analysis that you have described for the jury?

A.   Right.  Ultimately, yes.  If they have evaluated it and

come to the conclusion that they can't make the product

reasonably safe for a particular application, then they

shouldn't even send it to UL.

03:53PM  Q.   Okay.  Let's keep going.  Let me ask you this:  Would it

be fair for a company like Sunbeam to say:  But UL tests our

heaters to see if they start fires, and we passed their test.

So this radiant heater is safe from fire?  Is that a fair

assessment by Sunbeam, or is that misleading?

03:54PM  MR. O'CONNELL:  Objection.  Form.

1          THE COURT:  Overruled.

2          THE WITNESS:  If UL tests the product, then UL

3     tests the product.  But they didn't declare it safe.  They

4     said it passes our standard.  It's the manufacturer who is

03:54PM   5     responsible to ensure that the product is safe.

6     BY MR. HOMAMPOUR:

7     Q.   I'm asking something different.

8     A.   I'm sorry.

9     Q.   I'm on a different page.  If Sunbeam says UL did fire

03:54PM  10     testing to see if these heaters start fires and they found it

11     was safe, is that a fair assessment of what UL did, or is it

12     misleading because UL didn't do testing where they put the

13     combustible materials in front of the heater but not actually

14     blocking it?

03:54PM  15     A.   Right.  UL doesn't actually declare it safe.  UL says it

16     met the standard.  If UL has said it met the standard, that

17     doesn't necessarily mean that every scenario, every

18     potentiality of that particular hazard has been mitigated.

19     Q.   Has UL even addressed this issue that we're talking

03:55PM  20     about here today?

21     A.   Not that I'm aware of.

22     Q.   Is it like -- I've seen these commercials when I was a

23     kid, like, they pass the AAMCO 10-point inspection.  But if

24     they didn't inspect for the carburetor, would it be right to

03:55PM  25     say it's safe for a carburetor?

UNITED STATES DISTRICT COURT

A.   Well, yeah.  If you looked at the other parts of the car
and you haven't looked at carburetor and then you say that
the carburetor is fine, that is just overstretching the
evaluation that was done.

03:55PM  Q.   Would that be a fair analogy to criticize if the
defendant is saying, hey, we passed the UL tests?

A.   Yes, that's a reasonable analogy.

Q.   Let me ask you this:  Is there any documentation from
the defendant where they analyze what is more likely?

03:56PM  Someone deliberately violating the warning and putting a
towel on the heater or someone facing a heater against a wall
versus someone keeping material three feet away or more and
it getting inadvertently in front of the heater?  Is there
any analysis from the defendant as to which scenario is more

03:56PM  likely in the real world?

A.   In going through the material and in testimony that was
given by representatives of Sunbeam, they didn't evaluate the
scenario that we've been discussing at all.  They simply said
if the warning says you can't put anything within three feet,

03:56PM  then you can't put anything within three feet, and that
protects us against any possibility.

Q.   But isn't it fair to say that even with that warning,
they recognize that materials get within three feet of the
heater?

03:57PM  A.   I would expect that, yes.

```
 1    Q.   And they actually tried to design or guard against

 2    people putting towels on the heater itself by putting in that

 3    thermostat sensor?

 4    A.   Their high-limit switch is capable of detecting

 5    specifically the hazard that UL requires them to look at.

 6    Q.   The defendant does recognize based on the high-limit

 7    switch and the safety beam which we'll talk about in a moment

 8    that people can get materials on or within three feet of the

 9    heater?

10    A.   Absolutely.

11    Q.   What is more likely in your opinion to occur?  Someone

12    intentionally takes a towel and puts it on a heater, or in an

13    ordinary home environment materials may get inadvertently

14    within three feet of the heater?

15              MR. O'CONNELL:  Objection.  Beyond the scope of

16    expert testimony.

17              THE COURT:  Overruled.  I assume you're asking from

18    an engineering standpoint.

19    BY MR. HOMAMPOUR:

20    Q.   From an engineering standpoint.

21    A.   From an engineering standpoint I would look at it and

22    say it's more likely that things are going to inadvertently

23    be displaced into the path in front of the heater rather than

24    somebody draping something over the top.

25    Q.   So these heaters are used in environments with animals?
```

UNITED STATES DISTRICT COURT

```
 1   A.    I would -- that's my expectation, yes.

 2   Q.    Young children?

 3   A.    Yes.

 4   Q.    Multiple adults?

 5   A.    Sure.

 6   Q.    While people are sleeping?

 7   A.    That's my understanding.

 8   Q.    While people are groggy?

 9   A.    Sure.

10   Q.    While people get up and have to go to the bathroom in

11   the middle of the night?

12   A.    Yes.

13   Q.    So would it be foreseeable -- strike that.

14         Can someone comply with the warning, keep materials

15   more than three feet away, and then through inadvertence a

16   hazard be created?

17   A.    Sure.  If you're in an environment with small children,

18   with pets, with people walking around in the dark and getting

19   up to go to the bathroom or whatever, then it is entirely

20   possible that things are going to get moved around,

21   displaced, knocked over in the vicinity of the heater.

22   Q.    Well, let me take a theme from the defense attorney,

23   personal responsibility.  Well, how do you balance personal

24   responsibility versus corporate responsibility when it comes

25   to materials getting within three feet of that heater?
```

03:58PM (lines 5)
03:58PM (line 10)
03:58PM (line 15)
03:59PM (line 20)
03:59PM (line 25)

1          MR. O'CONNELL:  Objection.  Beyond the scope of

2     expert testimony.

3          THE COURT:  I assume again you're asking from a

4     design safety engineering?

03:59PM    5          MR. HOMAMPOUR:  I am.

6          THE COURT:  With that assumption, overruled.

7          THE WITNESS:  From a design engineering standpoint,

8     the product needs to be designed for the application and

9     environment where it will be used, and the hazards that that

03:59PM   10     product will be subjected to in that environment must be

11     mitigated.

12          If you can't mitigate it for the particular

13     environment that it will be in, then it shouldn't be in that

14     environment.  In this case what we're talking about, the

04:00PM   15     possibility of children or pets or groggy people walking in

16     the dark room knocking things over, that's expected.  I mean,

17     that's the kind of environment that you can reasonably

18     anticipate this heater that is marketed for residential use

19     being subjected to.

04:00PM   20          So while, yes, there is some responsibility that an

21     on owner needs to be attentive to the circumstances, there's

22     still that more overarching manufacturer's responsibility to

23     do the engineering analysis in the first place to identify

24     and mitigate the hazards so that the person who is stumbling

04:01PM   25     through the dark in the middle of the night isn't going to

1    end up having a crisis on their hands because they didn't

2    think to read the warning label at that point in time.

3    BY MR. HOMAMPOUR:

4    Q.   Now, you've talked about something and I'll call it

5    misuse.  Can you explain to the jury what is the concept of

6    foreseeable misuse.

7    A.   From an engineering standpoint, when an engineer is

8    doing this hazard analysis, first of all they know what they

9    are expecting in terms of how they are expecting the product

10   to be used.  We want it to be used under these particular

11   conditions.

12        And then there's the second tier.  They've also got

13   to contemplate that there's a possibility that it's not going

14   to be used exactly the way we expect it to be.  And they need

15   to look at reasonable misuse.  Just as a simple car analogy,

16   you expect that people are going to drive their car and every

17   three months they are going to get their oil changed and that

18   will make the car work great.

19        Well, from the desired or intended use standpoint,

20   that monthly or quarterly oil change is expected by the

21   manufacturer.  From the manufacturer's standpoint, if you use

22   it exactly as intended, then you can expect it to be reliable

23   and safe.  But the manufacturer also has a duty to make sure

24   that it's safe for reasonably foreseeable misuse.

25        Can you foresee somebody not getting their oil

UNITED STATES DISTRICT COURT

1    changed every three months?  Yes.  Is it okay for a car to

2    burst into blames because you didn't get the oil changed

3    after 91 days?  No, of course not.  It's expected -- from an

4    engineering standpoint it's anticipated that the possibility

04:03PM    5    exists that somebody is going to not use it exactly the way

6    we expect, but we still need to design so that it's a safe

7    product for that reasonably foreseeable misuse.

8            Now, is it reasonably foreseeable?  Would you

9    expect a reasonable person to stand on the top of their car

04:03PM   10    while they're driving down the highway?  No.  That's not a

11    reasonably foreseeable misuse.  That's perhaps a foreseeable

12    misuse but not reasonably foreseeable.

13            But for the car, if you don't change the oil, a

14    reasonable person might forget to change the oil, and

04:03PM   15    similarly a reasonable person might well drop or knock over a

16    laundry hamper in front of the heater.  It doesn't make them

17    unreasonable that that happened, and that's a reasonably

18    foreseeable misuse.  It's not the way that the heater

19    manufacturer intended that it be used, but it's reasonably

04:04PM   20    foreseeable and they must make it safe for reasonably

21    foreseeable conditions.

22    Q.   Let me give you another analogy.  Like with a blow

23    dryer, would a manufacturer have to look at that that's used

24    in a potentially wet environment so it has to be insulated so

04:04PM   25    that if it drops into the sink or the bathtub, you're not

UNITED STATES DISTRICT COURT

1    electrocuted?

2    A.    Sure.   You don't expect it to be knocked off the counter

3    into the bathtub or into the sink; but because of the

4    environment where the hair dryer is being used, that is a

04:04PM   5    possibility that you need to foresee and you need to take

6    precautions against that eventuality.

7    Q.    Let's continue on with the slides.   I'd like to go to

8    this auto safety shutoff feature, which is 249.46.

9    Describe -- what are we looking at?

04:05PM   10   A.    What we're looking at is actually the manual that comes

11   with the Holmes HQH307, basically the user's manual that goes

12   with this.   And on there -- I think if you click one more

13   time, it blows it up -- it specifically provides the

14   information that this heater is equipped with a patented

04:05PM   15   technologically advanced safety system that requires the user

16   to reset the heater if there's a potential overheat

17   situation.

18         When a potential overheat temperature is reached,

19   the system will automatically shut the heater off.

04:05PM   20   Q.    Now, does the auto safety shutoff work if the heater --

21   in a potential overheat situation where material is within

22   three feet of the heater but not blocking it?

23   A.    In the situation that we've been discussing where you

24   may have things setting on the floor, it is ineffective.   It

04:06PM   25   does not work.

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | Q.   Do they tell the consumer that anywhere in a warning or |
| 2 | in this manual? |
| 3 | A.   Not so far as I've been able to read. |
| 4 | Q.   Do you believe they should have given that warning, I |
| 04:06PM 5 | mean, at a minimum that this auto safety shutoff may not |
| 6 | work? |
| 7 | A.   Well, yeah, if they were going to -- given that they |
| 8 | didn't mitigate the hazard, if they are going to sell it, at |
| 9 | a minimum they should have provided a more effective warning |
| 04:06PM 10 | that would let people know that this feature that they are |
| 11 | touting here is not always effective. |
| 12 | Q.   Did you find anywhere where it was an actually patented |
| 13 | safety system? |
| 14 | A.   No. |
| 04:07PM 15 | Q.   Let me go to another warning.  We're now on |
| 16 | Exhibit 249.49.  On here we have -- is this the warning |
| 17 | label? |
| 18 | A.   This is the warning label.  And just for the jury to |
| 19 | see, that would be right here (indicating) at the bottom in |
| 04:07PM 20 | this little alcove below the heating element. |
| 21 | Q.   Is it your opinion the warning is insufficient? |
| 22 | A.   It is my opinion that this warning is insufficient. |
| 23 | Q.   Why is that? |
| 24 | A.   Well, for several reasons.  One is you've got it down at |
| 04:07PM 25 | the floor level.  It's even a little bit tucked underneath so |

1    you can't see it very well.  And if you have dropped

2    something on the floor, you wouldn't be able to read it there

3    anyway.

4          The second reason is that if you've got children in

04:08PM 5    this environment, if you've got pets in this environment,

6    they may not understand or be able to read that warning, so

7    there's the possibility of that warning being violated by the

8    occupants of the area.

9          And, you know, it may be that even somebody is up

04:08PM 10   in the middle of the night and may not be able to stop and

11   read it when they are groggy and trying to get to the

12   bathroom.

13   Q.   Let me ask you this again.  Even if you're groggy,

14   getting up to the bathroom and you inadvertently knocked over

04:08PM 15   a hamper of clothing or a pile of clothing or a box of

16   clothing, if that non-radiant convection heater is used, is a

17   fire going to start?

18   A.   If --

19          MR. O'CONNELL:  Objection.  Asked and answered.

04:09PM 20          THE COURT:  Overruled.

21          THE WITNESS:  If this non-radiant heater were used,

22   then no fire would result.

23   BY MR. HOMAMPOUR:

24   Q.   And why is the choice of the heater to use the

04:09PM 25   responsibility of Sunbeam from an engineering perspective

UNITED STATES DISTRICT COURT

 1    versus Mr. Shinedling?

 2    A.    Mr. Shinedling or any average user doesn't have the

 3    engineering tools to assess the hazard.  They look at

 4    something that says it's got an automatic safety shutoff

 5    against the possibility of overheat, and they assume that

 6    that means what it says.

 7              But the designer of the product has the engineering

 8    wherewithal or should have the engineering wherewithal to

 9    evaluate the hazards effectively and actually mitigate them

10    rather than relying on the user to mitigate those hazards for

11    them.

12    Q.    For a user to mitigate hazards, they would need

13    information about those hazards; is that fair?

14    A.    That is fair.

15    Q.    Is that specific hazard communicated to the user, that

16    the shutoff may not work?

17    A.    Correct.  That is not communicated to the user.

18    Q.    I'm going to go to Exhibit 249.55, and if we could just

19    describe what we see here.

20    A.    This is a later-generation version of this Quartz

21    heater.  It has a little bit different form factor but has in

22    it a feature they call the SafetyMax invisible contact

23    sensor.  It basically has a little -- has some sensors at the

24    top and bottom and will detect if something is blocking them,

25    if something is coming up against the heater between the top

1    of the heater and the bottom of the heater, if anything comes

2    up within an inch of the heater or maybe within a half inch,

3    then that will interrupt the operation of the heater.  It's a

4    safety feature that they patented in, I want to say it was,

04:11PM  5    2005.  I can't remember off the top of my head.

6    Q.   But before the subject incident?

7    A.   Before the subject incident.

8    Q.   Now, what is the relevance of this safety feature to

9    your opinion?

04:11PM  10   A.   Well, what it tells me is they were aware.  This hazard

11   of something coming up against the heater at the floor level

12   was something that they were aware of.  And they had

13   technology; they had an approach to try and eliminate that

14   hazard.

04:11PM  15   Q.   What would have been the best way to eliminate that

16   hazard for the subject heater when used at home while

17   sleeping?

18   A.   The best way would have been to substitute in a

19   convection-type heater.

04:11PM  20   Q.   Let's look at Exhibit 249.60.  I think this is the

21   patent you were referring to.  Is that the patent you were

22   referring to?

23   A.   It is.

24   Q.   The date of that was two thousand -- provisional

04:12PM  25   application 2005, at the bottom right?

A.   Right.  It was first -- the concept was first embodied within a provisional application in 2005.

Q.   I'd like to show you Exhibit 108.  Exhibit 108 is a letter dated 2004 from the Consumer Product Safety Commission to Underwriters Laboratories.  And explain what this -- how is this letter relevant to your opinions here?

          MR. O'CONNELL:  Object to publishing this, Your Honor, in a portion format.

          THE COURT:  Overruled.

BY MR. HOMAMPOUR:

Q.   First, what is the U.S. Product Safety Commission?

A.   The U.S. -- the Consumer Product Safety Commission, CPSC, is an organization, a branch of the federal -- well, a department within the federal government that evaluates consumer products to try and maintain a certain level of safety among consumers.  It's a place where people can complain if they found products that have hurt or injured them.

Q.   Whether or not the U.S. Consumer Product Safety Commission recall a product, does that determine whether it's safe or unsafe?

A.   The fact that they recall products, issue recalls on various products that may have been around for several years says that -- no, that if something has not been recalled, that doesn't necessarily mean that it's safe.

1    Q.   Are there lots of consumer products out there that are

2    deemed unsafe that the Consumer Product Safety Commission

3    doesn't get involved in?

4          MR. O'CONNELL:  Objection.  Calls for speculation.

04:14PM   5          THE COURT:  Overruled.

6          THE WITNESS:  I would certainly expect that there

7    are various products that the Consumer Product Safety

8    Commission has not evaluated or hasn't drawn a conclusion

9    from.

04:15PM   10   BY MR. HOMAMPOUR:

11   Q.   So explain this 2004 letter.  How is it relevant to your

12   opinions?

13   A.   Well, in this, particularly in the lower paragraph, it

14   actually illustrates or explains the distinction between an

04:15PM   15   air heater such as this convection type heater and the

16   radiant heater like the subject one, that essentially it

17   addresses -- and to read from that last sentence there, for

18   materials with low thermal conductivity or high emissivity,

19   there is the possibility of continued heating until ignition

04:15PM   20   temperatures are reached.

21          This, of course, just affirms what I've already

22   been trying to explain in my terms.  The Consumer Product

23   Safety Commission was aware that these radiant heaters have

24   that potential to generate temperatures on materials in front

04:16PM   25   of the heater in advance of or in excess of the ignition

1    temperature.

2    Q.    The first sentence of that part says unlike air heaters.

3    What does that part mean?

4    A.    Well, again it says:  Unlike air heaters, radiant

04:16PM  5    heaters have the possibility of raising the surface

6    temperature of an object in the path of the radiant flux very

7    high.

8            Again, air heaters blow warm or even hot air, but

9    that temperature is -- you're never going to see a

04:16PM  10    temperature higher than the air temperature on the surface of

11    materials that are in front of it.

12            The radiant heater, because of the way the energy

13    is transferred -- and it uses the term flux -- is talking

14    about how concentrated it's going in this radiation mode.  It

04:16PM  15    can -- a surface can absorb that energy and the temperature

16    can get hotter than the air around it.

17    Q.    Now, it says -- this refers to Underwriters Laboratories

18    standard technical panel ULSTP-1042 and a meeting or working

19    group.  What does that mean?

04:17PM  20    A.    Essentially the concept is that a working group is

21    basically a smaller part of the organization that is focused

22    on a particular issue.  They were working on forming a group

23    to analyze how can we assess how much energy or how

24    concentrated the energy is coming out of these heaters in

04:18PM  25    order to better address the issue of this hazard.

Q.   And is it your understanding, do you know if Sunbeam was on that group or panel?

A.   I know that Sunbeam has indicated that they had some association, some membership on the standards technical panel, but I don't know if they were specifically involved in this particular standards technical panel.

Q.   Is this considered scientific material, this report?

A.   The report itself I would say is probably scientific material.

Q.   And is this material that you would expect companies like Sunbeam to collect and review and pay attention to?

A.   For any organization that is developing products in that realm, it certainly seems like they should be maintaining a library of such technical materials.

Q.   And based on your review of the testimony of Sunbeam, did they maintain any such library?

A.   They testified -- Mr. Vernaglia testified that he wasn't aware that they maintained any such library.

Q.   And by not maintaining a basic library of scientific materials, how does that affect their ability to sell safe products --

         MR. O'CONNELL:  Objection.  Calls for speculation.

         MR. HOMAMPOUR:  -- from an engineering design standpoint?

         THE COURT:  Overruled.

1              THE WITNESS:  In order to design safe products, you

2    need to know what the principles are that apply.  By not

3    being attentive to the technical and scientific materials

4    that apply to their industry, they are limiting the

04:19PM    5    understanding level of their engineering staff, and the

6    possibility exists that they are not going to be able to

7    perform their hazard analysis effectively.

8              MR. HOMAMPOUR:  I want to show Exhibit 212, a

9    blowup.  I don't have it published.

04:20PM   10              MR. O'CONNELL:  I want to see what it is.

11              MR. HOMAMPOUR:  It's the 2005.  Okay?

12              MR. O'CONNELL:  Thank you.

13    BY MR. HOMAMPOUR:

14    Q.   So if we look at Exhibit 212, this is from again U.S.

04:20PM   15    Consumer Product Safety Commission, and it's regarding flux

16    mapping of radiant electric heaters, August 2005.  What's the

17    relevance of this document?

18    A.   This document again was -- it was focused on the issue

19    of radiant heaters and of evaluating or what they call

04:20PM   20    mapping the concentration of energy coming out of the front

21    of the heater.  And specifically in this report it talked

22    about the effect that no commonly found materials ignite in

23    the -- at the air temperatures exhausted by -- sorry.  I

24    was getting about halfway down.

04:21PM   25              I want to read:  Radiant energy transmission is

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:21PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:22PM | 10 |

1 | capable of continuing to heat an object's surface until its

2 | temperature approaches that of the heating element.  With

3 | ignition temperatures ranging from 233 C for paper to

4 | 590 degrees C for wool, there's the prospect for materials

5 | with high emissivities and high geometric view factors to

6 | absorb enough IR or infrared energy to ignite.

7 | Q.   Does this basically illustrate scientifically the

8 | concept you've been discussing with the jury here today?

9 | A.   It does.

10 | Q.   If we look at Exhibit 73, this is a letter of

11 | February 25, 2004.  This is a letter again from U.S. Product

12 | Safety Commission to Underwriters Laboratories dated

13 | February 25, 2004.

14 | A.   Yes.

15 | Q.   And this second paragraph highlighted, is it more of the

16 | same topic you've been discussing?

17 | A.   It is, just basically reiterating what we've already

18 | talked about, that radiant heaters have the possibility of

19 | raising surrounding materials to temperatures that are

20 | significantly higher than what you would see for an air

21 | heater.

22 | Q.   And then I'd like to go to the second page of this

23 | letter and go over this sentence, the highlighted sentence.

24 | If you could explain that to the jury, please.

25 | A.   It says:  The maximum heat flux value is independent of

UNITED STATES DISTRICT COURT

heater wattage and is based on factors under the control of

the product designer.

Q.   What does that mean?

A.   Basically the term heat flux, again that's talking about

04:24PM   how concentrated is the radiated energy coming out of the

heater.  The higher that concentration, the more likely you

are to achieve ignition temperatures.

So essentially what he's saying is that the

manufacturer has the ability to control that by design.  You

04:24PM   can have it highly concentrated or you can have it more

dispersed as it comes out so that heat flux coming out of the

heater is something that is in the control of the

manufacturer.

Q.   Is there any documentation or materials from Sunbeam

04:24PM   where they address that particular issue of controlling the

flux that comes out of radiant heaters?

A.   No, as far as I'm aware.  In fact, as I recall,

Mr. Vernaglia testified that he didn't know what heat flux

was.

04:24PM   Q.   Are you critical of that?

A.   Well, it's a pretty fundamental principle when you're

trying to design radiant heaters.  That's a pretty critical

element of the analysis.

Q.   So are you critical of the fact that someone at project

04:25PM   management at Sunbeam doesn't know that concept?

```
 1    A.    I am.
 2    Q.    Had he known the basic concepts you've discussed today,
 3    do you think they would have sold that product for use
 4    unattended while people are sleeping?
 5    A.    I would hope not.
 6    Q.    Let's go to Exhibit 96.
 7              MR. HOMAMPOUR:  Is that okay?
 8              MR. O'CONNELL:  Without knowing the purpose for
 9    which he's submitting it --
10              MR. HOMAMPOUR:  Well, let me ask the question.
11    BY MR. HOMAMPOUR:
12    Q.    Sunbeam performed internal testing where they draped
13    materials on the heater and et cetera?
14    A.    Yes.  In their product development they did testing that
15    was required by UL.
16              MR. HOMAMPOUR:  Actually I'm going to move on to
17    save time.
18    BY MR. HOMAMPOUR:
19    Q.    Let me show you a document from January 2004.  It's
20    Exhibit 107.
21              MR. HOMAMPOUR:  Is that okay, the CPSC document?
22              MR. O'CONNELL:  The one you used in opening?
23              MR. HOMAMPOUR:  A different one, an earlier one.
24    BY MR. HOMAMPOUR:
25    Q.    So what is this that we're looking at?
```

04:25PM  5
04:26PM  10
04:26PM  15
04:26PM  20
04:27PM  25

1    A.   This was a public service bulletin that was published by

2    the Consumer Product Safety Commission.

3    Q.   What does it say here, these two points?

4    A.   It highlights specifically:  Never leave a space heater

04:27PM   5    on when you go to sleep and never place a space heater close

6    to any sleeping person; and also to turn the space heater off

7    if you leave the area, and keep children and pets away from

8    heaters.

9    Q.   Do you agree with those warnings?

04:27PM   10   A.   I think those are good -- that's good advice.

11   Q.   Now, would your average person even know about these

12   warnings back in 2004?  In other words -- strike that.

13         So you said these are public notices?

14   A.   It was published by the Consumer Product Safety

04:27PM   15   Commission, I think, on their website.

16   Q.   Okay.  So if you didn't know to go to the website, is

17   this something that is generally communicated to average

18   users?

19   A.   No.

04:28PM   20   Q.   Okay.  And is the point of this exhibit that consumers

21   need to know those two points when using radiant heaters in

22   home while sleeping?

23   A.   Certainly the CPSC believed that this was important

24   enough to publish.

04:28PM   25   Q.   Okay.  And ultimately from a design engineering

1   standpoint selling safe products, whose responsibility is it

2   to communicate those two points to the end user?

3   A.   From a design engineering standpoint, it's the

4   manufacturer's responsibility to communicate the constraints

04:28PM  5   under which their product should be used.

6   Q.   And did they?

7   A.   There was nothing in the material that I read related to

8   the HQH307 that said don't use it while you're sleeping and

9   keep it away from children and pets.

04:29PM  10   Q.   Is there any logic to not including these warnings if

11   you're actually going to sell this product for use while

12   people are sleeping?

13   A.   Other than the fact that it may not be an effective way

14   to communicate to the end user, no, there's no reason to not

04:29PM  15   include those warnings.

16   Q.   Did you see any analysis from Sunbeam where they looked

17   at this information about never leave a space heater on when

18   you go to sleep, never place a space heater close to any

19   sleeping person, where they evaluated that information and

04:29PM  20   concluded we don't need to tell our users about it?

21   A.   I did not see that they did any evaluation of this

22   information that was published by the CPSC.

23   Q.   Are you critical of that?

24   A.   Well, it seems to me the manufacturers would be the

04:29PM  25   first to see anything that is published by the CPSC.   In

1    fact, they -- the fact that they didn't incorporate those

2    into their warnings seems like a significant oversight on

3    their part.

4    Q.   Now, the consequences of that oversight, not to be

04:30PM  5    dramatic but to be realistic, are deadly fires?

6    A.   Yes.

7    Q.   Now, to you as a design engineer, does it matter -- if

8    we come up with statistics of 5,000 fires, one fire, or no

9    fires, is this product unsafe in your opinion?

04:30PM  10   A.   From a design standpoint, yes, it's unsafe.  We do have

11   documentation of other fires as well, but from a design

12   standpoint you can evaluate the hazard independent of

13   experience.  In fact, you're supposed to evaluate the hazard

14   before you start burning places down.

04:30PM  15   Q.   Let's talk about the statistics.  Are you able to go

16   over with me just a general summary of your findings as to

17   the statistics relating to fires and the subject heater?

18   A.   Sure.

19   Q.   Why don't we go ahead and do that now.

04:31PM  20   A.   Okay.

21   Q.   This is all covered in your report?

22   A.   It is.

23         MR. HOMAMPOUR:  I'm sorry.  I can't find his

24   report.

04:31PM  25         MR. O'CONNELL:  It's 11.

|  |  |
|---|---|
| 1 | THE COURT:  It's 4:30 now, Mr. Homampour.  Do you |
| 2 | anticipate being done soon? |
| 3 | MR. HOMAMPOUR:  No.  If you want to take your |
| 4 | afternoon recess, that would be a perfect time. |
| 04:31PM 5 | THE COURT:  For the day. |
| 6 | MR. HOMAMPOUR:  I mean your afternoon end.  No |
| 7 | recess. |
| 8 | THE COURT:  Okay. |
| 9 | Ladies and gentlemen, I do have to give you an |
| 04:31PM 10 | instruction since it is our first break, first I guess long |
| 11 | recess until Thursday morning. |
| 12 | Remember until the trial is over, do not discuss |
| 13 | this case with anyone including your fellow jurors, members |
| 14 | of your family, people involved in the trial, or anyone else. |
| 04:32PM 15 | And do not allow others to discuss the case with you.  This |
| 16 | includes discussing the case in internet chat rooms or |
| 17 | through internet blogs, internet bulletin boards, e-mails, or |
| 18 | test messaging. |
| 19 | If anyone tries to communicate with you about the |
| 04:32PM 20 | case, please let me know about it immediately.  Do not read, |
| 21 | watch, or listen to any news reports or other accounts about |
| 22 | the trial or anyone associated with it, including any online |
| 23 | information. |
| 24 | Do not do any research such as consulting |
| 04:32PM 25 | dictionaries, searching the internet, or using other |

```
 1    reference materials; and do not make any investigation about

 2    the case on your own.  Finally, keep an open mind until all

 3    the evidence has been presented and you have heard the

 4    arguments of counsel, my instructions on the law, and the

 5    views of your fellow jurors.

 6            Ladies and gentlemen, we got a lot accomplished

 7    today.  As I indicated, we're not in session tomorrow.  We'll

 8    be getting back on Thursday.  Have a great tomorrow, and I'll

 9    look forward to seeing you on Thursday about 8:15.  We'll

10    start promptly at 8:30.

11            THE CLERK:  All rise.

12            (Open court - jury not present)

13            THE COURT:  Please be seated.

14            Dr. Palmer, you may step down.  We'll see you on

15    Thursday morning.  All right, sir?

16            THE WITNESS:  Thank you.

17            THE COURT:  Is there anything we need to discuss?

18            MR. O'CONNELL:  Not from our end.

19            MR. HOMAMPOUR:  No.

20            THE COURT:  Mr. Wolensky, you may recall Ms. Alice

21    was kind enough to volunteer.  She'll get me those jury

22    instructions and that verdict form tomorrow by 11?

23            MR. WOLENSKY:  By 11:00 a.m., yes, Your Honor.

24            THE COURT:  Okay.  Have a good evening, a good day

25    off, and I'll see everybody Thursday.
```

04:33PM   5
04:33PM  10
04:34PM  15
04:34PM  20
04:34PM  25

```
1              MR. O'CONNELL:  Thank you, Your Honor.

2              MR. WOLENSKY:  Thank you, sir.

3              MR. HOMAMPOUR:  Thanks for being patient, too.

4                  (Proceeding adjourned at 4:30 p.m.)

5                          CERTIFICATE

6    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

7    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

8    THE ABOVE MATTER.

9    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

10   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

11   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13   /s/ Miriam V. Baird          06/10/2015

14   MIRIAM V. BAIRD                        DATE
     OFFICIAL REPORTER
15

16

17

18

19

20

21

22

23

24

25
```

**'** 

**'90s** [2] - 10:3, 76:17

**/**

**/s** [1] - 108:13

**0**

**0.9** [2] - 42:6, 43:7
**06/09/2015** [1] - 108:13

**1**

**1** [2] - 1:17, 5:19
**1-053** [1] - 1:24
**10** [2] - 5:19, 6:9
**10,000** [1] - 56:20
**10-point** [1] - 83:23
**1000** [1] - 2:5
**107** [1] - 102:20
**108** [2] - 95:3
**10:30** [1] - 33:5
**11** [2] - 105:25, 107:22
**11893** [1] - 1:23
**11:00** [2] - 33:5, 107:23
**1200** [6] - 9:5, 9:14, 10:10, 63:9, 63:15, 70:4
**124** [3] - 59:14, 63:14, 71:9
**15(b** [1] - 39:4
**15-minute** [1] - 45:14
**150** [1] - 7:21
**1500** [6] - 7:11, 7:12, 61:18, 61:21, 61:23, 71:2
**15303** [1] - 2:4
**16** [1] - 5:18
**160** [1] - 60:19
**17** [2] - 5:21, 24:13
**180** [1] - 65:2
**185** [2] - 7:24, 8:8
**1973** [1] - 5:19
**1975** [1] - 5:19
**1993** [1] - 5:18
**1998** [1] - 5:21
**1:00** [1] - 5:1

**2**

**20** [1] - 18:9
**200** [2] - 7:25, 59:19
**2001** [1] - 5:22
**2003** [1] - 31:14
**2004** [6] - 95:4, 96:11, 100:11, 100:13,

102:19, 103:12
**2005** [9] - 15:19, 16:2, 16:7, 17:2, 94:5, 94:25, 95:2, 99:11, 99:16
**2006** [3] - 6:9, 27:8, 27:11
**2007** [2] - 12:24, 14:22
**2009** [3] - 49:17, 49:18, 49:21
**2010** [1] - 31:23
**2011** [4] - 5:23, 6:4, 20:23, 33:10
**2015** [2] - 1:20, 5:1
**212** [2] - 99:8, 99:14
**233** [1] - 100:3
**2450** [1] - 2:15
**249** [1] - 53:18
**249.12** [1] - 71:5
**249.16** [1] - 71:6
**249.17** [1] - 71:22
**249.2** [1] - 53:21
**249.23** [1] - 72:9
**249.24** [1] - 74:4
**249.26** [1] - 77:2
**249.32** [1] - 77:9
**249.46** [1] - 90:8
**249.49** [1] - 91:16
**249.55** [1] - 93:18
**249.60** [1] - 94:20
**25** [2] - 100:11, 100:13
**26** [1] - 5:21
**28** [1] - 3:4
**2:35** [1] - 48:3

**3**

**31** [1] - 5:22
**311** [1] - 2:14
**329-1** [1] - 33:17
**35** [1] - 6:5
**3:00** [1] - 48:4

**4**

**411** [1] - 1:24
**450** [9] - 7:18, 8:4, 9:6, 10:1, 60:1, 60:23, 61:3, 61:5, 70:3
**48** [2] - 3:4, 3:5
**48TH** [1] - 2:11
**4:30** [2] - 106:1, 108:4

**5**

**5** [3] - 5:23, 6:4, 33:10
**5,000** [1] - 105:8
**50** [1] - 40:14
**555** [1] - 2:11
**590** [1] - 100:4

**6**

**6** [1] - 3:3
**60** [2] - 8:19, 40:14
**60606** [1] - 2:15
**64** [1] - 71:11

**7**

**714** [1] - 1:25
**73** [1] - 100:10

**8**

**8270** [1] - 5:25
**894-5384** [1] - 1:25
**8:15** [1] - 107:9
**8:30** [1] - 107:10

**9**

**9** [2] - 1:20, 5:1
**90013-1065** [1] - 2:12
**91** [1] - 89:3
**911** [10] - 23:5, 23:6, 23:10, 23:18, 27:21, 35:21, 35:22, 35:23, 35:24
**91403** [1] - 2:5
**92701** [1] - 1:24
**96** [1] - 102:6

**A**

**a.m** [1] - 107:23
**AAMCO** [1] - 83:23
**AARON** [2] - 1:4, 2:3
**abilities** [1] - 52:14
**ability** [5] - 21:15, 33:13, 47:9, 98:20, 101:9
**able** [10] - 38:21, 44:25, 64:10, 78:1, 91:3, 92:2, 92:6, 92:10, 99:6, 105:15
**abnormal** [3] - 38:20, 80:19, 80:22
**ABOVE** [1] - 108:8
**absolutely** [5] - 17:24, 29:19, 58:21, 68:14, 85:10
**absorb** [7] - 72:20, 74:8, 75:20, 75:21, 97:15, 100:6
**absorbed** [6] - 64:4, 72:22, 73:6, 75:10, 75:12, 75:17
**absorbs** [1] - 72:16
**accident** [9] - 11:11, 14:18, 26:8, 29:1,

29:5, 31:23, 32:25, 34:14, 39:21
**accidentally** [3] - 14:3, 66:15, 66:23
**accomplished** [1] - 107:6
**according** [1] - 47:11
**accounts** [1] - 106:21
**accredited** [1] - 51:11
**accumulate** [4] - 8:23, 16:15, 74:25, 76:6
**accumulates** [1] - 16:16
**accumulation** [1] - 75:25
**accurate** [1] - 47:18
**achieve** [1] - 101:7
**achieving** [1] - 51:12
**acknowledged** [1] - 19:8
**acknowledgment** [1] - 76:4
**acquainted** [1] - 59:1
**acted** [1] - 27:17
**actions** [2] - 44:3, 55:1
**actual** [2] - 50:12, 61:17
**added** [1] - 40:4
**Addison** [4] - 5:20, 5:21, 6:2, 6:6
**addition** [4] - 38:13, 40:21, 42:9, 42:17
**address** [5] - 13:7, 81:6, 81:8, 97:25, 101:15
**addressed** [3] - 46:6, 80:7, 83:19
**addresses** [1] - 96:17
**adequately** [1] - 31:2
**adjourned** [1] - 108:4
**administer** [1] - 48:15
**Administration** [1] - 36:22
**admonished** [1] - 47:7
**adults** [1] - 86:4
**advance** [1] - 96:25
**advanced** [2] - 11:19, 90:15
**advice** [1] - 103:10
**affect** [1] - 98:20
**affected** [1] - 21:15
**affirms** [1] - 96:21
**afraid** [1] - 58:14
**afternoon** [4] - 48:8, 49:2, 106:4, 106:6
**afterwards** [1] - 27:9
**agency** [1] - 15:15
**agree** [5] - 12:19, 17:10, 18:14, 28:3,

103:9
**agreed** [4] - 5:16, 5:23, 12:16, 19:10
**agrees** [1] - 44:12
**ahead** [6] - 5:8, 6:10, 54:7, 58:6, 74:3, 105:19
**air** [55] - 15:22, 16:10, 16:12, 16:14, 16:15, 38:1, 58:16, 58:17, 59:3, 59:4, 59:8, 59:13, 59:15, 59:18, 60:14, 61:9, 61:21, 63:5, 63:13, 68:24, 70:23, 70:24, 70:25, 71:1, 71:9, 71:11, 71:15, 71:16, 71:17, 71:18, 71:19, 71:20, 71:25, 72:2, 72:18, 72:21, 73:7, 75:3, 75:7, 75:14, 75:19, 77:5, 77:14, 77:22, 77:23, 96:15, 97:2, 97:4, 97:8, 97:10, 97:16, 99:23, 100:20
**airbags** [1] - 36:23
**AL** [4] - 1:4, 1:10, 2:4, 2:11
**Alabama** [1] - 51:4
**alarm** [2] - 33:11, 55:22
**alcove** [1] - 91:20
**Alexia** [4] - 5:20, 5:21, 6:2, 6:6
**Alice** [1] - 107:20
**alive** [1] - 23:13
**alleging** [1] - 27:16
**allow** [1] - 106:15
**allowed** [1] - 45:6
**allows** [3] - 30:13, 38:14, 60:15
**almost** [2] - 24:19, 80:7
**alternate** [1] - 25:13
**alternative** [2] - 68:13, 68:15
**alternatives** [1] - 53:9
**amount** [13] - 7:22, 60:14, 61:7, 61:19, 61:20, 61:22, 62:1, 62:2, 62:8, 71:1, 73:8, 73:9, 75:5
**Amy** [9] - 5:17, 5:19, 6:1, 6:4, 6:5, 21:14, 21:22, 22:5, 22:12
**ANA** [3] - 1:19, 1:24, 5:1
**analogy** [6] - 62:4, 62:8, 84:5, 84:7, 88:15, 89:22

**analysis** [31] - 25:10, 49:25, 52:8, 52:11, 52:14, 53:5, 54:4, 55:24, 56:24, 57:3, 57:5, 57:10, 57:13, 57:15, 57:18, 69:8, 69:10, 76:11, 76:12, 76:16, 76:20, 81:24, 82:12, 82:15, 84:14, 87:23, 88:8, 99:7, 101:23, 104:16
**analyze** [3] - 24:23, 84:9, 97:23
**AND** [2] - 2:13, 108:6
**AND/OR** [1] - 108:10
**ANGELES** [1] - 2:12
**animal** [1] - 8:17
**animals** [1] - 85:25
**anomalies** [1] - 50:15
**answer** [4] - 19:4, 19:19, 67:6, 76:19
**answered** [1] - 92:19
**anticipate** [2] - 87:18, 106:2
**anticipated** [1] - 89:4
**ANY** [1] - 108:9
**anytime** [1] - 36:21
**anyway** [1] - 92:3
**appliance** [2] - 43:1, 55:3
**appliances** [1] - 42:22
**applicable** [1] - 38:4
**application** [8] - 53:12, 66:3, 77:1, 80:1, 82:18, 87:8, 94:25, 95:2
**applied** [1] - 52:9
**applies** [1] - 11:17
**apply** [2] - 99:2, 99:6
**apprise** [1] - 31:2
**approach** [2] - 60:5, 94:13
**approaches** [1] - 100:2
**appropriate** [1] - 44:3
**April** [1] - 5:19
**ARASH** [1] - 2:3
**ARE** [1] - 108:10
**area** [4] - 17:8, 29:22, 92:8, 103:7
**ARENT** [1] - 2:11
**argument** [2] - 30:9, 37:3
**ARGUMENT** [4] - 3:3, 3:4, 6:17, 28:21
**argumentative** [1] - 12:23
**arguments** [1] - 107:4
**Arizona** [1] - 51:4
**arms** [2] - 23:1, 34:20

**arrive** [2] - 52:18, 52:19
**arthritis** [2] - 21:14, 34:12
**Arthur** [3] - 3:4, 48:16, 48:19
**ARZOUMANIAN** [1] - 2:3
**assert** [2] - 51:21, 51:22
**assess** [2] - 93:3, 97:23
**assessment** [2] - 82:24, 83:11
**assistance** [1] - 21:17
**associated** [6] - 50:1, 50:19, 54:14, 56:5, 57:1, 106:22
**associating** [1] - 51:14
**association** [1] - 98:4
**assume** [4] - 57:12, 85:17, 87:3, 93:5
**assumption** [1] - 87:6
**attention** [3] - 17:5, 45:12, 98:11
**attentive** [2] - 87:21, 99:3
**attorney** [4] - 33:7, 47:7, 80:4, 86:22
**attorneys** [1] - 30:10
**August** [1] - 99:16
**authorities** [1] - 39:21
**authorization** [1] - 78:22
**auto** [15] - 11:17, 19:3, 59:23, 65:6, 65:9, 67:15, 70:5, 70:7, 70:10, 70:13, 74:9, 77:6, 90:8, 90:20, 91:5
**automatic** [18] - 6:22, 9:15, 11:3, 13:20, 17:14, 18:4, 19:14, 20:1, 21:7, 26:14, 32:17, 43:14, 43:16, 43:18, 43:22, 64:20, 64:22, 93:4
**automatically** [4] - 11:22, 19:7, 19:12, 90:19
**Ava** [13] - 5:20, 5:22, 6:1, 6:2, 6:6, 21:21, 22:12, 22:15, 22:20, 33:5, 33:15, 34:6, 34:7
**ava** [1] - 21:10
**available** [1] - 25:13
**average** [5] - 62:11, 73:10, 93:2, 103:11,

103:17
**avoid** [5] - 16:11, 43:3, 44:4, 55:1, 60:2
**avoided** [1] - 27:25
**awakened** [1] - 33:11
**aware** [10] - 8:14, 39:7, 44:1, 44:3, 83:21, 94:10, 94:12, 96:23, 98:18, 101:17

## B

**baby** [7] - 17:17, 17:22, 21:10, 22:15, 23:1, 27:19
**bachelor's** [3] - 49:6, 51:10, 51:12
**background** [4] - 49:5, 51:24, 52:2, 52:4
**bad** [2] - 21:17, 21:19
**Baird** [1] - 108:13
**BAIRD** [2] - 1:23, 108:14
**balance** [1] - 86:23
**bare** [2] - 27:12, 43:3
**barely** [1] - 11:15
**based** [3] - 85:6, 98:15, 101:1
**basic** [10] - 9:20, 20:8, 26:23, 27:8, 42:22, 52:12, 76:1, 80:14, 98:19, 102:2
**basis** [1] - 53:14
**basket** [2] - 28:5, 35:3
**baskets** [1] - 33:2
**bathroom** [5] - 9:10, 86:10, 86:19, 92:12, 92:14
**bathtub** [2] - 89:25, 90:3
**beam** [3] - 15:5, 15:7, 85:7
**become** [2] - 25:7, 51:7
**bed** [14] - 17:17, 21:13, 21:21, 22:13, 22:19, 33:6, 33:16, 33:24, 33:25, 34:6, 72:23, 73:4, 73:14
**bedding** [1] - 43:6
**bedroom** [10] - 5:24, 6:1, 17:25, 18:20, 21:21, 33:21, 33:23, 35:14, 35:15, 66:5
**begin** [1] - 75:23
**BEHALF** [2] - 2:3, 2:10
**behalf** [2] - 45:12, 46:4
**behind** [2] - 23:15,

55:14
**below** [6] - 60:2, 60:16, 61:5, 65:6, 77:5, 91:20
**benefit** [1] - 25:10
**benefits** [3] - 25:9, 25:12, 37:18
**best** [3] - 56:14, 94:15, 94:18
**better** [5] - 25:19, 33:18, 33:19, 72:25, 97:25
**between** [9] - 7:2, 20:3, 21:4, 33:6, 62:17, 73:23, 78:3, 93:25, 96:14
**beyond** [3] - 52:14, 85:15, 87:1
**big** [2] - 37:25, 62:9
**bigger** [1] - 62:6
**bit** [6] - 25:7, 31:11, 50:25, 59:17, 91:25, 93:21
**blades** [1] - 70:23
**blames** [1] - 89:2
**blare** [1] - 33:11
**blender** [1] - 78:24
**block** [4] - 13:10, 13:11, 68:24, 81:19
**blocking** [5] - 12:5, 82:2, 83:14, 90:22, 93:24
**blogs** [1] - 106:17
**blow** [6] - 7:19, 37:21, 59:3, 59:4, 89:22, 97:8
**blowing** [1] - 7:13
**blows** [5] - 58:16, 59:8, 63:13, 75:3, 90:13
**blowup** [1] - 99:9
**boards** [1] - 106:17
**body** [2] - 8:22, 53:1
**born** [5] - 5:18, 5:19, 5:21, 5:22
**bottom** [7] - 10:17, 10:18, 82:10, 91:19, 93:24, 94:1, 94:25
**bought** [3] - 17:13, 28:15, 31:14
**BOULEVARD** [1] - 2:4
**box** [4] - 22:6, 30:12, 92:15
**boxes** [1] - 33:2
**branch** [1] - 95:13
**break** [4] - 20:15, 45:14, 58:18, 106:10
**breakers** [2] - 50:7, 56:5
**breaking** [1] - 15:7

**breathe** [1] - 33:14
**briefly** [3] - 7:4, 41:1, 44:6
**Brigham** [1] - 49:7
**brutal** [1] - 24:5
**built** [2] - 31:14, 50:6
**built-in** [1] - 50:6
**bulletin** [3] - 17:3, 103:1, 106:17
**bulletins** [1] - 17:3
**burned** [3] - 7:6, 23:14, 52:22
**burning** [3] - 23:20, 74:11, 105:14
**burns** [2] - 43:3, 55:7
**burst** [1] - 89:2
**business** [2] - 43:15, 49:19
**buy** [1] - 66:4
**BY** [18] - 3:3, 3:4, 6:17, 28:21, 48:23, 53:20, 60:7, 67:10, 83:6, 85:19, 88:3, 92:23, 95:10, 96:10, 99:13, 102:11, 102:18, 102:24

## C

**CA** [2] - 2:5, 2:12
**CALIFORNIA** [4] - 1:2, 1:19, 1:24, 5:1
**California** [2] - 5:25, 25:6
**cannot** [1] - 54:18
**capable** [4] - 34:24, 47:21, 85:4, 100:1
**car** [7] - 84:1, 88:15, 88:16, 88:18, 89:1, 89:9, 89:13
**carburetor** [4] - 83:24, 83:25, 84:2, 84:3
**care** [1] - 24:5
**CARNEY** [1] - 1:3
**carry** [1] - 59:8
**case** [47] - 6:18, 11:14, 14:7, 18:25, 20:17, 24:20, 28:16, 29:11, 29:15, 29:16, 29:19, 30:4, 30:14, 30:20, 44:23, 45:4, 45:5, 45:11, 45:16, 46:2, 46:3, 46:5, 50:1, 50:3, 50:23, 51:25, 52:5, 52:9, 52:11, 52:18, 53:4, 54:5, 55:3, 55:11, 56:11, 62:12, 63:9, 65:19, 68:23, 77:11, 87:14, 106:13, 106:15,

106:16, 106:20, 107:2
**catch** [8] - 7:16, 7:17, 7:18, 40:16, 40:18, 40:19, 59:24, 76:7
**causation** [1] - 47:15
**caused** [1] - 28:2
**causes** [1] - 78:7
**causing** [1] - 80:25
**caution** [1] - 43:9
**CCRA** [1] - 1:23
**Celeste** [1] - 6:4
**CENTRAL** [1] - 1:2
**ceramic** [3] - 59:4, 59:5, 59:8
**certain** [14] - 5:8, 15:16, 21:2, 40:19, 51:8, 51:9, 51:16, 55:1, 57:22, 75:15, 80:21, 81:3, 95:15
**certainly** [4] - 79:17, 96:6, 98:13, 103:23
**CERTIFICATE** [1] - 108:5
**CERTIFY** [1] - 108:6
**cetera** [1] - 102:13
**chance** [2] - 45:10, 44:14
**change** [4] - 72:19, 88:20, 89:13, 89:14
**changed** [3] - 88:17, 89:1, 89:2
**changes** [1] - 40:3
**changing** [2] - 61:24, 62:11
**char** [1] - 75:23
**characteristics** [1] - 75:16
**characterization** [1] - 47:11
**characterize** [2] - 52:12, 52:13
**charge** [1] - 12:13
**CHARGED** [1] - 108:9
**chase** [1] - 64:14
**chat** [1] - 106:16
**CHICAGO** [1] - 2:15
**children** [8] - 43:10, 66:14, 86:2, 86:17, 87:15, 92:4, 103:7, 104:9
**chilly** [1] - 31:17
**choice** [1] - 92:24
**choices** [1] - 35:6
**chores** [1] - 34:15
**church** [1] - 24:11
**CIRCUIT** [1] - 108:9
**circuit** [2] - 50:7, 56:5
**circulation** [1] - 75:20
**circumstances** [2] -

50:13, 87:21
**claim** [7] - 24:21, 26:16, 27:1, 27:6, 27:15, 29:23, 40:10
**claims** [3] - 24:19, 27:15, 41:19
**cleaning** [1] - 66:19
**clear** [8] - 24:20, 30:5, 31:2, 32:9, 41:2, 43:12, 66:13, 81:11
**CLERK** [4] - 5:3, 45:20, 48:17, 107:11
**click** [1] - 90:12
**client** [2] - 17:12, 18:18
**close** [20] - 8:5, 8:9, 15:11, 17:7, 22:3, 24:11, 24:13, 29:21, 31:6, 31:8, 41:15, 44:7, 44:13, 44:21, 61:4, 67:14, 75:19, 103:5, 104:18
**closer** [2] - 10:23, 42:13
**closing** [1] - 18:10
**cloth** [1] - 63:19
**clothes** [1] - 10:20, 14:6, 22:1, 29:20, 31:7, 32:22, 32:25, 33:2, 41:15, 42:5, 42:13, 43:6, 44:19, 66:20
**clothing** [37] - 7:16, 7:18, 8:11, 8:15, 9:2, 9:3, 9:7, 9:9, 9:10, 9:11, 9:22, 10:1, 10:9, 10:14, 11:9, 11:10, 13:15, 13:18, 14:9, 14:23, 22:9, 22:10, 22:11, 26:7, 28:2, 28:3, 28:5, 28:7, 28:12, 63:19, 65:5, 66:9, 67:13, 72:2, 92:15, 92:16
**coil** [13] - 58:16, 59:4, 70:21, 70:24, 71:1, 71:4, 71:12, 71:16, 71:17, 71:18, 71:21, 72:1
**cold** [5] - 8:19, 8:25, 22:23, 31:18, 62:25
**collect** [1] - 98:11
**collecting** [2] - 32:21, 74:22
**color** [1] - 75:15
**Colorado** [4] - 49:11, 49:16, 49:18, 51:4
**combination** [1] - 75:18
**combustible** [22] -

7:16, 8:3, 8:15, 10:19, 13:14, 14:3, 14:6, 14:8, 15:11, 30:6, 40:18, 41:5, 42:4, 43:5, 59:24, 63:19, 63:22, 65:7, 66:15, 72:5, 83:13
**combustibles** [11] - 11:9, 16:11, 16:14, 29:20, 31:6, 32:5, 41:15, 44:7, 44:13, 64:6, 66:13
**combustion** [1] - 64:12
**coming** [21] - 8:1, 36:4, 59:15, 61:7, 62:9, 70:25, 71:9, 71:11, 71:25, 72:2, 72:14, 72:19, 73:3, 73:8, 73:9, 93:25, 94:11, 97:24, 99:20, 101:5, 101:11
**comment** [1] - 45:25
**commenting** [1] - 80:4
**comments** [1] - 73:21
**commercials** [1] - 83:22
**commission** [1] - 40:1
**Commission** [26] - 10:4, 15:14, 15:20, 16:2, 16:5, 16:8, 16:19, 17:2, 36:17, 36:18, 39:15, 39:23, 39:25, 40:7, 69:14, 95:4, 95:11, 95:12, 95:20, 96:2, 96:8, 96:23, 99:15, 100:12, 103:2, 103:15
**committee** [1] - 16:4
**common** [4] - 16:14, 44:24, 45:1, 64:6
**commonly** [2] - 16:11, 99:22
**communicate** [6] - 26:23, 55:23, 104:2, 104:4, 104:14, 106:19
**communicated** [6] - 17:11, 23:24, 26:12, 93:15, 93:17, 103:17
**communication** [1] - 16:7
**communications** [2] - 10:5, 73:24
**companies** [1] - 17:4, 98:10
**company** [13] - 12:6, 12:13, 14:22, 15:1, 15:11, 17:21, 19:22,

20:6, 49:14, 55:25, 69:4, 79:14, 82:21
**compare** [1] - 61:16
**compared** [2] - 10:12, 25:9
**competent** [1] - 30:10
**complain** [1] - 95:17
**complete** [1] - 41:2
**completing** [1] - 49:11
**complied** [3] - 21:6, 38:25, 44:14
**complies** [1] - 43:24
**comply** [3] - 11:8, 14:1, 86:14
**computer** [1] - 47:25
**computers** [1] - 33:19
**conceivable** [1] - 82:6
**concentrated** [4] - 97:14, 97:24, 101:5, 101:10
**concentration** [2] - 99:20, 101:6
**concept** [10] - 16:1, 74:21, 76:1, 77:17, 78:15, 88:5, 95:1, 97:20, 100:8, 101:25
**concepts** [2] - 20:8, 102:2
**concerning** [1] - 37:9
**conclude** [2] - 15:24, 76:21
**concluded** [1] - 104:20
**conclusion** [4] - 53:25, 57:20, 82:17, 96:8
**conclusions** [1] - 57:19
**condition** [3] - 65:13, 70:9
**conditions** [8] - 40:17, 56:5, 75:18, 78:5, 80:21, 81:4, 88:11, 89:21
**conductivity** [1] - 96:18
**CONFERENCE** [1] - 108:11
**CONFORMANCE** [1] - 108:10
**confusing** [1] - 46:7
**connection** [1] - 40:7
**consequences** [1] - 105:4
**consider** [1] - 30:11
**considered** [1] - 90:7
**consistent** [1] - 53:8
**consistently** [1] - 32:23
**conspicuous** [2] -

30:5, 43:12
**constant** [1] - 31:18
**constantly** [1] - 31:22
**constraints** [1] - 104:4
**consult** [1] - 20:11
**consulting** [4] - 38:8, 49:13, 49:23, 106:24
**Consumer** [24] - 10:3, 15:14, 15:19, 16:1, 16:4, 16:8, 16:18, 17:2, 36:16, 36:17, 39:14, 39:23, 39:25, 40:7, 69:14, 95:4, 95:12, 95:19, 96:2, 96:7, 96:22, 99:15, 103:2, 103:14
**consumer** [17] - 19:3, 19:5, 19:10, 19:14, 24:24, 24:25, 25:2, 25:5, 26:5, 26:12, 38:13, 55:25, 60:22, 72:23, 91:1, 95:15, 96:1
**consumers** [7] - 20:7, 31:6, 44:9, 65:23, 68:3, 95:16, 103:20
**contact** [2] - 41:5, 93:22
**contain** [1] - 55:15
**contemplate** [1] - 88:13
**contemplated** [1] - 80:11
**contention** [2] - 29:12, 29:15
**context** [13] - 50:19, 50:20, 52:5, 52:9, 52:24, 53:11, 54:11, 55:2, 56:3, 56:6, 57:24, 69:11, 80:6
**continue** [3] - 75:20, 75:21, 90:7
**continued** [3] - 15:25, 49:16, 96:19
**continuing** [1] - 100:1
**continuously** [1] - 58:2
**contrived** [1] - 30:3
**control** [3] - 101:1, 101:9, 101:12
**controlled** [1] - 66:11
**controlling** [1] - 101:15
**convection** [5] - 58:12, 58:17, 92:16, 94:19, 96:15
**convection-type** [1] - 94:19
**convective** [2] - 71:13, 75:4

convectively [1] - 71:3
cool [3] - 70:25, 71:10, 75:14
cooler [1] - 71:16
cord [2] - 39:1, 42:10
cordless [2] - 23:5, 23:12
core [1] - 26:23
COREY [1] - 2:3
CORMAC [1] - 1:3
corner [2] - 21:23, 22:9
corporate [2] - 13:5, 86:24
correct [9] - 5:14, 5:15, 19:4, 19:7, 19:12, 19:13, 68:17, 81:15, 93:17
CORRECT [1] - 108:6
cotton [1] - 9:11
counsel [5] - 28:22, 29:8, 40:11, 44:14, 107:4
counter [1] - 90:2
counterpart [1] - 56:18
couple [2] - 80:19, 80:22
course [4] - 16:22, 72:15, 89:3, 96:21
COURT [45] - 1:1, 1:23, 5:4, 5:14, 6:11, 6:14, 12:24, 18:6, 20:10, 20:14, 20:21, 28:18, 37:4, 39:8, 39:10, 45:13, 45:22, 46:8, 46:14, 46:20, 46:22, 47:5, 47:12, 47:17, 48:6, 48:13, 48:20, 53:19, 60:6, 67:5, 83:1, 85:17, 87:3, 87:6, 92:20, 95:9, 96:5, 98:25, 106:1, 106:5, 106:8, 107:13, 107:17, 107:20, 107:24
Court [1] - 28:22
court [6] - 20:15, 45:14, 45:21, 48:5, 48:14, 107:12
Courts [1] - 11:16
cover [4] - 28:1, 79:25, 80:1, 80:23
covered [2] - 26:19, 105:21
covering [4] - 9:12, 14:24, 15:12, 80:7
covers [5] - 25:21, 25:22, 27:7, 27:15, 72:23

coyotes [1] - 21:11
CPSC [12] - 36:20, 36:24, 37:8, 38:8, 39:3, 39:5, 40:9, 95:13, 102:21, 103:23, 104:22, 104:25
create [1] - 53:13
created [1] - 86:16
creates [1] - 37:20
creating [1] - 53:15
credibility [3] - 30:14, 30:15, 45:2
credible [1] - 30:17
crisis [1] - 88:1
critical [4] - 101:20, 101:22, 101:24, 104:23
criticize [1] - 84:5
CSR [1] - 1:23
current [1] - 49:18
curtains [4] - 10:20, 42:5, 42:13, 43:6
cut [2] - 64:14, 72:11
cutting [1] - 70:20

# D

Dad [1] - 21:13
Daddy [1] - 21:12
damage [1] - 50:15
dangerous [3] - 54:1, 54:3, 55:20
dark [3] - 86:18, 87:16, 87:25
data [3] - 40:21, 40:22, 41:10
date [1] - 94:24
DATE [1] - 108:14
dated [2] - 95:4, 100:12
daughter [3] - 23:15, 23:16, 72:24
daughters [12] - 5:20, 22:22, 22:25, 23:3, 23:7, 23:18, 24:6, 24:7, 27:20, 35:14, 35:16, 35:25
daughters' [1] - 22:21
David [1] - 28:23
DAVID [1] - 2:13
DAY [1] - 1:17
days [7] - 18:13, 21:16, 21:17, 21:18, 32:19, 34:13, 89:3
dead [1] - 23:14
deadly [1] - 105:5
deal [1] - 37:15
death [3] - 6:6, 18:22, 24:3

debris [1] - 52:21
decades [4] - 36:15
decedent [1] - 5:17
decide [3] - 15:9, 30:17, 47:19
decides [1] - 35:20
deciding [2] - 15:16, 66:21
declare [2] - 83:3, 83:15
deemed [1] - 96:2
defect [8] - 12:2, 13:8, 26:1, 29:6, 29:14, 29:16, 41:8, 81:6
defective [6] - 6:19, 6:20, 24:22, 24:23, 25:6, 25:25, 26:3, 26:15, 36:23
defendant [18] - 5:13, 8:13, 9:19, 12:19, 16:3, 16:20, 19:17, 23:6, 25:4, 25:14, 27:7, 27:15, 56:10, 56:23, 84:6, 84:9, 84:14, 85:6
defendant's [6] - 13:2, 13:5, 17:9, 18:13, 18:24, 21:3
DEFENDANTS [1] - 2:10
Defendants [1] - 1:12
defense [8] - 30:16, 46:5, 47:3, 47:7, 47:13, 69:8, 80:4, 86:22
DEFENSE [2] - 3:4, 28:21
defenses [1] - 24:21
definitely [1] - 65:25
degree [3] - 49:6, 51:10, 51:13
degrees [26] - 7:18, 7:21, 7:24, 7:25, 8:4, 8:8, 8:19, 9:5, 9:6, 9:14, 10:1, 10:10, 59:14, 59:19, 60:1, 61:3, 61:5, 63:9, 63:14, 63:15, 65:2, 70:3, 70:4, 71:9, 71:11, 100:4
delay [1] - 48:7
deliberate [1] - 45:19
deliberately [2] - 14:10, 84:10
delivered [1] - 61:20
demand [6] - 39:16, 39:17, 39:18
demonstrate [2] - 60:11, 64:10
demonstrates [1] -

40:23
department [1] - 95:14
DEPOSIT [1] - 108:10
deposition [3] - 18:12, 18:23, 56:13
depth [1] - 51:16
describe [5] - 53:6, 54:7, 77:2, 90:9, 93:19
described [1] - 82:15
design [43] - 12:2, 12:12, 14:19, 24:22, 25:8, 39:17, 40:3, 40:23, 49:23, 50:18, 50:21, 52:25, 53:2, 54:16, 54:18, 54:23, 57:17, 61:1, 61:2, 67:22, 68:1, 68:11, 68:13, 68:21, 69:25, 70:1, 76:24, 77:7, 79:9, 85:1, 87:4, 87:7, 89:6, 98:23, 99:1, 101:9, 101:22, 103:25, 104:3, 105:7, 105:10, 105:11
designator [1] - 81:25
designed [7] - 9:17, 30:23, 36:13, 43:22, 67:13, 68:5, 87:8
designer [3] - 82:6, 93:7, 101:2
designers [2] - 38:11, 38:22
designing [1] - 55:17
designs [2] - 25:13
desired [2] - 38:3, 88:19
despite [3] - 7:9, 19:14, 20:1
destroyed [1] - 7:6
detail [3] - 35:21, 43:19, 43:20
detect [2] - 81:9, 93:24
detecting [1] - 85:4
detects [1] - 81:21
determine [3] - 30:19, 39:12, 95:20
determined [2] - 54:22, 79:1
devastating [1] - 24:15
develop [3] - 38:10, 38:15, 38:23
developed [2] - 38:6, 38:18
developers [1] - 38:11
developing [4] - 38:14, 38:21, 56:2,

98:12
development [2] - 57:14, 102:14
device [8] - 7:23, 9:16, 12:16, 61:7, 64:21, 73:9, 73:10
devices [2] - 62:3, 62:12
diameter [1] - 78:1
dictates [1] - 54:19
dictionaries [1] - 106:25
die [1] - 47:4
died [2] - 6:4, 23:22
difference [9] - 7:2, 7:9, 20:3, 62:14, 62:17, 62:18, 63:7, 63:16, 73:13
differences [1] - 73:23
different [19] - 7:11, 8:17, 19:20, 40:16, 50:12, 55:8, 58:4, 59:2, 61:8, 61:15, 62:3, 78:3, 79:24, 80:19, 83:7, 83:9, 93:21, 102:23
difficult [1] - 11:13
difficulty [1] - 22:5
dire [1] - 19:21
DIRECT [2] - 3:5, 48:22
direct [2] - 8:20, 73:12
direction [1] - 44:18
directly [2] - 47:15, 66:12
director [1] - 18:13
disabilities [1] - 22:5
discuss [6] - 19:18, 20:8, 45:23, 106:12, 106:15, 107:17
discussed [5] - 20:5, 20:9, 29:8, 70:16, 102:2
discussing [5] - 84:18, 90:23, 100:8, 100:16, 106:16
discussion [5] - 18:8, 19:24, 34:21, 48:2, 58:18
disk [1] - 77:25
dispersed [1] - 101:11
displaced [2] - 85:23, 86:21
dispute [1] - 29:19
distance [1] - 63:6
distances [2] - 21:18, 40:16
distinct [1] - 52:3
distinction [3] - 21:4, 76:5, 96:14

5

distributed [1] - 19:2
DISTRICT [3] - 1:1,
 1:2, 1:23
document [6] - 10:4,
 76:3, 99:17, 99:18,
 102:19, 102:21
documentation [7] -
 53:2, 57:1, 57:12,
 57:13, 84:8, 101:14,
 105:11
documents [3] -
 19:18, 19:21, 39:17
dog [2] - 9:9, 14:18
dollars [1] - 12:14
donate [1] - 22:11
done [16] - 12:6,
 24:19, 27:24, 39:20,
 50:23, 54:4, 57:2,
 57:18, 76:10, 76:12,
 76:14, 80:3, 81:5,
 84:4, 106:2
doors [3] - 35:8, 35:9
dot [1] - 77:25
down [14] - 15:6,
 23:14, 43:2, 43:9,
 48:24, 62:20, 67:17,
 72:13, 82:10, 89:10,
 91:24, 99:24,
 105:14, 107:14
Dr [3] - 48:12, 48:25,
 107:14
drafty [1] - 37:24
dramatic [1] - 105:5
dramatically [1] - 61:8
drape [3] - 77:12,
 78:6, 80:23
draped [4] - 15:3,
 78:8, 80:9, 102:12
draping [1] - 85:24
draw [1] - 70:23
drawing [1] - 33:16
drawn [1] - 96:8
Drive [1] - 5:25
DRIVE [1] - 2:14
drive [1] - 88:16
driving [1] - 89:10
drop [2] - 60:13, 89:15
dropped [2] - 72:3,
 92:1
drops [2] - 64:1, 89:25
dryer [2] - 89:23, 90:4
dryers [1] - 50:5
duplicate [1] - 64:7
during [5] - 18:10,
 31:19, 32:24, 33:20,
 71:2
dust [2] - 37:21, 37:23
duty [1] - 88:23

E

e-mail [1] - 20:8
e-mails [1] - 106:17
early [2] - 22:13, 66:20
easier [2] - 24:15,
 24:16
easily [1] - 38:2
easy [3] - 31:2, 41:2,
 43:13
easy-to-understand
 [1] - 43:13
EDCV12-00438-CJC
 [1] - 1:8
education [3] - 51:9,
 51:15, 52:2
educational [1] - 49:4
effect [4] - 61:23,
 73:2, 74:2, 99:22
effective [7] - 69:23,
 70:8, 70:10, 70:12,
 91:9, 91:11, 104:13
effectively [7] - 55:23,
 67:18, 69:3, 69:22,
 70:5, 93:9, 99:7
efficient [1] - 46:16
effort [2] - 27:20, 36:1
efforts [1] - 49:25
eight [1] - 40:9
either [9] - 22:11,
 31:14, 32:14, 35:2,
 59:4, 62:20, 72:13,
 78:12, 81:5
elaborate [1] - 53:9
electric [3] - 42:24,
 49:8, 99:16
Electric [2] - 34:3,
 49:13
electrical [6] - 42:22,
 49:3, 49:6, 52:6,
 55:5, 61:19
electricity [2] - 58:14,
 70:22
electrocuted [1] - 90:1
element [8] - 55:13,
 55:9, 59:7, 60:2,
 64:1, 91:20, 100:2,
 101:23
elevated [2] - 12:3,
 13:12
eliminate [2] - 94:13,
 94:15
eliminated [2] - 76:22,
 76:23
eliminating [1] - 55:15
embedded [1] - 59:7
embodied [1] - 95:1
emergency [1] - 27:18
emissivities [1] -
 100:5

emissivity [1] - 96:18
emit [2] - 37:19, 63:11
emits [2] - 63:5, 72:13
emitted [2] - 37:22,
 64:4
emitting [1] - 63:4
employee [1] - 18:24
employees [1] - 56:14
empty [1] - 66:8
enclosing [1] - 55:13
end [9] - 34:20, 42:6,
 43:7, 73:4, 88:1,
 104:2, 104:14,
 106:6, 107:18
energy [28] - 61:20,
 61:22, 62:1, 62:2,
 62:22, 71:1, 71:3,
 71:16, 71:17, 72:21,
 73:3, 73:6, 73:8,
 73:9, 74:8, 75:21,
 97:12, 97:15, 97:23,
 97:24, 99:20, 99:25,
 100:6, 101:5
engineer [14] - 9:19,
 13:3, 20:7, 51:2,
 51:6, 51:7, 51:18,
 52:1, 52:3, 54:12,
 55:10, 65:21, 88:7,
 105:7
engineering [40] -
 49:3, 49:6, 49:8,
 49:15, 49:23, 50:21,
 50:22, 51:10, 51:24,
 52:6, 52:8, 52:13,
 52:16, 56:1, 56:2,
 57:3, 57:10, 57:16,
 60:3, 61:19, 69:8,
 69:10, 76:10, 85:18,
 85:20, 85:21, 87:4,
 87:7, 87:23, 88:7,
 89:4, 92:25, 93:3,
 93:7, 93:8, 98:23,
 99:5, 103:25, 104:3
Engineering [3] -
 49:14, 49:19, 49:20
engineers [11] - 25:8,
 38:8, 38:14, 51:14,
 51:20, 51:21, 51:23,
 52:15, 56:15
ensure [3] - 56:8,
 69:12, 83:5
entire [3] - 21:1, 25:23
entirely [2] - 66:13,
 86:19
entity [1] - 5:10
environment [14] -
 57:25, 66:11, 68:12,
 85:13, 86:17, 87:9,
 87:10, 87:13, 87:14,
 87:17, 89:24, 90:4,

92:5
environmental [1] -
 29:18
environments [1] -
 85:25
equipment [3] - 23:3,
 48:7, 50:8
equipped [2] - 11:19,
 90:14
equivalent [1] - 62:6
escape [1] - 23:22
escaping [1] - 22:20
especially [2] - 40:7,
 57:11
essence [4] - 6:18,
 16:9, 28:16, 67:25
essentially [14] - 7:7,
 7:10, 30:20, 33:11,
 33:20, 34:19, 35:17,
 50:10, 59:6, 60:12,
 63:3, 96:16, 97:20,
 101:8
established [1] -
 79:22
establishes [1] -
 78:20
establishing [1] -
 79:12
et [1] - 102:13
ET [4] - 1:4, 1:10, 2:3,
 2:11
evaluate [14] - 39:24,
 41:24, 50:11, 50:17,
 50:18, 50:20, 52:9,
 54:13, 55:10, 69:11,
 84:17, 93:9, 105:12,
 105:13
evaluated [4] - 52:23,
 54:21, 56:6, 82:16,
 96:8, 104:19
evaluates [1] - 78:21,
 80:12, 95:14
evaluating [2] - 53:7,
 99:19
evaluation [5] - 53:23,
 53:24, 56:3, 84:4,
 104:21
evening [2] - 32:24,
 107:24
event [7] - 8:21, 9:22,
 24:16, 26:25, 64:15,
 65:21, 66:1
eventuality [1] - 90:6
eventually [1] - 36:3
everywhere [2] - 33:1,
 44:19
evidence [47] - 5:11,
 14:25, 19:13, 23:23,
 24:6, 25:1, 25:25,
 26:2, 26:11, 26:15,

26:22, 27:4, 27:11,
 27:23, 29:11, 29:14,
 30:10, 30:11, 30:13,
 31:12, 31:13, 31:20,
 31:25, 32:3, 32:11,
 34:8, 34:9, 36:10,
 37:3, 37:6, 37:7,
 37:15, 39:7, 39:11,
 39:12, 39:16, 41:18,
 41:22, 41:24, 45:3,
 45:6, 45:18, 46:9,
 47:11, 52:20, 107:3
exactly [5] - 61:25,
 73:9, 88:14, 88:22,
 89:5
exam [1] - 51:17
EXAMINATION [2] -
 3:5, 48:22
example [4] - 7:17,
 68:23, 71:8, 71:11
examples [2] - 52:22,
 58:24
exceeded [1] - 38:24
except [1] - 47:16
excess [5] - 64:6,
 70:2, 70:3, 96:25
excessive [1] - 55:19
excuse [1] - 55:16
exemplar [2] - 39:17,
 53:5
exemplars [1] - 52:23
exhausted [2] - 16:12,
 99:23
exhaustive [1] - 12:11
exhibit [1] - 103:20
Exhibit [15] - 33:17,
 53:18, 53:21, 71:5,
 74:4, 91:16, 93:18,
 94:20, 95:3, 99:8,
 99:14, 100:10,
 102:6, 102:20
exhibits [2] - 3:7,
 11:14
exist [2] - 41:8, 41:9
exists [2] - 89:5, 99:6
exits [1] - 35:6
expect [22] - 24:25,
 25:5, 31:20, 31:25,
 32:2, 34:7, 34:9,
 34:22, 36:9, 41:17,
 44:10, 76:21, 77:24,
 84:25, 88:14, 88:16,
 88:22, 89:6, 89:9,
 90:2, 96:6, 98:10
expectation [5] -
 19:10, 19:15, 24:24,
 25:2, 86:1
expected [6] - 31:9,
 31:13, 53:11, 87:16,
 88:20, 89:3

**expecting** [2] - 88:9
**expensive** [1] - 20:25
**experience** [8] -
25:19, 25:20, 49:10,
51:8, 51:13, 51:15,
72:25, 105:13
**experiment** [1] - 60:11
**expert** [16] - 7:1, 8:13,
11:4, 13:1, 15:8,
17:10, 18:17, 20:11,
29:23, 37:17, 40:12,
48:25, 49:2, 49:25,
85:16, 87:2
**expert's** [1] - 56:17
**experts** [1] - 53:3
**explain** [16] - 7:3,
11:5, 15:8, 18:17,
53:22, 67:23, 68:18,
70:18, 71:6, 71:22,
77:9, 88:5, 95:5,
96:11, 96:22, 100:24
**explained** [2] - 16:1,
16:9
**explaining** [1] - 7:1
**explains** [1] - 96:14
**explicitly** [1] - 79:8
**explore** [2] - 47:8,
53:10
**expose** [1] - 66:16
**exposed** [1] - 54:2
**exposure** [1] - 78:4
**extensive** [2] - 12:11,
40:14
**extent** [1] - 68:21
**extracted** [1] - 52:21
**extreme** [3] - 43:9,
66:17, 81:9
**extremely** [2] - 37:24,
38:3

**F**

**fabric** [1] - 81:2
**face** [2] - 15:6, 81:12
**facility** [1] - 20:16
**facing** [4] - 73:14,
81:2, 81:15, 84:11
**fact** [17] - 25:19, 29:5,
29:25, 32:15, 36:8,
36:24, 38:22, 44:18,
57:12, 57:14, 95:22,
101:17, 101:24,
104:13, 105:1,
105:13
**factor** [1] - 93:21
**factors** [2] - 100:5,
101:1
**facts** [3] - 5:8, 30:18,
44:25
**Fahrenheit** [11] - 7:19,

7:21, 7:24, 9:14,
10:1, 10:10, 59:14,
59:20, 60:1, 63:9,
65:3
**fail** [1] - 44:11
**fails** [1] - 44:9
**failure** [3] - 30:5, 30:6,
49:25
**fair** [11] - 56:20, 56:22,
68:13, 69:15, 82:21,
82:23, 83:11, 84:5,
84:22, 93:13, 93:14
**fairly** [1] - 51:16
**fall** [1] - 44:17
**falls** [1] - 58:22
**family** [7] - 20:25,
24:11, 26:25, 29:2,
35:13, 64:16, 106:14
**fan** [9] - 7:8, 58:12,
58:15, 58:17, 64:18,
70:19, 70:23, 73:23,
75:2
**far** [6] - 21:18, 25:12,
31:12, 37:12, 91:3,
101:17
**fashioned** [1] - 17:1
**fast** [1] - 75:17
**favor** [1] - 73:22
**feature** [13] - 6:21,
6:22, 14:19, 14:22,
15:8, 15:10, 24:1,
70:13, 90:8, 91:10,
93:22, 94:4, 94:8
**February** [2] - 100:11,
100:13
**federal** [3] - 69:18,
95:13, 95:14
**FEE** [1] - 108:9
**FEES** [1] - 108:9
**feet** [46] - 8:12, 8:16,
9:3, 9:11, 9:22, 10:9,
10:20, 10:24, 11:9,
11:11, 12:4, 13:19,
13:24, 14:23, 18:4,
20:2, 21:6, 22:2,
22:4, 22:12, 26:8,
28:2, 28:3, 28:6,
28:8, 28:12, 32:5,
34:9, 34:10, 42:6,
42:13, 43:6, 63:20,
66:23, 82:2, 84:12,
84:19, 84:20, 84:23,
85:8, 85:14, 86:15,
86:25, 90:22
**fell** [1] - 35:4
**fellow** [2] - 106:13,
107:5
**few** [4] - 12:13, 18:13,
60:20, 70:17
**field** [2] - 40:21, 40:22

**FIFTH** [1] - 2:11
**fifth** [1] - 27:6
**finally** [3] - 40:6, 44:6,
107:2
**findings** [1] - 105:16
**fine** [4] - 46:21, 58:21,
68:7, 84:3
**fire** [112] - 5:24, 6:2,
6:3, 6:5, 6:19, 6:23,
7:17, 7:18, 7:19, 8:2,
8:5, 8:10, 8:13, 8:14,
9:6, 9:13, 10:2,
10:10, 10:14, 10:19,
11:7, 11:10, 12:2,
14:2, 14:11, 14:14,
14:16, 14:25, 15:1,
15:3, 15:13, 16:14,
17:6, 17:15, 18:3,
18:16, 18:21, 19:16,
20:4, 20:5, 20:22,
22:14, 22:16, 23:22,
24:2, 25:3, 26:6,
28:4, 28:13, 29:9,
29:13, 29:17, 30:7,
31:3, 31:5, 31:9,
32:15, 32:20, 33:4,
33:12, 34:5, 34:8,
34:9, 34:10, 35:3,
35:4, 35:24, 35:25,
36:2, 36:10, 39:3,
39:5, 40:16, 40:18,
41:4, 41:7, 42:4,
42:16, 42:24, 43:25,
44:6, 44:12, 47:4,
52:21, 55:5, 57:11,
59:24, 60:3, 60:10,
60:24, 61:3, 62:15,
63:19, 64:17, 64:19,
65:5, 65:18, 66:17,
66:25, 68:6, 73:25,
74:12, 74:16, 74:19,
74:20, 76:7, 82:23,
83:9, 92:17, 92:22,
105:8
**fires** [12] - 16:21,
18:14, 29:10, 41:14,
41:20, 82:22, 83:10,
105:5, 105:8, 105:9,
105:11, 105:17
**firm** [2] - 49:16, 49:22
**FIRM** [1] - 2:4
**first** [33] - 5:6, 5:10,
8:2, 16:11, 24:21,
24:23, 30:22, 33:11,
35:24, 36:4, 36:6,
36:8, 42:3, 43:16,
45:5, 47:1, 47:24,
48:9, 50:12, 51:8,
52:19, 54:8, 54:12,
67:22, 87:23, 88:8,

95:1, 95:11, 97:2,
104:25, 106:10
**fit** [1] - 68:5
**five** [7] - 22:2, 22:4,
28:6, 35:14, 35:15,
36:9, 69:6
**fix** [1] - 47:22
**fixed** [1] - 33:20
**flame** [1] - 41:4
**flames** [2] - 64:13,
75:24
**floor** [15] - 22:20,
34:17, 34:18, 34:19,
34:24, 60:13, 66:10,
72:3, 74:8, 80:10,
81:10, 90:24, 91:25,
92:2, 94:11
**FLOOR** [1] - 2:12
**Florida** [1] - 51:4
**flow** [1] - 68:24
**flowing** [1] - 70:22
**flows** [1] - 58:15
**flux** [9] - 15:24, 97:6,
97:13, 99:15,
100:25, 101:4,
101:11, 101:16,
101:18
**focused** [3] - 25:21,
97:21, 99:18
**follow** [5] - 30:5, 44:9,
44:11, 44:25, 69:5
**followed** [3] - 31:10,
42:23, 44:3
**following** [2] - 13:8,
42:25
**foot** [1] - 29:21
**FOR** [1] - 108:9
**forced** [5] - 58:12,
58:17, 59:18, 64:18,
77:5
**forced-air** [2] - 58:17,
59:18
**FOREGOING** [1] -
108:6
**forensic** [2] - 49:15,
49:24
**Forensics** [2] - 49:20,
49:21
**foresee** [2] - 88:25,
90:5
**foreseeable** [13] -
44:16, 66:1, 86:13,
88:6, 88:24, 89:7,
89:8, 89:11, 89:12,
89:18, 89:20, 89:21
**forget** [1] - 89:14
**form** [8] - 7:11, 62:23,
62:24, 67:1, 67:4,
82:25, 93:21, 107:22
**format** [2] - 8:24, 95:8

**forming** [1] - 97:22
**forms** [1] - 79:24
**forth** [1] - 80:2
**forward** [2] - 48:14,
107:9
**four** [2] - 31:15, 49:12
**FOURTH** [1] - 1:24
**fourth** [1] - 27:1
**FOX** [1] - 2:11
**freaking** [2] - 22:14,
22:17
**free** [1] - 20:16
**French** [3] - 35:8, 35:9
**front** [30] - 9:13,
10:21, 10:24, 14:3,
42:7, 42:13, 43:7,
59:12, 60:9, 60:13,
64:1, 64:11, 66:13,
66:16, 67:14, 74:8,
75:2, 75:9, 75:11,
76:6, 76:7, 80:10,
81:10, 83:13, 84:13,
85:23, 89:16, 96:24,
97:11, 99:20
**full** [4] - 22:1, 48:17,
64:13, 75:24
**functional** [1] - 48:8
**fundamental** [8] -
50:21, 52:6, 52:13,
52:15, 56:1, 62:14,
62:17, 101:21
**furniture** [4] - 10:20,
42:5, 42:12, 43:5

**G**

**garbage** [2] - 29:20,
31:8
**GARY** [1] - 2:10
**gasoline** [1] - 14:8
**gasoline-soaked** [1] -
14:8
**general** [4] - 60:9,
60:21, 79:22, 105:16
**General** [1] - 34:3
**generalized** [1] - 80:2
**generally** [6] - 51:9,
54:10, 59:10, 59:18,
59:19, 103:17
**generate** [6] - 60:23,
63:10, 63:21, 67:8,
70:22, 96:24
**generated** [3] - 59:10,
64:3, 75:5
**generates** [1] - 58:15
**generating** [3] - 55:4,
63:14, 68:24
**generation** [1] - 93:20
**gentlemen** [11] - 5:4,
20:14, 28:23, 37:5,

39:11, 44:23, 45:13, 48:6, 49:2, 106:9, 107:6
**geometric** [1] - 100:5
**girl** [1] - 33:6
**girls** [3] - 21:10, 22:18, 36:3
**given** [5] - 27:10, 81:2, 84:17, 91:4, 91:7
**glaring** [1] - 81:23
**glasses** [1] - 11:15
**glow** [1] - 62:22
**glowing** [1] - 63:10
**goal** [2] - 56:7, 56:8
**GOLDBERG** [1] - 2:14
**government** [3] - 15:15, 69:18, 95:14
**grab** [1] - 33:15
**grabs** [2] - 22:15, 34:6
**gradually** [1] - 9:1
**graphic** [3] - 71:23, 71:24, 73:15
**graphics** [4] - 33:19, 67:20, 70:17, 72:6
**great** [7] - 11:7, 37:15, 43:19, 43:20, 76:22, 88:18, 107:8
**greater** [2] - 25:12, 73:25
**grill** [2] - 55:14, 78:2
**groggy** [4] - 86:8, 87:15, 92:11, 92:13
**ground** [1] - 22:24
**group** [4] - 97:19, 97:20, 97:22, 98:2
**guarantee** [1] - 79:20
**guard** [8] - 54:20, 54:22, 54:23, 68:22, 69:22, 70:5, 85:1
**guarded** [2] - 55:13, 69:2
**guarding** [4] - 55:14, 55:18, 76:23, 78:15
**guess** [2] - 56:22, 106:10
**guide** [2] - 19:2, 42:19

**H**

**hair** [1] - 90:4
**half** [6] - 15:7, 49:12, 65:4, 70:20, 72:11, 94:2
**halfway** [2] - 8:5, 99:24
**hall** [2] - 35:12, 35:13
**hallway** [1] - 35:11
**hamper** [6] - 22:1, 28:11, 66:8, 66:9, 89:16, 92:15

**hand** [3] - 7:2, 60:20, 75:8
**handful** [1] - 41:13
**handles** [1] - 43:4
**hands** [2] - 34:20, 88:1
**hard** [2] - 24:7, 58:13
**harrowing** [1] - 23:7
**hauler** [6] - 23:2, 23:3, 23:4, 35:17, 35:19
**hazard** [47] - 52:7, 54:18, 54:20, 55:5, 55:6, 55:12, 55:15, 55:17, 55:18, 55:23, 56:24, 57:3, 57:4, 57:10, 57:13, 57:15, 57:18, 60:3, 68:20, 69:23, 69:25, 70:1, 70:6, 76:11, 76:22, 76:23, 76:24, 77:8, 78:15, 80:15, 82:12, 83:18, 85:5, 86:16, 88:8, 91:8, 93:3, 93:15, 94:10, 94:14, 94:16, 97:25, 99:7, 105:12, 105:13
**hazards** [23] - 19:25, 27:8, 54:14, 54:15, 54:16, 54:17, 54:25, 55:1, 55:3, 55:8, 55:9, 55:11, 67:23, 68:1, 68:21, 68:22, 87:9, 87:24, 93:9, 93:10, 93:12, 93:13
**head** [1] - 94:5
**headed** [1] - 42:15
**hear** [49] - 7:1, 10:8, 12:6, 12:25, 13:2, 14:21, 15:15, 17:12, 17:25, 18:12, 18:17, 18:24, 19:17, 19:24, 21:20, 23:5, 23:7, 23:9, 23:11, 24:4, 24:6, 24:14, 25:9, 25:13, 25:18, 29:24, 30:9, 30:13, 32:15, 32:19, 35:2, 35:21, 37:18, 38:7, 38:16, 38:17, 38:19, 40:12, 40:13, 40:20, 40:21, 41:13, 41:17, 41:18, 41:21, 42:18, 43:19, 43:20, 46:16
**heard** [7] - 19:20, 20:23, 21:11, 34:12, 36:4, 45:18, 107:3
**heart** [1] - 27:19
**hearts** [1] - 29:1
**heat** [77] - 6:9, 7:10, 7:11, 7:13, 7:14,

7:15, 7:18, 7:20, 7:22, 7:24, 8:1, 8:18, 8:23, 9:14, 10:10, 10:13, 10:14, 13:15, 14:15, 16:15, 16:16, 20:25, 21:1, 21:2, 21:23, 21:25, 25:22, 25:23, 37:19, 37:20, 37:22, 52:6, 55:4, 58:15, 59:9, 60:15, 60:23, 61:7, 61:23, 62:24, 63:1, 63:5, 63:10, 63:11, 68:24, 70:22, 71:14, 71:15, 72:16, 72:20, 73:16, 74:6, 74:22, 74:24, 75:4, 75:5, 75:8, 75:13, 75:16, 75:20, 75:25, 76:1, 76:6, 77:18, 78:6, 81:13, 81:16, 81:19, 81:21, 100:1, 100:25, 101:4, 101:11, 101:18
**heated** [2] - 61:21, 72:21
**heater** [312] - 6:8, 6:9, 6:19, 6:20, 6:23, 6:24, 7:5, 7:6, 7:7, 7:8, 7:9, 7:14, 8:12, 8:16, 8:18, 9:3, 9:4, 9:12, 9:15, 9:17, 9:21, 9:24, 9:25, 10:5, 10:7, 10:10, 10:12, 10:18, 10:21, 10:24, 11:1, 11:4, 11:9, 11:11, 11:12, 11:16, 11:17, 11:18, 11:20, 11:23, 11:24, 11:25, 12:1, 12:3, 12:4, 12:5, 13:10, 13:11, 13:12, 13:19, 14:2, 14:4, 14:10, 14:11, 14:12, 14:23, 15:2, 15:4, 15:6, 15:12, 16:13, 16:16, 17:6, 17:7, 17:8, 17:13, 17:15, 17:16, 17:21, 17:25, 18:2, 18:16, 18:19, 18:20, 19:3, 19:7, 19:8, 19:12, 19:15, 20:6, 21:3, 21:8, 21:23, 21:24, 22:3, 22:12, 22:17, 24:21, 25:3, 25:11, 25:18, 25:25, 26:3, 26:9, 26:18, 27:9, 28:4, 28:15, 29:6, 29:9, 29:12, 29:13, 29:17, 29:21, 30:7, 30:23, 31:1,

31:6, 31:8, 32:2, 32:8, 32:16, 34:2, 34:3, 35:3, 36:12, 36:13, 36:18, 36:21, 39:1, 40:2, 40:3, 40:5, 41:2, 41:4, 41:7, 41:16, 42:2, 42:7, 42:14, 43:2, 43:4, 43:8, 43:10, 43:11, 44:4, 44:8, 44:13, 44:21, 52:21, 52:22, 53:12, 58:10, 58:11, 58:12, 58:17, 58:22, 58:23, 59:5, 59:11, 60:9, 60:14, 60:17, 60:22, 61:2, 61:12, 61:13, 61:14, 62:15, 62:19, 62:21, 63:3, 63:18, 63:24, 63:25, 64:11, 64:16, 64:17, 64:18, 64:19, 64:20, 64:22, 64:24, 64:25, 65:9, 65:15, 65:22, 66:13, 66:16, 66:24, 67:7, 67:11, 67:12, 67:14, 68:4, 68:9, 68:10, 68:15, 68:16, 68:23, 69:2, 69:24, 70:2, 70:8, 70:12, 70:19, 71:10, 71:11, 71:25, 72:7, 72:11, 72:25, 73:1, 73:12, 73:14, 73:15, 73:19, 73:20, 74:1, 74:6, 74:18, 74:19, 74:24, 75:2, 75:3, 75:6, 75:9, 75:11, 76:8, 76:9, 76:12, 76:14, 76:17, 76:18, 77:5, 77:7, 77:10, 77:11, 77:12, 77:16, 77:17, 77:20, 77:21, 78:9, 78:24, 80:6, 80:10, 81:10, 81:12, 81:14, 81:18, 81:24, 82:1, 82:23, 83:13, 84:11, 84:13, 84:24, 85:2, 85:9, 85:12, 85:14, 85:23, 86:21, 86:25, 87:18, 89:16, 89:18, 90:14, 90:16, 90:19, 90:20, 90:22, 92:16, 92:21, 92:24, 93:21, 93:25, 94:1, 94:2, 94:3, 94:11, 94:16, 94:19, 96:15, 96:16, 96:25, 97:12, 99:21, 100:21, 101:1, 101:6, 101:12, 102:13, 103:4, 103:5, 103:6,

104:17, 104:18, 105:17
**heaters** [113] - 5:12, 7:2, 7:3, 7:13, 7:15, 7:20, 7:22, 8:1, 8:5, 8:17, 8:18, 9:7, 9:14, 10:16, 11:6, 13:9, 13:23, 14:5, 14:13, 14:15, 14:17, 15:20, 15:22, 16:10, 16:14, 16:15, 16:21, 17:5, 17:25, 18:14, 19:19, 19:23, 19:25, 20:3, 20:4, 21:5, 21:22, 23:25, 25:14, 25:17, 26:20, 27:13, 29:10, 29:25, 31:15, 31:16, 31:17, 31:18, 31:21, 32:3, 32:6, 32:13, 32:14, 33:7, 36:14, 36:21, 36:25, 37:9, 37:11, 37:12, 37:19, 38:12, 39:17, 41:3, 41:11, 41:20, 41:23, 42:20, 50:3, 53:5, 53:7, 55:11, 56:5, 58:3, 58:5, 58:7, 58:19, 58:20, 58:25, 59:3, 59:11, 59:18, 66:4, 66:18, 73:23, 74:22, 76:5, 78:12, 79:25, 80:18, 82:22, 83:10, 85:25, 96:23, 97:2, 97:4, 97:5, 97:8, 97:24, 99:16, 99:19, 100:18, 101:16, 101:22, 103:8, 103:21
**heating** [16] - 15:25, 20:25, 25:19, 25:20, 50:5, 50:6, 55:3, 59:5, 59:7, 64:1, 71:21, 72:24, 76:1, 91:20, 96:19, 100:2
**heats** [6] - 37:24, 37:25, 70:24, 75:2, 77:14, 77:21
**heeded** [1] - 41:6
**help** [5] - 20:20, 34:22, 35:20, 36:5, 38:22
**HEREBY** [1] - 108:6
**hierarchy** [10] - 54:4, 54:8, 54:13, 54:19, 54:24, 56:24, 68:18, 69:6, 69:16, 69:20
**high** [36] - 7:15, 7:22, 8:2, 10:14, 14:15, 15:24, 24:10, 33:8, 34:10, 63:8, 63:22, 63:25, 64:23, 64:24,

65:12, 65:19, 67:8, 70:7, 70:13, 74:7, 77:14, 77:23, 78:2, 78:7, 78:9, 81:3, 81:8, 81:16, 82:9, 82:10, 85:4, 85:6, 96:18, 97:7, 100:5
**high-limit** [7] - 64:23, 65:12, 77:14, 77:23, 78:2, 85:4, 85:6
**higher** [9] - 59:17, 60:23, 61:3, 63:15, 75:7, 76:8, 97:10, 100:20, 101:6
**highest** [1] - 33:9
**highlighted** [2] - 100:15, 100:23
**highlights** [2] - 54:11, 103:4
**highly** [1] - 101:10
**Highway** [1] - 36:22
**highway** [1] - 89:10
**Hills** [2] - 5:25, 20:24
**history** [1] - 39:19
**hits** [3] - 72:16, 73:4
**hold** [1] - 67:3
**holds** [1] - 30:1
**Holmes** [11] - 5:10, 5:13, 21:24, 30:23, 31:1, 31:16, 34:2, 36:12, 41:1, 42:19, 90:11
**HOMAMPOUR** [52] - 2:3, 2:4, 5:7, 5:16, 6:18, 12:25, 16:25, 18:9, 20:13, 20:19, 20:22, 37:2, 39:6, 46:19, 46:21, 46:24, 47:6, 47:23, 48:1, 48:1, 48:21, 48:23, 53:17, 53:20, 60:5, 60:7, 67:3, 67:10, 83:6, 85:19, 87:5, 88:3, 92:23, 95:10, 96:10, 98:23, 99:8, 99:11, 99:13, 102:7, 102:10, 102:11, 102:16, 102:18, 102:21, 102:23, 102:24, 105:23, 106:3, 106:6, 107:19, 108:3
**Homampour** [6] - 5:5, 6:15, 20:10, 47:20, 48:9, 106:1
**home** [24] - 5:24, 6:5, 6:19, 6:20, 9:8, 11:6, 20:24, 25:11, 25:14, 31:19, 36:5, 46:25, 49:19, 58:24, 60:22,

65:23, 66:3, 68:3, 68:12, 76:19, 85:13, 94:16, 103:22
**homes** [1] - 76:13
**Honor** [17] - 5:7, 6:13, 12:22, 16:22, 18:11, 28:20, 30:8, 33:17, 37:2, 39:6, 39:9, 45:24, 53:17, 60:5, 95:8, 107:23, 108:1
**HONORABLE** [1] - 1:3
**hop** [1] - 60:12
**hope** [2] - 45:9, 102:5
**horrible** [1] - 62:4
**hot** [20] - 8:4, 8:25, 13:14, 20:4, 29:25, 32:4, 36:19, 37:1, 40:10, 43:2, 43:3, 44:5, 55:6, 55:12, 71:18, 75:12, 75:22, 77:14, 77:23, 97:8
**hotter** [1] - 71:25, 72:1, 97:16
**hour** [2] - 36:6, 80:7
**hours** [2] - 31:23, 41:12
**hours'** [1] - 40:14
**house** [16] - 21:1, 23:4, 23:9, 23:10, 23:12, 23:17, 23:19, 23:20, 31:14, 36:3, 36:7, 36:9, 47:2, 47:10, 47:16
**household** [1] - 59:25
**housekeeping** [1] - 32:20
**HQ307** [1] - 21:24
**HQH307** [9] - 37:13, 38:24, 41:11, 57:1, 57:5, 57:15, 61:14, 90:11, 104:8
**huddled** [1] - 23:1
**hundreds** [1] - 41:12
**hurt** [2] - 34:25, 95:17
**husband** [1] - 5:17
**hyper** [1] - 40:8
**hypoallergenic** [1] - 37:21

**I**

**idea** [7] - 17:13, 17:14, 17:16, 17:18, 28:13, 34:19, 38:10
**ideally** [1] - 54:15
**identified** [3] - 27:8, 68:20, 80:15
**identify** [5] - 54:13, 55:9, 56:24, 68:1, 87:23

**identifying** [2] - 54:15, 55:2
**ignite** [9] - 16:12, 41:4, 63:22, 64:2, 67:9, 67:14, 72:4, 99:22, 100:6
**ignited** [2] - 64:13, 65:19
**igniting** [2] - 16:11, 80:24
**ignition** [15] - 15:25, 16:17, 59:22, 59:23, 60:16, 64:6, 65:7, 69:1, 72:5, 74:9, 77:6, 96:19, 96:25, 100:3, 101:7
**II** [1] - 1:18
**IL** [1] - 2:15
**illustrate** [5] - 58:7, 74:12, 74:16, 80:13, 100:7
**illustrated** [1] - 53:16
**illustrates** [5] - 53:13, 71:8, 72:10, 74:5, 96:14
**illustrating** [3] - 67:20, 71:24, 77:13
**image** [1] - 77:13
**immediately** [2] - 41:5, 106:20
**impact** [2] - 24:14, 62:13
**impair** [1] - 33:13
**impairments** [1] - 21:15
**imparting** [1] - 71:2
**impinge** [1] - 75:10
**impinging** [1] - 75:22
**implication** [1] - 47:3
**implying** [1] - 46:24
**important** [13] - 17:10, 18:15, 30:15, 32:4, 32:8, 41:3, 42:21, 57:6, 59:21, 59:22, 60:2, 73:14, 103:23
**importantly** [1] - 50:20
**impossible** [2] - 41:6, 43:25
**improper** [1] - 37:3
**IN** [4] - 2:3, 2:10, 2:10, 7:8, 108:10
**in-court** [1] - 20:15
**in-depth** [1] - 51:16
**inability** [1] - 81:8
**inadequate** [1] - 57:16
**inadvertence** [1] - 86:15
**inadvertently** [5] - 11:11, 84:13, 85:13, 85:22, 92:14

**INC** [2] - 1:10, 2:11
**inch** [6] - 13:19, 13:24, 15:7, 78:1, 94:2
**incident** [14] - 6:7, 7:8, 11:25, 15:9, 17:13, 18:15, 21:9, 21:20, 27:25, 39:19, 50:13, 69:24, 94:6, 94:7
**incidents** [3] - 41:14, 41:19, 41:25
**include** [2] - 37:19, 104:15
**includes** [2] - 38:7, 106:16
**including** [8] - 32:14, 42:24, 53:2, 55:11, 80:22, 104:10, 106:13, 106:22
**incorporate** [1] - 105:1
**incorporated** [1] - 54:23
**increase** [2] - 9:1, 9:5
**increased** [1] - 44:2
**independent** [3] - 78:19, 100:25, 105:12
**INDEX** [1] - 3:1
**indicate** [1] - 57:2
**indicated** [2] - 98:3, 107:7
**indicates** [1] - 70:13
**indicating** [3] - 34:17, 78:25, 91:19
**indicating** [5] - 33:25, 34:1, 34:4, 34:7, 36:1
**indicative** [2] - 50:15, 57:16
**individual** [1] - 52:24
**individually** [1] - 33:1
**individuals** [2] - 51:19, 51:21
**industrial** [1] - 50:7
**industrial-level** [1] - 50:7
**industry** [4] - 38:4, 38:6, 50:19, 99:4
**ineffective** [1] - 90:24
**information** [10] - 17:9, 17:10, 17:24, 26:24, 90:14, 93:13, 104:17, 104:19, 104:22, 106:23
**infrared** [10] - 62:23, 63:2, 63:4, 63:14, 72:14, 72:15, 72:19, 75:9, 78:5, 100:6
**injured** [1] - 95:17
**injury** [1] - 42:24

**inside** [8] - 7:14, 9:20, 9:24, 58:14, 64:24, 72:12, 77:15, 77:22
**insofar** [1] - 68:2
**inspect** [1] - 83:24
**inspection** [1] - 83:23
**instance** [4] - 41:4, 65:17, 65:18, 67:15
**instances** [1] - 57:23
**instant** [1] - 11:18
**instantaneous** [1] - 37:20
**instead** [5] - 25:16, 35:19, 61:9, 72:20, 80:9
**Institute** [1] - 49:9
**institution** [1] - 51:11
**instructed** [2] - 30:8, 46:15
**instruction** [4] - 39:1, 46:20, 47:20, 106:10
**instructions** [15] - 31:1, 31:9, 32:1, 32:10, 41:1, 42:1, 42:3, 42:22, 42:25, 43:24, 44:9, 44:11, 44:15, 107:4, 107:22
**insufficient** [2] - 91:21, 91:22
**insulated** [1] - 89:24
**intended** [6] - 29:7, 38:23, 40:24, 88:19, 88:22, 89:19
**intensity** [2] - 62:10, 63:25
**intentionally** [3] - 78:11, 81:18, 85:12
**internal** [1] - 102:12
**internet** [4] - 106:16, 106:17, 106:25
**interrupt** [1] - 94:3
**introduce** [1] - 37:15
**introduced** [1] - 37:16
**introducing** [1] - 61:25
**invalids** [1] - 43:11
**investigated** [1] - 50:2
**investigation** [6] - 39:4, 39:20, 45:17, 50:1, 50:14, 107:1
**investigations** [1] - 36:25
**invisible** [1] - 93:22
**involved** [14] - 7:7, 11:25, 15:16, 15:17, 29:17, 32:14, 38:9, 50:3, 50:13, 53:15, 69:24, 96:3, 98:5, 106:14
**involving** [1] - 64:15

**IR** [1] - 100:6
**IS** [1] - 108:6
**issue** [11] - 16:20, 29:18, 46:19, 64:14, 80:6, 83:19, 95:22, 97:22, 97:25, 99:18, 101:15
**issues** [3] - 24:6, 26:18, 69:9
**IT** [2] - 20:11, 47:21
**item** [2] - 52:24, 61:11
**items** [2] - 40:15, 67:17
**itself** [13] - 10:11, 11:2, 14:24, 15:7, 35:3, 37:22, 40:5, 50:17, 60:23, 71:13, 72:18, 85:2, 98:8

## J

**January** [7] - 5:19, 5:23, 6:4, 20:23, 33:10, 66:20, 102:19
**jet** [1] - 23:2
**job** [3] - 30:17, 30:19, 82:11
**John** [5] - 3:4, 37:16, 48:12, 48:16, 48:19
**judge** [3] - 30:13, 45:2, 45:6
**JUDGE** [1] - 1:3
**JUDICIAL** [1] - 108:11
**July** [2] - 5:21, 5:22
**jump** [1] - 70:15
**JUNE** [2] - 1:20, 5:1
**jurisdiction** [2] - 36:16, 38:20
**jurors** [2] - 106:13, 107:5
**jury** [20] - 5:11, 28:23, 45:21, 46:3, 46:15, 47:19, 48:5, 48:25, 53:22, 58:25, 60:8, 67:24, 80:15, 82:15, 88:5, 91:18, 100:8, 100:24, 107:12, 107:21
**JURY** [1] - 1:17
**jury's** [1] - 46:17

## K

**keep** [27] - 10:19, 11:8, 18:11, 20:19, 21:6, 23:2, 26:24, 30:6, 32:4, 42:4, 42:14, 43:5, 43:8, 45:10, 45:17, 55:16, 55:17, 57:12, 57:13,

66:8, 66:12, 69:1, 82:20, 86:14, 103:7, 104:9, 107:2
**keeping** [2] - 60:1, 84:12
**keeps** [1] - 71:18
**KENNETH** [2] - 1:4, 2:3
**Kenneth** [7] - 5:17, 5:18, 6:1, 6:2, 21:21, 22:12, 22:13
**kept** [4] - 22:2, 22:4, 22:6, 28:5
**kicked** [1] - 66:23
**kid** [1] - 83:23
**kids** [2] - 24:12, 24:15
**kids'** [2] - 22:21, 66:10
**kill** [1] - 28:14
**killed** [1] - 6:19
**kind** [11] - 40:19, 45:17, 55:3, 57:2, 60:16, 70:19, 71:8, 72:10, 77:4, 87:17, 107:21
**kinds** [3] - 58:4, 78:20, 79:24
**knee** [2] - 21:19, 34:13
**knock** [2] - 66:15, 89:15
**knocked** [6] - 28:11, 32:16, 32:17, 86:21, 90:2, 92:14
**knocking** [1] - 87:16
**knocks** [2] - 9:9, 9:10
**Knott** [1] - 49:15
**knowing** [2] - 26:18, 102:8
**knowledge** [1] - 60:25
**known** [8] - 11:5, 18:3, 21:8, 26:5, 26:18, 28:14, 76:2, 102:2

## L

**label** [7] - 11:8, 42:10, 55:22, 61:18, 88:2, 91:17, 91:18
**Laboratories** [17] - 12:8, 13:22, 15:21, 16:3, 16:5, 16:9, 38:17, 78:18, 78:19, 78:25, 80:14, 81:6, 81:25, 95:5, 97:17, 100:12
**Laboratories'** [1] - 81:24
**Laboratory** [1] - 49:15
**laboratory** [1] - 16:19
**ladies** [11] - 5:4, 20:14, 28:23, 37:5,

39:11, 44:23, 45:13, 48:6, 49:2, 106:9, 107:6
**laid** [1] - 79:6
**large** [3] - 20:24, 37:24, 53:1
**larger** [1] - 50:6
**last** [7] - 31:5, 40:8, 44:6, 48:18, 67:20, 69:20, 96:17
**later-generation** [1] - 93:20
**laundry** [5] - 33:2, 35:3, 66:8, 66:9, 89:16
**LAW** [1] - 2:4
**law** [4] - 12:17, 25:6, 44:25, 107:4
**lawsuit** [3] - 28:25, 30:3, 41:9
**lead** [1] - 35:10
**leading** [1] - 34:14
**leak** [1] - 75:13
**learn** [1] - 27:9
**learns** [1] - 23:21
**least** [7] - 10:20, 27:10, 32:5, 32:16, 42:6, 43:6, 48:8
**leave** [7] - 10:13, 17:6, 17:8, 32:8, 103:4, 103:7, 104:17
**left** [5] - 11:13, 43:11, 49:16, 49:18, 70:23
**LESS** [1] - 108:9
**less** [2] - 41:14, 65:4
**letter** [7] - 15:20, 95:4, 95:6, 96:11, 100:10, 100:11, 100:23
**level** [6] - 50:7, 60:23, 91:25, 94:11, 95:15, 99:5
**liable** [1] - 29:5
**library** [4] - 98:14, 98:16, 98:18, 98:19
**license** [1] - 52:1
**licensed** [6] - 50:25, 51:2, 51:5, 51:7, 51:20, 51:22
**life** [2] - 24:11, 24:18
**light** [3] - 62:24, 63:4, 63:5
**likely** [5] - 84:9, 84:15, 85:11, 85:22, 101:6
**limit** [17] - 55:10, 64:23, 65:12, 65:20, 70:7, 70:13, 77:14, 77:23, 78:2, 78:7, 78:9, 81:3, 81:8, 81:17, 82:9, 85:4, 85:6

**limitations** [1] - 80:13
**limited** [1] - 54:18
**limiting** [1] - 99:4
**Line** [1] - 5:25
**line** [3] - 25:16, 73:12, 78:4
**lines** [1] - 72:15
**list** [1] - 78:22
**listen** [3] - 44:24, 45:10, 106:21
**literally** [2] - 31:22, 36:14
**literature** [1] - 26:13
**live** [1] - 22:25
**lived** [1] - 20:24
**living** [2] - 66:5, 66:6
**LLP** [2] - 2:11, 2:14
**located** [1] - 5:25
**location** [2] - 18:21, 19:18
**logic** [1] - 104:10
**look** [23] - 25:8, 50:9, 50:11, 50:12, 50:14, 50:18, 61:15, 61:17, 71:22, 72:9, 72:11, 80:20, 80:24, 81:3, 85:5, 85:21, 88:15, 89:23, 93:3, 94:20, 99:14, 100:10, 107:9
**looked** [8] - 15:20, 50:4, 52:19, 52:22, 52:24, 84:1, 84:2, 104:16
**looking** [8] - 50:10, 54:12, 70:20, 71:5, 90:9, 90:10, 102:25
**looks** [1] - 34:17
**LOS** [1] - 2:12
**loss** [1] - 29:2
**Loud** [1] - 37:16
**love** [1] - 24:18
**loved** [1] - 24:12
**low** [2] - 67:17, 96:18
**lower** [6] - 55:16, 55:18, 59:17, 71:21, 72:4, 96:13
**lucky** [1] - 69:10
**lying** [1] - 80:10

## M

**machine** [2] - 8:7, 14:24
**machines** [2] - 50:5, 56:4
**mail** [1] - 20:8
**mails** [1] - 106:17
**maintain** [2] - 95:15, 98:16
**maintained** [1] - 98:18

**maintaining** [2] - 98:13, 98:19
**malfunction** [1] - 41:8
**malfunctioned** [1] - 29:12
**malfunctions** [1] - 29:11
**management** [2] - 18:14, 101:25
**manager** [1] - 57:14
**manual** [15] - 9:17, 11:3, 11:16, 11:17, 11:25, 13:21, 17:11, 20:2, 25:4, 39:2, 40:4, 73:18, 90:10, 90:11, 91:2
**manuals** [1] - 39:22
**manufactured** [1] - 6:8
**manufacturer** [16] - 26:17, 26:23, 27:2, 61:2, 69:13, 69:19, 79:10, 83:4, 88:21, 88:23, 89:19, 89:23, 101:9, 101:13
**manufacturer's** [5] - 82:11, 82:13, 87:22, 88:21, 104:4
**manufacturers** [3] - 17:4, 38:8, 104:24
**manufacturing** [3] - 29:14, 29:16, 41:8
**map** [2] - 31:11, 45:5
**mapping** [2] - 99:16, 99:20
**mark** [5] - 12:9, 12:15, 78:24, 79:5, 79:11
**marked** [2] - 35:7, 35:16
**market** [6] - 13:20, 15:17, 20:6, 54:1, 65:23, 82:14
**marketed** [3] - 76:13, 76:14, 87:18
**marketing** [6] - 12:15, 73:22, 76:18, 79:14, 79:17
**markings** [1] - 50:15
**married** [2] - 5:18, 24:13
**master** [4] - 5:24, 6:1, 33:21, 33:23
**master's** [1] - 49:7
**material** [26] - 8:15, 10:9, 10:15, 13:14, 14:6, 14:8, 21:6, 42:5, 53:1, 59:8, 61:4, 65:8, 72:5, 74:10, 75:16, 80:25, 82:2, 84:12, 84:16,

90:21, 98:7, 98:9, 98:10, 104:7
**materials** [41] - 7:16, 8:3, 10:19, 11:10, 14:3, 15:11, 16:12, 18:3, 20:2, 30:7, 43:5, 56:10, 56:21, 56:23, 59:25, 63:23, 64:4, 64:5, 65:19, 66:16, 67:9, 73:22, 75:10, 83:13, 84:23, 85:8, 85:13, 86:14, 86:25, 96:18, 96:24, 97:11, 98:14, 98:20, 99:3, 99:22, 100:4, 100:19, 101:14, 102:13, 107:1
**MATTER** [1] - 108:8
**matter** [11] - 13:3, 29:5, 30:1, 35:18, 36:7, 36:24, 44:18, 54:9, 66:24, 69:4, 105:7
**max** [1] - 16:13
**maximum** [3] - 59:10, 79:3, 100:25
**mean** [17] - 12:20, 13:1, 14:7, 46:2, 46:11, 51:5, 53:22, 74:23, 79:19, 83:17, 87:16, 91:5, 95:25, 97:3, 97:19, 101:3, 106:6
**meaning** [1] - 14:7
**means** [8] - 12:10, 14:9, 16:13, 24:24, 26:3, 26:17, 55:14, 93:6
**measured** [2] - 59:15, 60:18
**measures** [1] - 9:23
**meet** [4] - 51:8, 51:16, 79:7, 79:22
**meeting** [1] - 97:18
**members** [3] - 24:10, 58:25, 106:13
**membership** [1] - 98:4
**men** [1] - 28:24
**mentioned** [3] - 29:9, 33:8, 40:11
**messaging** [1] - 106:18
**met** [4] - 38:24, 79:13, 83:16
**meters** [2] - 42:6, 43:7
**middle** [9] - 14:19, 28:10, 46:5, 66:15, 70:21, 72:13, 86:11, 87:25, 92:10
**might** [9] - 44:19,

45:7, 46:7, 53:10, 54:14, 57:25, 78:1, 89:14, 89:15
**million** [2] - 37:14, 69:6
**millions** [2] - 41:11, 41:12
**mind** [3] - 45:10, 45:18, 107:2
**mine** [1] - 48:1
**Mines** [2] - 49:12, 49:17
**minimize** [1] - 38:13
**minimum** [12] - 12:7, 12:10, 12:15, 12:17, 27:12, 38:5, 79:3, 79:6, 79:12, 91:5, 91:9
**minute** [2] - 32:10, 40:22
**minutes** [1] - 60:20
**Miriam** [1] - 108:13
**MIRIAM** [2] - 1:23, 108:14
**misleading** [2] - 82:24, 83:12
**missing** [2] - 81:23, 82:1
**mistrial** [2] - 47:5, 47:6
**misuse** [8] - 88:5, 88:6, 88:15, 88:24, 89:7, 89:11, 89:12, 89:18
**mitigate** [6] - 87:12, 87:24, 91:8, 93:9, 93:10, 93:12
**mitigated** [3] - 76:25, 83:18, 87:11
**mitigates** [1] - 77:8
**mode** [1] - 97:14
**model** [4] - 37:12, 40:2, 42:2, 61:14
**modify** [1] - 54:16
**Mom** [1] - 21:13
**mom** [1] - 24:18
**moment** [5] - 10:5, 18:6, 20:11, 20:17, 85:7
**Mommy** [1] - 21:12
**money** [2] - 12:13, 79:14
**monthly** [1] - 88:20
**months** [2] - 88:17, 89:1
**Mormon** [1] - 24:11
**morning** [5] - 22:13, 33:10, 34:5, 106:11, 107:15
**most** [5] - 50:20, 51:9,

52:15, 55:11, 59:3
**mother** [3] - 6:20, 24:8, 29:2
**move** [4] - 21:15, 64:12, 71:17, 102:16
**moved** [3] - 38:2, 49:18, 86:20
**moves** [1] - 71:17
**moving** [3] - 34:20, 43:4, 61:8
**MR** [82] - 5:7, 5:15, 5:16, 6:13, 6:18, 12:22, 12:25, 16:25, 18:9, 20:13, 20:19, 20:22, 28:20, 28:22, 37:2, 37:8, 39:6, 39:9, 39:14, 45:24, 46:11, 46:18, 46:19, 46:21, 46:23, 46:24, 47:6, 47:15, 47:23, 47:25, 48:1, 48:11, 48:21, 48:23, 53:17, 53:20, 60:5, 60:7, 67:1, 67:3, 67:4, 67:10, 82:25, 83:6, 85:15, 85:19, 87:1, 87:5, 88:3, 92:19, 92:23, 95:7, 95:10, 96:4, 96:10, 98:22, 98:23, 99:8, 99:10, 99:11, 99:12, 99:13, 102:7, 102:8, 102:10, 102:11, 102:16, 102:18, 102:21, 102:22, 102:23, 102:24, 105:23, 105:25, 106:3, 106:6, 107:18, 107:19, 107:23, 108:1, 108:2, 108:3
**multiple** [1] - 86:4
**must** [4] - 67:22, 69:23, 87:10, 89:20
**MVB11893@aol.com** [1] - 1:25

### N

**name** [3] - 5:12, 48:17, 48:18
**nameplate** [1] - 61:17
**National** [1] - 36:22
**natural** [1] - 37:19
**nature** [3] - 55:4, 71:13, 71:15
**near** [3] - 13:15, 43:10, 78:3
**necessarily** [6] - 15:9, 63:5, 66:7, 66:8,

83:17, 95:25
**necessary** [3] - 26:24, 43:10, 65:4
**need** [16] - 20:15, 20:20, 45:23, 51:13, 56:6, 68:5, 80:3, 88:14, 89:6, 90:5, 93:12, 99:2, 103:21, 104:20, 107:17
**needed** [2] - 21:17, 35:20
**needs** [5] - 34:22, 79:10, 82:7, 87:8, 87:21
**negligent** [2] - 26:16, 27:16
**NEI** [1] - 49:13
**neighbor** [4] - 35:22, 35:23, 36:5, 47:1
**neighbor's** [2] - 23:17, 36:3
**never** [27] - 7:15, 7:20, 8:2, 8:3, 10:13, 11:6, 14:15, 17:6, 18:9, 20:4, 21:8, 28:14, 32:12, 32:13, 36:17, 37:10, 64:19, 71:12, 71:25, 72:1, 75:7, 76:8, 97:9, 103:4, 103:5, 104:17, 104:18
**nevertheless** [1] - 29:4
**news** [1] - 106:21
**next** [7] - 14:11, 18:13, 45:8, 54:19, 54:24, 68:18, 74:3
**NHTSA** [1] - 36:22
**nice** [2] - 70:16, 71:10
**night** [13] - 14:19, 20:22, 21:9, 21:20, 28:2, 28:10, 31:18, 33:4, 33:5, 66:15, 86:11, 87:25, 92:10
**non** [47] - 7:3, 7:13, 7:15, 7:20, 7:22, 8:1, 8:5, 8:12, 8:16, 10:12, 14:5, 14:10, 14:13, 14:15, 18:19, 20:3, 21:5, 25:17, 58:19, 58:23, 59:2, 59:11, 59:18, 60:9, 60:22, 62:15, 63:18, 64:17, 64:20, 64:22, 66:18, 66:24, 68:10, 68:15, 68:23, 73:1, 73:20, 74:1, 76:8, 77:10, 77:11, 92:16, 92:21

**non-radiant** [47] - 7:3, 7:13, 7:15, 7:20, 7:22, 8:1, 8:5, 8:12, 8:16, 10:12, 14:5, 14:10, 14:13, 14:15, 18:19, 20:3, 21:5, 21:23, 25:17, 58:19, 58:23, 58:24, 59:2, 59:11, 59:18, 60:9, 60:22, 62:15, 63:18, 64:17, 64:20, 64:22, 66:18, 66:24, 68:9, 68:10, 68:15, 68:23, 73:1, 73:20, 74:1, 74:19, 76:8, 77:10, 77:11, 92:16, 92:21
**none** [3] - 17:9, 20:5, 81:8
**normal** [5] - 38:19, 70:1, 78:5, 80:20, 80:21
**normally** [3] - 63:21, 67:8, 67:13
**nothing** [6] - 20:8, 27:24, 47:9, 104:7
**notice** [2] - 27:10, 27:13
**notices** [1] - 103:13
**Number** [1] - 35:6
**number** [7] - 29:9, 35:14, 35:15, 36:12, 43:9, 50:11, 55:8
**nutshell** [1] - 54:10

### O

**O'CONNELL** [23] - 2:13, 5:15, 6:13, 45:24, 46:11, 46:18, 46:23, 67:1, 67:4, 82:25, 85:15, 87:1, 92:19, 95:7, 96:4, 98:22, 99:10, 99:12, 102:8, 102:22, 105:25, 107:18, 108:1
**O'Connell** [1] - 28:24
**OAKS** [1] - 2:5
**oath** [1] - 48:15
**object** [11] - 15:23, 16:16, 16:17, 37:25, 74:22, 74:25, 76:6, 76:7, 95:7, 97:6
**object's** [1] - 100:1
**objection** [10] - 12:22, 37:2, 67:1, 67:4, 82:25, 85:15, 87:1, 92:19, 96:4, 98:22
**objects** [4] - 8:23, 10:23, 42:12, 75:25

obligation [3] - 13:4, 79:9, 82:13
obviously [6] - 18:16, 22:15, 38:1, 39:22, 54:22, 65:19
occupants [1] - 92:8
occur [4] - 31:9, 44:8, 44:10, 85:11
occurring [1] - 8:15
October [3] - 5:18, 5:21, 6:9
OF [7] - 1:2, 1:16, 2:3, 2:10, 108:7, 108:11
Off-the-record [2] - 18:8, 48:2
OFFICIAL [2] - 1:23, 108:14
oil [6] - 88:17, 88:20, 88:25, 89:2, 89:13, 89:14
old [3] - 6:5, 17:1, 21:10
old-fashioned [1] - 17:1
on-product [1] - 42:8
once [5] - 13:13, 32:16, 36:17, 46:16, 54:21
one [42] - 5:10, 7:2, 16:10, 16:22, 17:25, 18:1, 20:7, 21:23, 28:1, 30:1, 30:2, 32:14, 35:6, 36:12, 40:11, 40:12, 40:17, 40:19, 42:25, 45:24, 46:1, 46:19, 57:11, 59:13, 61:12, 63:13, 64:14, 69:21, 71:13, 77:8, 82:8, 90:12, 91:24, 96:16, 102:22, 102:23, 105:8
online [1] - 106:22
open [5] - 35:9, 41:4, 45:10, 45:18, 107:2
Open [3] - 45:21, 48:5, 107:12
open-flame [1] - 41:4
OPENING [4] - 3:3, 3:4, 6:17, 28:21
opening [9] - 6:10, 6:15, 18:10, 29:8, 34:12, 37:5, 46:9, 46:24, 102:22
operate [2] - 78:7, 78:10
operates [1] - 81:3
operating [10] - 32:8, 33:8, 37:10, 43:11, 63:21, 67:7, 67:12,

67:13, 80:21, 81:17
operation [3] - 70:2, 77:15, 94:3
operator [1] - 23:10
operators [1] - 27:21
opinion [10] - 30:2, 58:3, 58:4, 71:23, 85:11, 91:21, 91:22, 94:9, 105:9
opinions [9] - 52:18, 52:19, 53:14, 53:16, 57:6, 67:24, 95:6, 96:12
opposed [3] - 41:23, 63:13, 64:18
order [9] - 7:17, 38:13, 51:7, 63:7, 63:9, 69:11, 79:5, 97:25, 99:1
ordered [1] - 69:14
ordinary [3] - 8:3, 9:8, 85:13
organization [4] - 78:20, 95:13, 97:21, 98:12
organized [1] - 30:20
otherwise [3] - 8:8, 21:16, 56:25
outdoor [1] - 8:21
outline [2] - 24:19, 52:17
outside [12] - 8:20, 12:4, 15:3, 22:22, 23:9, 35:10, 35:15, 35:16, 37:3, 39:7, 47:1, 63:1
outsides [1] - 8:25
over-temperature [1] - 70:9
overarching [1] - 87:22
overheat [13] - 9:18, 11:21, 19:6, 19:8, 19:11, 24:2, 65:13, 80:18, 90:16, 90:18, 90:21, 93:5
overruled [11] - 12:24, 37:4, 39:8, 67:5, 83:1, 85:17, 87:6, 92:20, 95:9, 96:5, 98:25
oversight [2] - 105:2, 105:4
overstretching [1] - 84:3
own [10] - 13:1, 13:2, 13:4, 13:5, 17:9, 25:4, 49:19, 50:17, 53:5, 107:2
owned [1] - 31:15

owner [1] - 87:21
owner's [2] - 19:2, 42:19

## P

P-a-l-m-e-r [1] - 48:19
P.M [1] - 5:1
p.m [3] - 48:3, 48:4, 108:4
page [2] - 83:9, 100:22
PAGE [1] - 3:2
pages [1] - 56:21
palmer [1] - 48:25
Palmer [9] - 3:4, 40:13, 48:12, 48:13, 48:16, 48:19, 49:19, 49:20, 107:14
panel [4] - 97:18, 98:2, 98:5, 98:6
paper [2] - 31:7, 100:3
papers [5] - 10:20, 22:7, 42:5, 42:12, 43:6
paragraph [2] - 96:13, 100:15
parens [4] - 42:6, 43:7
park [1] - 8:21
part [7] - 21:24, 42:19, 68:18, 97:2, 97:3, 97:21, 105:3
particular [18] - 31:23, 41:9, 50:14, 52:10, 54:11, 59:13, 77:1, 78:8, 79:1, 79:2, 79:7, 82:18, 83:18, 87:12, 88:10, 97:22, 98:6, 101:15
particularly [4] - 57:22, 57:25, 67:17, 96:13
parties [6] - 5:7, 5:16, 5:23, 37:7, 39:10, 46:15
parts [1] - 84:1
pass [2] - 12:14, 83:23
passed [2] - 82:22, 84:6
passes [1] - 12:20, 83:4
passing [1] - 79:19
patent [2] - 94:21
patented [4] - 11:19, 90:14, 91:12, 94:4
path [3] - 15:23, 85:23, 97:6
patient [1] - 108:3
Pause [2] - 16:24, 20:18
pay [2] - 17:5, 98:11

pays [1] - 79:14
pen [1] - 35:8
people [27] - 13:20, 25:11, 25:14, 27:13, 36:9, 56:9, 66:3, 66:5, 66:7, 66:14, 68:12, 76:13, 76:15, 76:18, 85:2, 85:8, 86:6, 86:8, 86:10, 86:18, 87:15, 88:16, 91:10, 95:16, 102:4, 104:12, 106:14
per [1] - 61:20
perfect [1] - 106:4
perform [2] - 24:25, 99:7
performed [1] - 102:12
performs [1] - 43:21
perhaps [1] - 89:11
period [2] - 8:13, 40:8
person [12] - 11:8, 14:1, 17:7, 37:25, 47:21, 87:24, 89:9, 89:14, 89:15, 103:6, 103:11, 104:19
personal [2] - 86:23
personally [1] - 28:7
persons [1] - 42:24
perspective [3] - 33:22, 60:3, 92:25
pets [6] - 66:14, 86:18, 87:15, 92:5, 103:7, 104:9
Ph.D [2] - 49:8, 49:11
phone [4] - 23:5, 23:12, 23:14, 23:18
phrase [1] - 14:9
physical [2] - 52:19
physically [1] - 73:11
pick [2] - 45:15, 73:19
picks [1] - 23:4
pictures [2] - 22:23, 24:9
pile [6] - 9:3, 9:4, 9:25, 22:9, 44:20, 92:15
piled [3] - 32:25, 33:1, 66:22
piles [1] - 33:1
pillows [1] - 43:5
Pinon [2] - 5:25, 20:24
place [9] - 8:2, 17:7, 33:3, 42:12, 55:19, 87:23, 95:16, 103:5, 104:18
placed [4] - 31:6, 38:25, 44:7, 44:13
places [2] - 66:5, 105:14
plaintiff [2] - 41:22,

45:5
PLAINTIFF [2] - 3:3, 6:17
Plaintiffs [1] - 1:6
plaintiffs [3] - 40:10, 41:18, 48:12
PLAINTIFFS [1] - 2:3
plaintiffs' [12] - 5:24, 6:5, 29:8, 29:23, 30:16, 33:7, 34:12, 40:11, 44:14, 46:3, 46:5
Plaintiffs' [2] - 3:4, 48:16
plastic [1] - 12:9
play [2] - 18:23, 23:6
plays [1] - 46:8
plug [2] - 42:10, 42:11
plugged [2] - 42:15, 62:21
point [11] - 15:10, 16:17, 34:8, 35:8, 36:1, 42:2, 56:7, 67:20, 76:6, 88:2, 103:20
pointed [1] - 15:21
points [3] - 103:3, 103:21, 104:2
Polytechnic [1] - 49:9
portable [7] - 21:3, 31:17, 31:21, 38:1, 38:2, 41:20, 60:22
portion [1] - 95:8
pose [1] - 55:5
posed [1] - 76:16
position [1] - 35:5
possibilities [1] - 53:10
possibility [17] - 15:22, 15:24, 65:13, 80:1, 80:9, 80:12, 84:21, 87:15, 88:13, 89:4, 90:5, 92:7, 93:5, 96:19, 97:5, 99:6, 100:18
possible [4] - 13:5, 66:14, 82:12, 86:20
potential [10] - 11:21, 19:5, 19:11, 57:11, 73:25, 90:16, 90:18, 90:21, 96:24
potentiality [1] - 83:18
potentially [2] - 9:5, 89:24
power [3] - 39:1, 49:8, 78:24
Power [1] - 49:14
PowerPoint [4] - 53:13, 53:15, 58:6, 60:19

**practicable** [1] - 68:2
**precaution** [1] - 42:23
**precautions** [1] - 90:6
**predict** [1] - 65:22
**preliminarily** [1] - 30:8
**prerequisite** [1] -
    51:17
**prescribe** [1] - 82:5
**present** [5] - 6:3,
    45:21, 48:5, 54:17,
    107:12
**presented** [3] - 39:13,
    45:3, 107:3
**president** [1] - 49:20
**PRESIDING** [1] - 1:3
**pretty** [5] - 24:5,
    43:12, 52:15,
    101:21, 101:22
**prevalent** [1] - 30:22
**prevent** [4] - 17:5,
    31:3, 55:18, 67:22
**prevented** [3] - 15:9,
    55:13, 65:20
**previously** [1] - 37:16
**principle** [2] - 76:2,
    101:21
**principles** [3] - 52:6,
    52:7, 99:2
**Prins** [6] - 37:15,
    43:20, 43:21, 46:12,
    46:13, 56:14
**private** [1] - 12:17
**privilege** [1] - 28:24
**problem** [3] - 32:13,
    34:14, 34:15
**proceed** [1] - 48:20
**Proceeding** [1] -
    108:4
**proceeding** [1] - 48:4
**PROCEEDINGS** [2] -
    1:16, 108:7
**proceedings** [2] -
    16:24, 20:18
**process** [8] - 38:7,
    50:21, 50:22, 52:16,
    53:7, 53:23, 56:1,
    57:9
**produce** [7] - 7:13,
    7:15, 7:22, 9:14,
    14:15, 56:23, 62:7
**produced** [3] - 8:23,
    56:10, 56:20
**produces** [2] - 10:13,
    70:2
**producing** [1] - 10:10
**product** [64] - 12:10,
    12:14, 12:20, 13:1,
    13:2, 13:5, 15:18,
    25:4, 25:9, 27:3,
    38:22, 38:23, 40:9,

42:8, 50:12, 50:17,
    50:18, 52:10, 52:25,
    53:24, 54:1, 54:12,
    54:13, 54:14, 55:25,
    56:3, 56:4, 56:6,
    57:3, 57:4, 57:10,
    57:21, 68:5, 68:7,
    68:11, 69:11, 76:25,
    78:22, 78:23, 79:1,
    79:11, 79:19, 79:20,
    80:12, 80:24, 82:7,
    82:17, 83:2, 83:3,
    83:5, 87:8, 87:10,
    88:9, 89:7, 93:7,
    95:20, 101:2, 102:3,
    102:14, 104:5,
    104:11, 105:9
**Product** [26] - 10:3,
    15:14, 15:19, 16:2,
    16:4, 16:8, 16:18,
    17:2, 36:16, 36:18,
    39:14, 39:23, 39:25,
    40:7, 69:14, 95:4,
    95:11, 95:12, 95:19,
    96:2, 96:7, 96:22,
    99:15, 100:11,
    103:2, 103:14
**PRODUCTS** [2] - 1:10,
    2:11
**products** [32] - 15:16,
    19:20, 25:16, 26:17,
    38:14, 38:15, 50:2,
    50:4, 50:6, 50:9,
    50:11, 53:24, 54:2,
    56:2, 56:9, 67:22,
    69:18, 78:16, 78:21,
    79:4, 79:16, 95:15,
    95:17, 95:22, 95:23,
    96:1, 96:7, 98:12,
    98:21, 99:1, 104:1
**professional** [5] -
    51:2, 51:5, 51:7,
    51:14, 51:18
**project** [3] - 18:13,
    57:14, 101:24
**promptly** [1] - 107:10
**prospect** [1] - 100:4
**protect** [2] - 65:13,
    68:22
**protecting** [1] - 70:8
**protection** [1] - 11:18
**protector** [1] - 68:25
**protects** [1] - 84:21
**prove** [2] - 29:6, 31:12
**provide** [4] - 7:10,
    25:18, 39:22, 52:17
**provided** [5] - 43:4,
    52:20, 57:2, 73:22,
    91:9
**provides** [5] - 6:9,

13:4, 18:20, 25:20,
    90:13
**providing** [3] - 21:23,
    21:25, 78:21
**provisional** [2] -
    94:24, 95:2
**proximity** [1] - 67:14
**public** [6] - 30:24,
    54:2, 56:8, 69:12,
    103:1, 103:13
**publish** [1] - 103:24
**published** [5] - 99:9,
    103:1, 103:14,
    104:22, 104:25
**publishing** [1] - 95:7
**purpose** [2] - 68:8,
    102:8
**purposes** [3] - 5:11,
    30:3, 58:18
**purview** [1] - 40:6
**pushes** [1] - 61:21
**put** [29] - 12:15, 13:11,
    13:18, 13:19, 14:11,
    20:1, 20:6, 22:6,
    23:17, 36:2, 41:18,
    45:6, 48:24, 55:2,
    59:13, 64:16, 65:22,
    71:3, 75:1, 77:18,
    77:20, 78:12, 79:15,
    81:1, 81:18, 82:14,
    83:12, 84:19, 84:20
**puts** [1] - 85:12
**putting** [5] - 31:7,
    64:10, 84:10, 85:2

**Q**

**quarterly** [1] - 88:20
**quarters** [2] - 58:1,
    78:1
**Quartz** [10] - 19:19,
    32:5, 36:13, 36:14,
    36:18, 41:2, 42:20,
    72:12, 78:3, 93:20
**questions** [1] - 30:9
**quickly** [3] - 21:15,
    77:2, 80:17
**quote** [2] - 51:19,
    56:15

**R**

**radiant** [174] - 6:9,
    6:24, 7:2, 7:3, 7:5,
    7:8, 7:13, 7:15, 7:20,
    7:22, 8:1, 8:5, 8:12,
    8:16, 8:17, 8:18,
    8:23, 9:4, 9:7, 9:12,
    9:13, 9:15, 9:17,
    9:21, 9:24, 10:7,

10:9, 10:12, 10:18,
    11:1, 11:5, 11:24,
    11:25, 14:2, 14:5,
    14:10, 14:13, 14:15,
    14:17, 15:20, 15:22,
    15:24, 16:16, 16:20,
    17:13, 17:15, 17:16,
    17:21, 17:24, 18:1,
    18:2, 18:16, 18:19,
    19:23, 19:25, 20:3,
    20:4, 21:4, 21:5,
    21:8, 21:23, 21:24,
    23:24, 25:2, 25:11,
    25:17, 25:18, 26:3,
    26:18, 29:6, 29:24,
    30:7, 31:1, 31:8,
    31:16, 31:21, 32:2,
    32:3, 32:8, 32:13,
    36:14, 36:20, 36:21,
    36:25, 37:9, 37:11,
    37:12, 37:19, 41:7,
    41:11, 41:23, 42:2,
    44:21, 58:3, 58:19,
    58:23, 58:24, 59:2,
    59:11, 59:18, 60:9,
    60:22, 61:11, 61:13,
    61:23, 62:15, 62:19,
    63:18, 63:24, 63:25,
    64:16, 64:17, 64:19,
    64:20, 64:22, 65:9,
    65:15, 65:22, 66:18,
    66:24, 67:11, 67:12,
    68:9, 68:10, 68:15,
    68:23, 69:2, 69:24,
    70:8, 72:7, 72:25,
    73:1, 73:15, 73:19,
    73:20, 73:23, 73:25,
    74:1, 74:18, 74:19,
    74:22, 74:23, 74:24,
    75:9, 76:1, 76:5,
    76:8, 76:12, 77:7,
    77:10, 77:11, 77:17,
    77:21, 82:23, 92:16,
    92:21, 96:16, 96:23,
    97:4, 97:6, 97:12,
    99:16, 99:19, 99:25,
    100:18, 101:16,
    101:22, 103:21
**radiate** [1] - 8:18
**radiated** [1] - 101:5
**radiates** [2] - 8:24,
    9:25
**radiating** [1] - 25:21
**radiation** [10] - 62:23,
    63:2, 63:4, 63:14,
    72:14, 72:15, 72:19,
    75:10, 78:5, 97:14
**raise** [1] - 64:5
**raising** [3] - 15:22,
    97:5, 100:19

**ran** [1] - 35:23
**range** [1] - 50:4
**ranging** [4] - 50:4,
    56:4, 78:23, 100:3
**rapt** [1] - 45:11
**rate** [1] - 62:2
**rather** [3] - 82:6,
    85:23, 93:10
**rating** [1] - 62:6
**reach** [1] - 75:7
**reached** [8] - 11:22,
    15:25, 19:6, 19:11,
    57:19, 57:20, 90:18,
    96:20
**read** [18] - 5:6, 5:9,
    10:25, 17:20, 21:5,
    32:1, 42:18, 42:21,
    42:25, 88:2, 91:3,
    92:2, 92:6, 92:11,
    96:17, 99:25, 104:7,
    106:20
**readily** [2] - 31:7, 44:9
**ready** [2] - 48:9, 48:24
**real** [3] - 18:3, 41:10,
    84:15
**real-world** [1] - 41:10
**realistic** [1] - 105:5
**realized** [1] - 54:8
**really** [5] - 30:4, 44:24,
    51:20, 54:1, 73:16
**realm** [1] - 98:13
**rear** [5] - 10:22, 34:20,
    42:7, 42:14, 43:8
**reason** [7] - 9:23,
    10:6, 16:23, 27:7,
    46:25, 92:4, 104:14
**reasonable** [15] -
    26:17, 26:23, 27:2,
    27:20, 27:24, 62:8,
    65:21, 69:13, 69:15,
    76:20, 84:7, 88:15,
    89:9, 89:14, 89:15
**reasonably** [12] -
    53:10, 65:25, 82:18,
    87:17, 88:24, 89:7,
    89:8, 89:11, 89:12,
    89:17, 89:19, 89:20
**reasons** [2] - 73:19,
    91:24
**recalled** [3] - 36:18,
    40:10, 95:24
**recapping** [1] - 77:4
**recess** [3] - 106:4,
    106:7, 106:11
**Recess** [1] - 48:3
**recognize** [2] - 84:23,
    85:6
**recognized** [1] - 16:2
**recognizes** [1] - 8:6
**record** [5] - 18:8,

33:17, 48:2, 48:18, 71:5
**RECORDED** [1] - 108:7
**red** [1] - 63:10
**reduce** [2] - 42:16, 42:23
**REDUCTION** [1] - 108:10
**reference** [1] - 107:1
**referring** [2] - 94:21, 94:22
**refers** [1] - 97:17
**reflected** [2] - 52:25, 81:16
**refrigerators** [1] - 50:5
**regarding** [2] - 41:25, 99:15
**registered** [1] - 51:17
**regular** [1] - 21:22
**regulation** [1] - 40:8
**REGULATIONS** [1] - 108:11
**reiterating** [1] - 100:17
**related** [2] - 58:3, 104:7
**relating** [1] - 105:17
**relatively** [1] - 72:18
**release** [1] - 72:21
**relevance** [2] - 94:8, 99:17
**relevant** [8] - 46:25, 47:2, 49:4, 49:10, 51:25, 52:1, 95:6, 96:11
**reliable** [2] - 38:11, 88:22
**reliably** [1] - 65:16
**relying** [1] - 93:10
**remains** [1] - 52:20
**remember** [3] - 9:5, 94:5, 106:12
**reminded** [1] - 24:17
**remote** [1] - 44:8
**Rensselaer** [1] - 49:9
**RENSSELAER** [1] - 49:9
**repeat** [1] - 47:8
**repeatable** [1] - 38:11
**repeating** [1] - 68:19
**replacement** [1] - 34:13
**report** [6] - 20:7, 98:7, 98:8, 99:21, 105:21, 105:24
**reporter** [2] - 45:14, 48:14
**REPORTER** [2] - 1:23, 108:14
**REPORTER'S** [1] -

1:16
**reports** [3] - 53:3, 69:7, 106:21
**representative** [1] - 13:6
**representatives** [1] - 84:17
**representing** [1] - 28:24
**represents** [1] - 25:4
**request** [1] - 45:9
**require** [2] - 40:1, 51:10
**required** [6] - 37:9, 37:10, 38:25, 39:22, 51:17, 102:15
**requirement** [2] - 51:8, 51:9
**requirements** [1] - 79:7
**requires** [3] - 11:20, 85:5, 90:15
**research** [2] - 45:17, 106:24
**reset** [2] - 11:20, 90:16
**residential** [4] - 53:11, 57:24, 66:3, 87:18
**respectful** [1] - 46:17
**respectfully** [2] - 41:21, 45:9
**responders** [4] - 36:4, 36:7, 36:8, 47:2
**response** [2] - 47:14, 69:15
**responsibility** [10] - 69:17, 82:5, 86:23, 86:24, 87:20, 87:22, 92:25, 104:1, 104:4
**responsible** [1] - 83:5
**rest** [3] - 20:15, 28:10, 45:15
**restating** [1] - 67:23
**result** [8] - 30:4, 39:3, 39:4, 72:19, 75:25, 81:9, 81:16, 92:22
**resumed** [1] - 48:4
**review** [2] - 98:11, 98:15
**reviewed** [4] - 53:1, 56:10, 56:13, 56:17
**rheumatoid** [1] - 21:14
**rid** [1] - 22:7
**rigorous** [1] - 80:5
**rise** [4] - 5:3, 45:20, 74:9, 107:11
**risk** [19] - 10:19, 11:7, 17:5, 18:3, 25:10, 26:4, 26:6, 26:10, 31:3, 31:7, 41:3,

42:4, 42:16, 42:23, 44:8, 44:10, 62:14
**risk/benefit** [1] - 25:24
**risks** [5] - 25:8, 25:10, 38:13, 44:2, 44:4
**road** [2] - 31:11, 45:5
**robes** [1] - 22:25
**rocket** [1] - 52:11
**rod** [1] - 72:12
**rods** [1] - 78:3
**room** [42] - 7:14, 10:6, 10:7, 11:6, 17:21, 20:15, 21:11, 21:25, 22:6, 22:10, 22:21, 23:25, 25:23, 26:7, 26:20, 27:14, 28:10, 32:25, 33:7, 35:13, 37:23, 38:2, 44:19, 59:9, 61:24, 62:1, 62:12, 66:5, 66:10, 66:18, 66:22, 66:24, 68:5, 71:4, 71:10, 73:3, 73:6, 73:7, 73:10, 87:16
**rooms** [4] - 21:2, 37:25, 106:16
**route** [1] - 35:12
**rule** [2] - 60:10, 60:21
**running** [1] - 23:4
**runs** [2] - 9:9, 34:7

## S

**sad** [1] - 28:25
**safe** [35] - 12:21, 13:1, 26:25, 29:7, 30:23, 36:13, 38:23, 40:23, 56:9, 57:21, 57:22, 57:24, 68:6, 69:18, 79:11, 79:19, 79:20, 81:25, 82:7, 82:18, 82:23, 83:3, 83:5, 83:11, 83:15, 83:25, 88:23, 88:24, 89:6, 89:20, 95:21, 95:25, 98:20, 99:1, 104:1
**safely** [2] - 24:25, 25:5
**safer** [3] - 19:19, 19:23, 38:15
**safest** [1] - 13:4
**safety** [42] - 6:21, 11:3, 11:17, 11:19, 14:12, 14:19, 14:22, 15:8, 15:10, 19:4, 23:1, 23:18, 24:1, 26:21, 42:21, 42:22, 52:8, 54:4, 54:8, 55:24, 56:8, 56:24, 67:15, 69:5, 69:12, 70:5, 70:7, 70:11,

70:13, 80:6, 85:7, 87:4, 90:8, 90:15, 90:20, 91:5, 91:13, 93:4, 94:4, 94:8, 95:16
**Safety** [27] - 10:4, 15:14, 15:19, 16:2, 16:5, 16:8, 16:19, 17:2, 36:17, 36:18, 36:22, 39:14, 39:23, 39:25, 40:7, 69:14, 95:4, 95:11, 95:12, 95:19, 96:2, 96:7, 96:23, 99:15, 100:12, 103:2, 103:14
**SafetyMax** [3] - 14:21, 15:1, 93:22
**sale** [2] - 30:24, 36:14
**SANTA** [3] - 1:19, 1:24, 5:1
**satisfies** [1] - 79:1
**save** [6] - 27:19, 27:20, 27:21, 42:21, 47:10, 102:17
**saved** [1] - 27:25
**saving** [1] - 27:17
**saw** [5] - 33:12, 34:25, 35:1, 35:24, 35:25
**scared** [1] - 21:12
**scenario** [3] - 83:17, 84:14, 84:18
**scenarios** [1] - 15:2
**scene** [1] - 6:3
**School** [2] - 49:12, 49:17
**school** [1] - 24:10
**science** [3] - 11:5, 27:8, 52:11
**scientific** [5] - 76:2, 98:7, 98:8, 98:19, 99:3
**scientifically** [1] - 100:7
**scope** [2] - 85:15, 87:1
**screaming** [2] - 22:13, 23:7
**searching** [1] - 106:25
**seated** [4] - 5:4, 45:22, 48:6, 107:13
**second** [13] - 16:15, 16:22, 25:7, 26:1, 30:25, 40:25, 45:7, 54:7, 61:20, 88:12, 92:4, 100:15, 100:22
**secondly** [1] - 43:19
**seconds** [1] - 35:18
**see** [52] - 5:12, 11:13, 11:14, 11:15, 11:17, 13:9, 13:23, 16:18,

18:6, 20:11, 22:23, 28:7, 33:12, 33:13, 34:18, 35:20, 38:21, 46:8, 46:9, 47:22, 47:24, 58:13, 59:25, 62:5, 62:19, 70:18, 70:21, 71:7, 71:22, 72:9, 72:15, 77:2, 77:10, 77:24, 78:2, 78:23, 78:24, 80:24, 82:22, 83:10, 91:19, 92:1, 93:19, 97:9, 99:10, 100:20, 104:16, 104:21, 104:25, 107:14, 107:25
**seeing** [3] - 16:20, 74:2, 107:9
**sees** [6] - 22:16, 23:15, 34:8, 34:11, 34:19, 35:5
**SEGALLA** [1] - 2:14
**sell** [6] - 25:14, 25:16, 68:3, 91:8, 98:20, 104:11
**selling** [4] - 25:10, 26:17, 76:17, 104:1
**send** [1] - 82:19
**sense** [7] - 7:23, 9:25, 12:3, 37:6, 44:24, 45:1, 82:9
**senses** [3] - 8:8, 15:6, 64:23
**sensor** [17] - 8:6, 8:8, 9:20, 9:23, 12:3, 13:13, 13:16, 14:14, 15:13, 65:9, 65:11, 81:14, 81:20, 81:21, 85:3, 93:23
**sensors** [1] - 93:23
**sent** [2] - 17:3, 27:12
**sentence** [4] - 96:17, 97:2, 100:23
**separate** [1] - 30:21
**series** [1] - 53:8
**service** [1] - 103:1
**session** [1] - 107:7
**set** [4] - 61:4, 65:1, 65:2, 81:5
**setting** [2] - 61:5, 90:24
**settings** [2] - 33:8, 33:9
**seven** [2] - 31:24, 40:8
**several** [3] - 35:2, 91:24, 95:23
**shape** [1] - 80:1
**shapes** [1] - 79:24
**SHERMAN** [1] - 2:5
**Shinedling** [41] - 5:17,

5:19, 6:4, 6:5, 20:23, 21:14, 22:2, 23:24, 24:4, 24:14, 27:16, 27:24, 28:4, 29:2, 31:4, 31:19, 31:25, 32:2, 32:7, 32:15, 32:20, 32:22, 33:5, 33:12, 33:15, 33:24, 33:25, 34:6, 34:16, 34:23, 35:5, 35:12, 36:5, 42:18, 44:1, 44:14, 47:8, 64:15, 93:1, 93:2
**SHINEDLING** [2] - 1:4, 2:3
**Shinedlings** [5] - 31:14, 32:12, 33:4, 33:6, 33:10
**shirt** [2] - 13:15, 14:11
**shirts** [1] - 14:9
**shock** [2] - 42:24, 55:6
**shoots** [1] - 15:5
**short** [1] - 41:7
**shortly** [3] - 29:24, 40:12, 40:20
**show** [37] - 8:13, 10:4, 15:1, 19:13, 23:23, 24:9, 25:1, 25:25, 26:2, 26:11, 26:15, 26:22, 27:4, 27:11, 27:23, 31:13, 31:20, 31:25, 32:3, 32:9, 32:11, 33:16, 34:8, 34:9, 34:23, 36:10, 41:10, 53:17, 60:8, 60:19, 61:11, 64:9, 74:4, 74:23, 95:3, 99:8, 102:19
**shower** [1] - 60:12
**shown** [1] - 72:14
**shows** [1] - 15:10
**shut** [27] - 9:18, 9:21, 10:11, 11:2, 11:12, 11:22, 12:1, 13:9, 13:21, 13:23, 14:14, 14:19, 14:24, 19:7, 19:8, 19:12, 19:15, 24:1, 25:3, 26:9, 60:17, 64:21, 64:24, 77:18, 78:13, 90:19
**shutoff** [28] - 6:22, 9:15, 11:4, 11:18, 13:20, 17:14, 18:4, 19:4, 19:14, 20:1, 21:7, 26:14, 26:21, 32:17, 43:15, 43:16, 43:18, 43:22, 64:22, 65:9, 67:15, 70:5, 70:11, 90:8, 90:20, 91:5, 93:4, 93:16

**shuts** [8] - 7:25, 8:7, 8:9, 13:16, 15:7, 81:14, 81:20, 81:22
**side** [9] - 33:15, 33:24, 33:25, 34:6, 45:4, 49:13, 62:21, 70:23, 72:13
**sides** [5] - 10:21, 42:7, 42:14, 43:8, 45:3
**sight** [2] - 73:12, 78:4
**significant** [1] - 105:2
**significantly** [3] - 63:15, 65:6, 100:20
**similar** [3] - 7:7, 61:12, 61:13
**similarly** [1] - 89:15
**simple** [6] - 17:23, 23:23, 30:4, 44:22, 76:16, 88:15
**simply** [6] - 18:18, 29:24, 74:5, 79:11, 79:12, 84:18
**single** [3] - 21:2, 79:23, 79:25
**sink** [2] - 89:25, 90:3
**sirens** [1] - 36:4
**sisters** [1] - 21:11
**sitting** [2] - 34:19, 62:20
**situation** [11] - 9:18, 11:21, 15:18, 19:9, 24:2, 27:18, 78:8, 82:8, 90:17, 90:21, 90:23
**situations** [1] - 13:10
**six** [3] - 31:24, 43:9, 51:2
**size** [2] - 7:9, 80:2
**sketch** [2] - 33:16, 33:20
**sketches** [1] - 33:18
**skin** [1] - 43:3
**skip** [1] - 43:2
**skis** [1] - 23:2
**Sky** [1] - 5:25
**sleep** [6] - 10:12, 17:6, 21:12, 33:5, 103:5, 104:18
**sleeping** [35] - 6:1, 9:8, 10:6, 10:8, 11:7, 17:7, 17:17, 17:22, 18:19, 21:21, 23:25, 25:11, 25:15, 25:19, 25:22, 26:7, 26:20, 27:3, 27:14, 37:9, 58:1, 65:24, 68:4, 68:12, 72:23, 76:19, 86:6, 94:17, 102:4, 103:6, 103:22, 104:8, 104:12,

104:19
**slept** [3] - 21:13, 33:24, 33:25
**slide** [10] - 54:7, 54:11, 67:22, 71:6, 71:22, 72:9, 74:3, 74:15, 77:2, 77:9
**slides** [2] - 67:19, 90:7
**slow** [1] - 60:14
**small** [7] - 34:8, 34:10, 35:25, 58:22, 59:11, 62:9, 86:17
**smaller** [4] - 16:10, 58:10, 62:5, 97:21
**smoke** [3] - 33:11, 33:12, 33:13
**smolder** [2] - 75:23, 80:25
**smoldering** [1] - 64:12
**snow** [1] - 22:24
**soaked** [1] - 14:8
**sold** [13] - 20:6, 27:2, 27:3, 29:25, 36:15, 37:14, 40:2, 41:11, 65:23, 69:6, 76:14, 76:25, 102:3
**someone** [12] - 9:9, 14:18, 26:24, 52:1, 52:3, 60:8, 84:10, 84:11, 84:12, 85:11, 86:14, 101:24
**someplace** [1] - 44:20
**sometimes** [8] - 15:16, 15:18, 21:17, 28:9, 31:19, 44:17, 62:5, 65:16
**somewhere** [1] - 44:20
**soon** [1] - 106:2
**sorry** [5] - 39:6, 48:7, 83:8, 99:23, 105:23
**sort** [7] - 6:25, 10:22, 26:25, 27:10, 33:22, 57:4, 81:23
**sorts** [1] - 40:15
**sound** [2] - 46:7, 62:9
**SOUTH** [1] - 2:14
**space** [27] - 17:4, 17:6, 17:7, 17:8, 21:3, 21:22, 22:17, 31:15, 36:12, 36:25, 38:12, 41:23, 50:3, 56:4, 58:24, 60:22, 66:4, 66:12, 66:16, 66:18, 79:25, 80:6, 103:4, 103:5, 103:6, 104:17, 104:18
**spaces** [2] - 37:24, 37:25
**spacing** [1] - 81:3

**speaker** [4] - 62:5, 62:6, 62:9, 62:10
**speakers** [1] - 62:5
**special** [2] - 14:7, 65:11
**specialized** [1] - 55:22
**specific** [3] - 80:3, 80:12, 93:15
**specifically** [7] - 38:18, 66:4, 85:5, 90:13, 98:5, 99:21, 103:4
**speculation** [2] - 96:4, 98:22
**spell** [1] - 48:18
**spent** [1] - 70:16
**spontaneously** [1] - 40:18
**spread** [1] - 73:5
**spring** [1] - 66:19
**squiggly** [1] - 72:14
**stack** [1] - 44:17
**staff** [1] - 99:5
**stagnant** [1] - 61:9
**stamp** [2] - 12:20, 79:15
**stamped** [1] - 12:9
**stand** [6] - 8:20, 20:16, 48:14, 48:15, 63:1, 89:9
**standard** [2] - 12:17, 79:12, 79:23, 79:25, 80:2, 83:4, 83:16, 97:18
**standards** [23] - 12:15, 12:18, 12:20, 16:6, 38:5, 38:6, 38:10, 38:18, 38:24, 50:19, 78:20, 79:2, 79:3, 79:4, 79:6, 79:8, 79:19, 79:22, 80:11, 98:4, 98:6
**standpoint** [15] - 61:19, 77:7, 85:18, 85:20, 85:21, 87:7, 88:7, 88:19, 88:21, 89:4, 98:24, 104:1, 104:3, 105:10, 105:12
**start** [37] - 7:19, 8:2, 8:12, 8:22, 9:13, 10:2, 10:11, 10:14, 11:10, 14:2, 14:12, 14:16, 14:25, 15:3, 15:13, 16:13, 17:15, 18:14, 20:4, 28:13, 29:10, 41:7, 41:20, 44:1, 60:10, 60:23, 61:3, 63:19, 65:4, 66:25, 74:10, 75:12,

82:22, 83:10, 92:17, 105:14, 107:10
**started** [22] - 5:24, 6:19, 15:2, 18:16, 19:15, 28:4, 29:9, 30:7, 31:5, 39:3, 41:14, 44:7, 44:12, 47:4, 49:14, 49:19, 64:12, 64:19, 68:6, 74:13, 74:17, 76:17
**starting** [4] - 8:5, 8:9, 16:21, 20:5
**starts** [6] - 6:23, 9:6, 12:2, 13:13, 14:14, 25:3
**state** [2] - 6:10, 48:17
**statement** [1] - 6:16
**statements** [3] - 32:23, 37:5, 46:9
**STATES** [2] - 1:1, 108:11
**states** [4] - 51:1, 51:2, 51:3, 51:9
**statistics** [5] - 41:19, 41:25, 105:8, 105:15, 105:17
**stay** [1] - 60:21
**stayed** [2] - 36:5, 46:25
**STENOGRAPHICALLY** [1] - 108:7
**step** [3] - 54:12, 75:1, 107:14
**still** [8] - 13:3, 14:2, 36:7, 44:8, 68:23, 79:10, 87:22, 89:6
**stipulated** [3] - 5:8, 6:12, 6:13
**stipulation** [1] - 5:5
**stop** [3] - 50:17, 75:5, 92:10
**stopped** [1] - 16:23
**story** [1] - 30:18
**STREET** [2] - 1:24, 2:11
**stretch** [1] - 20:16
**strictly** [1] - 58:3
**strike** [3] - 63:16, 86:13, 103:12
**stringent** [1] - 38:6
**strip** [1] - 78:24
**stuff** [1] - 22:7
**stumbling** [1] - 87:24
**style** [1] - 59:3
**subject** [18] - 6:8, 6:9, 7:5, 7:6, 11:16, 19:3, 36:12, 40:2, 61:12, 61:14, 65:18, 74:12, 74:16, 94:6, 94:7, 94:16, 96:16, 105:17

subjected [2] - 87:10, 87:19
submitting [1] - 102:9
subsequent [1] - 51:12
substitute [1] - 94:18
sudden [1] - 8:22
sufficient [1] - 51:15
sufficiently [1] - 76:25
suicide [1] - 24:6
SUITE [3] - 1:24, 2:5, 2:15
summary [1] - 105:16
sun [7] - 8:19, 8:24, 25:22, 37:20, 63:1, 63:2, 63:3
Sunbeam [40] - 5:10, 5:13, 6:8, 13:3, 17:4, 19:20, 21:24, 23:24, 28:25, 29:4, 31:12, 39:16, 39:21, 40:3, 45:12, 53:2, 54:11, 56:15, 57:18, 68:3, 68:11, 70:10, 73:18, 76:3, 76:4, 76:16, 78:16, 82:21, 82:24, 83:9, 84:17, 92:25, 98:1, 98:3, 98:11, 98:15, 101:14, 101:25, 102:12, 104:16
SUNBEAM [2] - 1:10, 2:11
Sunbeam's [3] - 30:20, 37:17, 45:4
sunlight [1] - 8:20
superheated [1] - 72:12
supposed [4] - 6:22, 9:17, 65:12, 105:13
supposedly [1] - 34:2
surface [6] - 15:23, 64:4, 97:5, 97:10, 97:15, 100:1
surfaces [4] - 43:4, 72:20, 72:21, 73:6
surrounding [1] - 100:19
surrounds [1] - 38:1
swap [2] - 64:16, 74:18
sweating [1] - 8:22
sweethearts [1] - 24:10
swirl [1] - 37:23
switch [9] - 47:23, 64:23, 65:12, 70:7, 77:15, 77:24, 78:2, 85:4, 85:7
Sworn [2] - 3:4, 48:16

system [9] - 11:20, 11:22, 14:13, 19:6, 19:12, 20:12, 90:15, 90:19, 91:13
systems [2] - 50:6

## T

T-shirt [2] - 13:15, 14:11
T-shirts [1] - 14:9
table [1] - 73:4
tag [1] - 10:17, 13:25
tailor [1] - 44:24
tailor-made [1] - 44:24
taught [1] - 49:11
technical [6] - 71:3, 97:18, 98:4, 98:6, 98:14, 99:3
technologically [2] - 11:19, 90:15
technology [1] - 94:13
temperature [72] - 8:6, 8:25, 9:4, 9:24, 11:22, 12:3, 13:12, 14:13, 15:12, 15:23, 16:13, 19:6, 19:11, 20:3, 55:16, 55:17, 55:19, 59:10, 59:14, 59:22, 59:23, 60:1, 60:16, 60:18, 61:5, 61:24, 62:11, 63:8, 63:15, 64:5, 64:6, 64:24, 65:1, 65:2, 65:4, 65:6, 65:7, 65:11, 66:17, 68:25, 70:7, 70:9, 71:9, 71:12, 71:19, 71:21, 72:2, 72:4, 72:5, 72:18, 73:3, 73:10, 74:7, 74:9, 74:10, 75:7, 76:8, 77:5, 77:6, 90:18, 97:1, 97:6, 97:9, 97:10, 97:15, 100:2
temperatures [21] - 12:4, 15:25, 16:12, 16:18, 59:19, 60:16, 61:8, 63:22, 64:3, 67:8, 69:2, 70:2, 80:21, 81:9, 82:10, 96:20, 96:24, 99:23, 100:3, 100:19, 101:7
ten [1] - 37:14
tending [1] - 58:1
term [3] - 63:11, 97:13, 101:4
terminates [1] - 77:15
terms [14] - 61:21, 61:22, 61:24, 61:25,

62:10, 62:11, 62:14, 63:16, 64:14, 64:20, 71:4, 80:18, 88:9, 96:22
test [21] - 12:11, 12:14, 13:19, 13:22, 13:23, 24:24, 25:7, 25:24, 79:4, 79:21, 80:12, 80:14, 80:23, 81:1, 81:12, 81:23, 82:1, 82:6, 82:11, 82:22, 106:18
tested [6] - 30:24, 36:13, 38:4, 40:15, 59:13
testified [3] - 98:17, 101:18
testifies [1] - 32:22
testify [2] - 19:1, 32:15
testifying [1] - 46:4
testimony [13] - 7:1, 12:25, 18:12, 30:12, 32:23, 34:22, 53:3, 56:13, 56:17, 84:16, 85:16, 87:2, 98:15
testing [21] - 12:7, 12:11, 13:7, 13:8, 16:19, 38:17, 40:13, 40:14, 40:15, 53:9, 64:7, 64:9, 78:19, 80:5, 80:14, 80:17, 82:14, 83:10, 83:12, 102:12, 102:14
tests [19] - 12:12, 24:22, 38:12, 38:19, 38:20, 38:21, 38:22, 39:18, 53:8, 80:3, 80:20, 80:22, 81:5, 82:21, 83:2, 83:3, 84:6
THAT [1] - 108:6
THE [64] - 2:3, 2:10, 5:3, 5:4, 5:14, 6:11, 6:14, 12:24, 18:6, 20:10, 20:14, 20:21, 28:18, 37:4, 39:8, 39:10, 45:13, 45:20, 45:22, 46:8, 46:14, 46:20, 46:22, 47:5, 47:12, 47:17, 48:6, 48:13, 48:17, 48:19, 48:20, 53:19, 60:6, 67:2, 67:5, 67:7, 83:1, 83:2, 85:17, 87:3, 87:6, 87:7, 92:20, 92:21, 95:9, 96:5, 96:6, 98:25, 99:1, 106:1, 106:5, 106:8, 107:11, 107:13, 107:16,

107:17, 107:20, 107:24, 108:6, 108:7, 108:8, 108:10, 108:11
theme [7] - 30:22, 30:25, 31:5, 36:12, 40:25, 44:6, 86:22
themes [3] - 30:21, 36:11
themselves [4] - 51:19, 51:21, 51:22, 52:3
therapy [1] - 6:7
therefore [1] - 76:24
thermal [3] - 62:1, 62:22, 96:18
thermodynamics [1] - 52:7
thermostat [3] - 7:23, 8:6, 85:3
they've [2] - 37:10, 88:12
thinks [2] - 22:20, 31:12
THIS [1] - 108:9
thorough [2] - 76:10, 80:5
thoroughly [3] - 30:24, 36:13, 38:3
thousand [2] - 12:13, 94:24
thousands [1] - 31:22
three [53] - 5:20, 8:11, 8:16, 9:3, 9:11, 9:22, 10:9, 10:20, 10:24, 11:9, 11:11, 12:4, 13:19, 13:24, 14:23, 18:4, 20:2, 21:6, 21:9, 21:10, 22:4, 22:12, 24:5, 26:8, 28:2, 28:3, 28:6, 28:8, 28:12, 29:21, 30:21, 32:5, 34:10, 35:15, 42:6, 42:13, 43:2, 43:6, 63:19, 66:23, 78:1, 82:2, 84:12, 84:19, 84:20, 84:23, 85:8, 85:14, 86:15, 86:25, 88:17, 89:1, 90:22
three-foot [1] - 29:21
three-quarters [1] - 78:1
threshold [2] - 51:16, 60:2
throughout [1] - 30:22
throw [3] - 22:11, 32:21, 66:22
Thursday [6] - 43:20, 106:11, 107:8,

107:9, 107:15, 107:25
tidy [1] - 66:7
tied [1] - 52:8
tier [3] - 54:19, 54:24, 88:12
tight [1] - 24:11
tightly [1] - 66:11
tip [4] - 11:18, 35:8, 43:18
tip-off [1] - 43:18
tip-over [2] - 11:18, 43:18
tipped [5] - 8:7, 32:17, 43:17, 44:20, 44:21
today [8] - 20:9, 26:19, 58:19, 81:7, 83:20, 100:8, 102:2, 107:7
together [1] - 52:8
tomorrow [3] - 107:7, 107:8, 107:22
took [2] - 35:15, 35:18
tool [2] - 12:16, 79:18
tools [1] - 93:3
top [9] - 78:3, 78:9, 80:10, 82:9, 85:24, 89:9, 93:24, 93:25, 94:5
topic [1] - 100:16
total [1] - 62:1
totally [1] - 8:17
touch [1] - 43:3
touching [1] - 55:12
touting [1] - 91:11
towel [32] - 7:17, 8:11, 9:11, 13:11, 13:14, 13:23, 15:3, 60:4, 60:8, 60:9, 60:13, 64:1, 64:10, 64:13, 65:5, 65:7, 74:23, 75:2, 75:9, 75:19, 77:12, 77:18, 77:20, 77:22, 78:6, 78:8, 78:12, 80:9, 81:18, 84:11, 85:12
towels [7] - 7:16, 9:2, 9:8, 9:22, 14:9, 14:23, 85:2
Tower [2] - 11:16, 42:20
toy [5] - 23:2, 23:4, 35:17, 35:19
tragic [1] - 28:25
trailer [1] - 35:17
training [3] - 9:20, 52:2, 55:22
TRANSCRIPT [3] - 1:16, 108:7, 108:9
transfer [4] - 52:7, 71:14, 71:15, 75:4

transferred [2] - 71:3, 97:13
transferring [1] - 75:8
transformers [1] - 50:7
transmission [1] - 99:25
Transportation [1] - 36:22
trap [1] - 77:18
trapping [1] - 77:23
traps [4] - 77:13, 77:22, 78:6, 81:21
trash [3] - 22:6, 29:20, 31:8
tremendously [1] - 24:12
TRIAL [1] - 1:17
trial [5] - 30:22, 33:20, 106:12, 106:14, 106:22
tried [1] - 85:1
tries [1] - 106:19
trigger [1] - 50:14
triggered [1] - 81:20
triggers [3] - 13:13, 13:16, 77:15
TRUE [1] - 108:6
true [4] - 11:24, 12:1, 47:18, 57:10
try [7] - 7:3, 23:13, 40:15, 44:19, 66:12, 94:13, 95:15
trying [5] - 23:17, 48:7, 92:11, 96:22, 101:22
tubes [2] - 62:20, 62:21
tucked [1] - 91:25
TUESDAY [2] - 1:20, 5:1
turn [6] - 6:22, 11:4, 17:7, 18:5, 81:12, 103:6
turns [1] - 80:24
two [23] - 16:11, 17:25, 21:22, 22:21, 24:22, 31:16, 31:17, 32:14, 33:7, 34:9, 35:6, 35:14, 35:24, 55:11, 58:7, 62:20, 78:3, 94:24, 103:3, 103:21, 104:2
type [8] - 23:3, 44:23, 48:25, 50:2, 58:10, 79:4, 94:19, 96:15
typical [1] - 59:24

## U

U.S [6] - 1:23, 95:11, 95:12, 95:19, 99:14, 100:11
UL [40] - 12:8, 12:13, 12:15, 12:16, 12:20, 13:3, 13:7, 13:8, 38:19, 53:8, 78:24, 79:5, 79:8, 79:11, 79:15, 79:19, 79:21, 79:22, 80:5, 80:8, 80:11, 80:18, 81:11, 82:4, 82:19, 82:21, 83:2, 83:9, 83:11, 83:12, 83:15, 83:16, 83:19, 84:6, 85:5, 102:15
UL's [1] - 82:11
ULSTP-1042 [1] - 97:18
ultimate [2] - 56:7, 56:8
ultimately [13] - 23:21, 53:23, 53:25, 69:9, 69:17, 73:2, 75:1, 75:22, 75:23, 77:23, 82:4, 82:16, 103:25
unable [3] - 23:22, 27:22
unattended [17] - 10:6, 10:7, 10:13, 11:7, 17:18, 23:25, 25:12, 25:15, 26:7, 26:21, 27:4, 27:14, 32:9, 43:12, 65:23, 68:4, 102:4
unchanged [1] - 73:11
under [16] - 25:6, 25:9, 25:21, 25:22, 25:24, 36:16, 59:19, 70:1, 72:23, 78:5, 80:11, 80:21, 81:4, 88:10, 101:1, 104:5
undergo [1] - 80:5
undergone [3] - 6:7, 12:10, 24:5
underneath [1] - 91:25
understandable [1] - 30:6
understood [4] - 31:4, 32:1, 42:18, 47:17
Underwriters [16] - 12:7, 13:22, 15:21, 16:3, 16:5, 16:8, 38:16, 78:18, 78:25, 80:13, 81:5, 81:23, 81:25, 95:5, 97:17, 100:12

underwriters [2] - 12:8, 78:19
unique [2] - 19:25, 82:8
unit [5] - 29:10, 38:3, 40:23, 43:17, 43:21
UNITED [2] - 1:1, 108:11
University [1] - 49:7
unless [3] - 12:5, 29:10, 73:11
unlike [3] - 15:21, 97:2, 97:4
unplug [1] - 42:11
unquote [2] - 51:20, 56:15
unreasonable [2] - 27:1, 89:17
unreasonably [2] - 53:25, 54:3
unsafe [4] - 95:21, 96:2, 105:9, 105:10
untidy [3] - 66:11, 66:19, 66:24
up [45] - 9:9, 14:18, 23:5, 28:10, 34:14, 34:24, 37:23, 39:11, 44:17, 45:15, 47:19, 47:21, 48:24, 50:25, 58:18, 60:15, 60:19, 63:5, 64:10, 66:14, 66:22, 68:25, 70:24, 71:20, 73:1, 75:1, 75:2, 77:14, 77:22, 78:3, 81:2, 82:5, 82:9, 82:11, 82:12, 86:10, 86:19, 88:1, 90:13, 92:9, 92:14, 93:25, 94:2, 94:11, 105:8
urge [2] - 45:1, 45:2
user [21] - 9:16, 11:2, 11:3, 11:20, 17:10, 17:11, 26:19, 31:3, 43:24, 44:9, 54:25, 55:23, 73:24, 90:15, 93:2, 93:10, 93:12, 93:15, 93:17, 104:2, 104:14
user's [1] - 90:11
users [3] - 73:18, 103:18, 104:20
uses [1] - 97:13
Utah [2] - 49:19, 51:4
utility [1] - 50:7

## V

valid [1] - 69:7
value [1] - 100:25

variant [1] - 82:12
variety [1] - 59:2
various [5] - 41:18, 53:10, 78:20, 95:23, 96:7
VENTURA [1] - 2:4
verdict [1] - 107:22
Vernaglia [6] - 18:24, 46:13, 56:14, 76:4, 98:17, 101:18
version [2] - 35:1, 93:20
versions [3] - 35:2
versus [5] - 58:19, 73:20, 84:12, 86:24, 93:1
vicinity [1] - 86:21
video [1] - 18:23
view [2] - 29:4, 100:5
views [1] - 107:5
violate [2] - 14:10, 78:11
violated [2] - 14:18, 92:7
violating [1] - 84:10
virtually [2] - 41:6, 43:25
voir [1] - 19:21
volume [2] - 62:7, 62:10
VOLUME [1] - 1:18
volunteer [1] - 107:21
Vs [1] - 1:8

## W

WACKER [1] - 2:14
waited [1] - 47:10
walk [2] - 21:18, 58:6
walker [1] - 21:17
walking [3] - 34:14, 86:18, 87:15
wall [6] - 73:5, 81:2, 81:12, 81:15, 84:11
wants [2] - 23:11, 36:21
warm [3] - 63:13, 71:1, 97:8
warmed [1] - 72:17
warmer [1] - 71:12
warn [1] - 54:24
warned [1] - 26:4
warning [43] - 9:17, 10:18, 10:22, 11:1, 11:8, 13:25, 14:1, 14:2, 14:10, 14:17, 17:20, 21:5, 26:3, 26:15, 26:16, 37:9, 37:10, 42:3, 42:8, 42:16, 55:21, 69:21,

69:23, 70:10, 70:12, 76:23, 78:11, 84:10, 84:19, 84:22, 86:14, 88:2, 91:1, 91:4, 91:9, 91:15, 91:16, 91:18, 91:21, 91:22, 92:6, 92:7
warnings [24] - 10:16, 10:17, 17:12, 26:13, 30:5, 30:25, 32:1, 38:25, 40:4, 41:1, 41:6, 42:3, 42:17, 43:13, 43:24, 44:1, 44:2, 44:11, 73:18, 103:9, 103:12, 104:10, 104:15, 105:2
washing [2] - 50:5, 56:4
waste [1] - 18:11
watch [1] - 106:21
watt [1] - 62:6
wattage [3] - 7:10, 18:20, 101:1
watts [6] - 7:11, 7:12, 61:18, 61:21, 61:23, 71:2
waves [3] - 63:4, 63:5, 63:11
ways [1] - 16:11
website [2] - 103:15, 103:16
week [1] - 45:8
weeks [1] - 34:13
well-known [1] - 76:2
WEST [2] - 1:24, 2:11
wet [1] - 89:24
whereas [3] - 16:16, 76:7, 77:6
wherewithal [1] - 93:8
whichever [1] - 44:18
white [1] - 12:9
whole [3] - 19:24, 25:16, 30:18
wide [3] - 34:10, 50:4, 59:2
wife [27] - 6:20, 17:17, 17:22, 20:23, 22:14, 22:18, 23:11, 23:13, 23:21, 24:7, 27:17, 27:21, 27:25, 28:9, 28:14, 29:3, 34:11, 34:17, 34:24, 34:25, 35:5, 35:20, 36:7, 47:2, 47:4, 72:24
winter [1] - 62:25
wire [4] - 58:16, 59:4, 70:21, 71:4
wires [2] - 23:14, 58:14

**WITH** [1] - 108:10
**witness** [6] - 30:12, 46:16, 48:10, 48:15, 49:25
**WITNESS** [10] - 3:2, 48:19, 67:2, 67:7, 83:2, 87:7, 92:21, 96:6, 99:1, 107:16
**Witness** [2] - 3:4, 48:16
**witnesses** [8] - 30:15, 30:16, 45:2, 46:1, 46:4, 53:3
**woken** [1] - 22:13
**Wolensky** [2] - 28:19, 107:20
**WOLENSKY** [11] - 2:10, 12:22, 28:20, 28:22, 37:8, 39:9, 39:14, 47:15, 47:25, 107:23, 108:2
**women** [1] - 28:25
**wool** [1] - 100:4
**words** [3] - 61:1, 62:25, 103:12
**works** [2] - 14:13, 77:21
**world** [5] - 30:1, 41:10, 49:23, 49:24, 84:15
**worse** [1] - 25:20
**worth** [1] - 40:14
**wrote** [1] - 15:20
**Wyoming** [1] - 51:4

**Y**

**year** [1] - 22:24
**years** [10] - 6:5, 18:9, 21:10, 24:13, 31:24, 32:12, 37:14, 40:9, 49:12, 95:23
**yelling** [1] - 23:8
**young** [2] - 21:9, 86:2
**Young** [1] - 49:7
**yourself** [2] - 41:22, 68:19
**yourselves** [1] - 45:15

**Z**

**zoom** [1] - 42:20